Amber L. Schubert (No. 278696)
**SCHUBERT JONCKHEER & KOLBE LLP**
2001 Union Street, Suite 200
San Francisco, CA 94123
Tel: (415) 788-4220
Fax: (415) 788-0161
aschubert@sjk.law

Fletch Trammell (TX Bar No. 24042053)
*Pro hac vice pending*
**TRAMMELL PC**
3262 Westheimer, #423
Houston, TX 77098
Tel: (800) 405-1740
Fax: (800) 532-0992
fletch@trammellpc.com

Don Bivens (AZ Bar No. 005134)
*Pro hac vice forthcoming*
Teresita T. Mercado (AZ Bar No. 020578)
*Pro hac vice forthcoming*
**DON BIVENS, PLLC**
15169 N. Scottsdale Road, Suite 205
Scottsdale, AZ, 85254
Tel: (602) 762-2661
don@donbivens.com
teresita@donbivens.com
***Counsel for Plaintiffs***

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

OTHAME DIB, JESUS GUERRERO, LUCA DELA CRUZ, JEANETTE PORILLO, PETER GHANEM, RITA CRANE, NATHANIEL SANSOM, individually and as the representatives of a class of similarly situated persons,

Plaintiffs,

v.

APPLE INC., a California corporation.

Defendant.

Case No:

<u>CLASS ACTION</u>

**COMPLAINT**

<u>JURY TRIAL DEMANDED</u>

Plaintiffs Othame Dib, Jesus Guerrero, Luca Dela Cruz, Jeanette Porillo, Peter Ghanem, Rita Crane, and Nathaniel Sansom ("Plaintiffs"), bring this action on behalf of themselves, and all other persons similarly situated, and allege the following against Apple Inc. ("Apple" or "Defendant"):

## NATURE OF ACTION

1. This is a class action lawsuit against Apple on behalf of all persons in the United States who purchased the Apple Watch Series 9, Apple Watch SE (2nd generation), or Apple Watch Ultra 2 (collectively, the "Products").

2. In September 2023, Apple announced the Products as what it claimed were its first-ever "carbon neutral" products. Apple has prominently marketed these Products as "carbon neutral," dedicating substantial portions of its product launch events and marketing materials to highlighting this purported environmental achievement.

3. According to Apple's representations, its carbon neutrality strategy involves reducing around 75% of these Products' emissions through various initiatives, while offsetting the remaining percentage through what it calls "high-quality carbon credits from nature-based projects." To meet its corporate emissions footprint for 2023, which includes the production of these Products, Apple claims to have retired 485,000 metric tons of carbon dioxide equivalents primarily through two offsetting projects: the Chyulu Hills Project in Kenya and the Guinan Project in China.

4. However, Apple's carbon neutrality claims are false and misleading because both projects fail to provide genuine, additional carbon reductions. The Chyulu Hills Project purports to generate carbon credits by preventing deforestation on land which has been legally protected from deforestation since 1983, while the Guinan Project claims to have planted trees on "barren land" that was already heavily forested before the project began. In both cases, the carbon reductions would have occurred regardless of Apple's involvement or the projects' existence. And because Apple's carbon neutrality claims are predicated on the efficacy and legitimacy of these projects, Apple's carbon neutrality claims are false and misleading.

5. Apple charges and maintains premium prices for its smartwatch products. Apple's ability to maintain these premium prices depends heavily on brand differentiation and perceived product superiority, including claims of environmental leadership. Research shows that approximately 70% of consumers consider environmental sustainability crucial in their purchasing decisions, with this percentage being even

*Dib, et al. v. Apple Inc.*
CLASS ACTION COMPLAINT

higher among premium product consumers who comprise Apple's target market. Apple has prominently displayed its "carbon neutrality" representations to the public, thereby ensuring that consumers are aware of its claims. Consumers thus know about, and reasonably rely upon, these representations when they make purchasing decisions in connection with the Products.

6.      Indeed, Apple's "carbon neutral" claims for these Products serve as a key market differentiator that helps Apple maintain and justify its premium pricing across the entire smartwatch category. By positioning the Products as "carbon neutral," Apple strengthens its brand premium and supports its ability to charge higher prices versus competitors. This market differentiation is particularly valuable in the premium smartwatch segment, where environmental responsibility claims significantly influence consumer choice and willingness to pay premium prices.

7.      As a result of Apple's misleading claims, consumers have suffered economic injury in multiple ways: they paid a price premium based in part on false environmental claims; the deceptive marketing distorted the marketplace by falsely differentiating Apple's products on environmental grounds; and, consumers did not receive the benefit of their bargain—they paid for watches marketed as environmentally superior but received products whose environmental claims rely on ineffective and redundant offset projects that fail to provide genuine carbon reductions.

8.      This action seeks to remedy Apple's deceptive conduct and obtain compensation for consumers who paid premium prices for Products that failed to deliver their promised environmental benefits. Plaintiffs bring this action on behalf of themselves and other similarly situated consumers for violations of state consumer protection laws, breach of express and implied warranties, unjust enrichment, and fraud.

## **PARTIES**

9.      Plaintiff Othame Dib is a citizen of California and resides in Palmdale, CA. On September 26, 2024, Othame Dib purchased an Apple Watch Ultra 2 (49mm, Black Titanium case, Black Trail Loop) at a store located in California.

10.      Plaintiff Jesus Guerrero is a citizen of California and resides in Moreno Valley, CA. On October 4, 2024, Jesus Guerrero purchased an Apple Watch Ultra 2 (49mm, Black Titanium case, Black Trail Loop) online for delivery to California.

11.     Plaintiff Luca Dela Cruz is a citizen of California and resides in Bakersfield, CA. On December 26, 2023, Luca Dela Cruz purchased an Apple Watch Series 9 (45mm, Midnight Aluminum case, Midnight Sport Loop) online for delivery to California.

12.     Plaintiff Peter Ghanem is a citizen of California and resides in Canyon Country, CA. On January 31, 2024, Peter Ghanem purchased an Apple Watch Series 9 (41mm, Pink Aluminum case, Pink Sport Loop) online for delivery to California.

13.     Plaintiff Jeanette Porillo is a citizen of California and resides in Pinole, CA. On December 15, 2023, Jeanette Porillo purchased an Apple Watch Ultra 2 (49mm, Black Titanium case, Navy Alpine Loop) and an Apple Watch SE (40mm, Starlight Aluminum case, Ultramarine Sport Loop) online for delivery to California.

14.     Plaintiff Rita Crane is a lawful permanent resident of the United States and resides in Orlando, FL. On September 7, 2024, Rita Crane purchased an Apple Watch SE (40mm, Aluminum case, Starlight Sport Loop) online for in-store pickup in Florida.

15.     Plaintiff Nathaniel Sansom is a citizen of Washington, D.C. and resides in Washington, D.C. On July 17, 2024, Nathaniel Sansom purchased an Apple Watch Series 9 (45mm, Aluminum case, Midnight Sport Loop) online for delivery to Washington, D.C.

16.     Defendant Apple Inc. is a corporation organized and existing under the laws of California, with its principal place of business in Cupertino, CA.

## JURISDICTION AND VENUE

17.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d)(2) (the "Class Action Fairness Act") because sufficient diversity of citizenship exists between the parties – Plaintiffs are citizens of several states and Apple is a California corporation with its principal place of business in California. Further, the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, with more than 100 potential class members based on the class defined below. In addition, more than two-thirds of the members of the Class reside in a state other than the state in which Apple is a citizen, and therefore any exceptions to jurisdiction under 28 U.S.C. § 1332(d) do not apply.

18.     Apple is incorporated in California and has its principal place of business in Cupertino, CA. This Court thus has general personal jurisdiction over Apple.

19.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Apple resides in this District and because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## DIVISIONAL ASSIGNMENT

20.    Pursuant to Civil L.R. 3-2(c), (e), this action should be assigned to the San Jose Division because a substantial part of the events or omissions giving rise to this action occurred in Santa Clara County.

## FACTS

### I.    The Climate Crisis

21.    The climate crisis represents one of the most significant challenges facing humanity today. Scientific consensus demonstrates that human activities, particularly the emission of greenhouse gasses, are fundamentally altering Earth's climate system in ways that pose severe risks to human societies and natural ecosystems.

22.    At the heart of the climate crisis is the greenhouse effect: a natural warming process where atmospheric gasses trap heat from the sun that would otherwise escape into space. While this process is essential for life on Earth, human activities have dramatically increased the concentration of greenhouse gasses in the atmosphere, intensifying this effect beyond natural levels.

23.    Carbon dioxide ($CO_2$) is the primary greenhouse gas driving human-induced climate change, accounting for approximately 80% of U.S. greenhouse gas emissions from human activities. While $CO_2$ occurs naturally in Earth's atmosphere, human activities—such as the burning of fossil fuels (which releases $CO_2$ into the atmosphere) and deforestation (which destroys natural carbon sinks that would have otherwise removed $CO_2$ from the atmosphere)—have increased atmospheric $CO_2$ concentrations to levels unprecedented in human history.

24.    The magnitude of human impact on atmospheric $CO_2$ levels is staggering. For over 800,000 years—a period encompassing all of human civilization—atmospheric greenhouse gas concentrations remained between 200 and 280 parts per million (ppm). However, since the Industrial Revolution, and particularly over the past century, these concentrations have skyrocketed to over 400 ppm, with current levels far exceeding anything experienced in human history.

*Dib, et al. v. Apple Inc.*
CLASS ACTION COMPLAINT

25.     This dramatic increase in atmospheric $CO_2$ has disrupted Earth's natural carbon cycle—the process by which carbon moves between the atmosphere, land, oceans, and living organisms. While natural processes can eventually remove $CO_2$ from the atmosphere, the current rate of human-caused $CO_2$ emissions far exceeds the planet's natural absorption capacity. This imbalance results in a net accumulation of $CO_2$ in the atmosphere, intensifying the greenhouse effect and accelerating climate change.

26.     The impacts of climate change are already evident and affecting communities across the United States. These impacts include increased frequency and intensity of extreme weather events, rising sea levels threatening coastal communities, disruption of agricultural systems and food security, changes in precipitation patterns affecting water resources, extended wildfire seasons, deteriorating air quality, longer and more severe allergy seasons, and threats to critical infrastructure.

27.     The urgency of addressing climate change has led to significant international action. In 2015, nearly every nation adopted the Paris Agreement, a legally binding international treaty aimed at limiting global temperature rise by reducing greenhouse gas and $CO_2$ emissions. The United States has subsequently enacted domestic legislation, including the Inflation Reduction Act of 2022, to address climate change through emissions reduction.

II.     **Carbon Neutrality Claims**

28.     Growing public awareness of the climate crisis is transforming consumer purchasing behavior, with research showing that an overwhelming majority of consumers actively seek out environmentally sustainable products. According to a comprehensive study conducted by IBM and the National Retail Federation, approximately 70% of consumers in the United States and Canada consider environmental sustainability a crucial factor in their purchasing decisions. The same research revealed that these environmentally conscious consumers are willing to pay premium prices—on average 35% more—for products they believe are sustainable or eco-friendly. A different study conducted by NielsenIQ and McKinsey found that products with environmental, social and governmental related marketing outperformed those without such marketing by 8% annually.

29.     In response to this consumer demand, companies increasingly market their products as environmentally responsible, with "carbon neutral" becoming a prominent environmental claim. In relation to products, the term "carbon neutral" means that the production and use of a product results in no net addition

of $CO_2$ to the atmosphere. This is typically achieved by either eliminating carbon emissions entirely from a product's production and use, or by balancing or "offsetting" carbon emissions from manufacture and use with an equivalent amount of carbon removal through verified offset projects.

30.     The practice of carbon offsetting requires companies to compensate for the emission of $CO_2$ or equivalent greenhouse gasses by providing for an emission reduction elsewhere. To offset emissions from the production and use of their products, companies typically purchase carbon "credits" in environmental projects such as forest preservation, renewable energy initiatives, and reforestation efforts. However, the effectiveness of these projects varies significantly.

31.     Central to legitimate carbon offsetting is the principle of "additionality"—the requirement that offset projects must result in carbon reductions that would not have occurred without the project. This principle is mandated by key international climate agreements, including Article 6 of the Paris Agreement and Article 6 of the Kyoto Protocol, which states that offset projects must demonstrate that "credits/units are not awarded for emission reductions that would have happened anyway."

32.     Companies wishing to demonstrate that their products are carbon neutral must meet rigorous standards established by technical specifications such as NQA's Publicly Available Standard 2060 and British Standards Institution's ISO 14068-1. These standards require companies to accurately measure their carbon emissions, implement genuine reduction strategies, verify the effectiveness of any offset projects, ensure offset projects meet additionality requirements, and provide transparent documentation of their carbon neutrality claims.

III.    **Carbon Neutrality and "Greenwashing"**

33.     The strong consumer preference for sustainable products has led to the proliferation of "greenwashing"—the practice of making false or misleading claims about the environmental benefits of a product. Companies engage in greenwashing to capitalize on growing environmental consciousness while avoiding the costs and challenges of achieving genuine sustainability.

34.     Carbon neutrality claims are particularly susceptible to greenwashing because of the technical complexity of carbon accounting, the lack of transparency and reliable standards in the carbon offset market, companies' frequent failure to properly qualify or explain their carbon neutrality claims, the questionable effectiveness of many offset projects, and limited regulatory oversight of environmental marketing claims.

*Dib, et al. v. Apple Inc.*
CLASS ACTION COMPLAINT

35.     Carbon neutrality claims based on offsetting are particularly susceptible to greenwashing when companies rely on ineffective or redundant offset projects that fail to deliver genuine environmental benefits. This occurs when offset projects would have happened regardless of the company's investment, when projects do not actually reduce emissions as claimed, or when the same environmental benefits are counted multiple times.

36.     Recognizing the potential for deception in environmental marketing claims, the Federal Trade Commission created the "Green Guides" (16 C.F.R. Part 260) to help marketers avoid making unfair or deceptive environmental claims. The Green Guides specifically address carbon offset claims, providing that marketers must "employ competent and reliable scientific and accounting methods to properly quantify claimed emission reductions" and ensure claims are appropriately substantiated. Under 16 C.F.R. § 260.5, it is deceptive to claim carbon offsets represent emission reductions if the same reductions are already required by law.

37.     Importantly, under 16 C.F.R. § 260.6(c), third-party certification does not eliminate a marketer's obligation to ensure that it has substantiation for all claims reasonably communicated by the certification. In other words, companies cannot simply rely on third-party certifications to validate their environmental claims - they must independently ensure the accuracy and reliability of their claims, including the effectiveness of any offset projects they use. Moreover, 16 C.F.R. § 260.4 prohibits unqualified general environmental benefit claims, requiring companies to be able to substantiate all reasonable interpretations of their environmental claims.

## IV.    Apple's False and Misleading Carbon Neutrality Claims

38.     In a September 12, 2023, product launch, Apple announced what it claimed was its first-ever carbon neutral products: the Apple Watch Series 9, the Apple Watch SE and the Apple Watch Ultra 2.[1] Apple utilized this product launch to emphasize its purported commitment to carbon neutrality by 2030, dedicating much of its release event to Apple's environmental initiatives.

39.     Apple disseminated its carbon neutral claims in, among other forums and mediums, a live stream announcement video that has garnered over 33 million views to date. In that video, Lisa Jackson,

---

[1] *See, e.g.*, https://www.apple.com/newsroom/2023/09/apple-unveils-its-first-carbon-neutral-products/;
https://www.apple.com/newsroom/2023/09/apple-introduces-the-advanced-new-apple-watch-series-9/.

Apple's vice president of Environment, Policy, and Social Initiatives, touted the carbon neutrality of the products and explained that a portion of the emissions caused by the Products "are offset by high-quality credits from projects like forests and wetlands that actively remove carbon from the atmosphere. This last step brings the net carbon footprint of Apple Watch Series 9 down to zero, making it our first-ever carbon neutral product! Any combination of aluminum Series 9 and new Sport Loop is carbon neutral and has been certified by an independent third party. To help you recognize it, you'll see this new logo on the box. We are so excited about this achievement, and it's how we plan to get all Apple products to carbon neutral, by innovating across design, engineering, and operations to steeply reduce emissions before applying high-quality carbon credits."[2]

40.    Apple prominently advertises the Products' carbon neutrality, highlighting this purported environmental achievement as a key feature in its marketing materials, product packaging, and retail displays. The "carbon neutral" designation appears on the products' packaging with a distinctive green icon, and features prominently in Apple's online marketing and retail presence.





_____

[2] Apple, *Apple Event – September 12*, YouTube (Sep. 12, 2023), https://www.youtube.com/live/ZiP1l7jlIIA?t=1308s, at 24:39-25:31.

*The image above shows the Apple Watch Series 9 product page on Apple's website.*

# Which Apple Watch is right for you?







**Apple Watch SE**

All the essentials.
Light on price.

Find a Store

Learn more >





**Apple Watch Series 9**

Powerful sensors,
advanced health features.

Find a Store

Learn more >





**Apple Watch Ultra 2**

The most rugged
and capable.

Find a Store

Learn more >

44mm or 40mm
aluminum case size

45mm or 41mm
aluminum or stainless
steel case size

49mm titanium
case size







Carbon-neutral
combinations available²

Carbon-neutral
combinations available²

Carbon-neutral
combinations available²

*Dib, et al. v. Apple Inc.*
CLASS ACTION COMPLAINT

**Case.** Let's start with your finish.

**Finish - Natural**



✻ 95% recycled titanium. Carbon neutral when paired with select bands. Learn more at apple.com/2030.

**Band.** Choose your adventure.



| Alpine Loop | $799 |
| For outdoor adventure and hiking. | or $66.58/mo. for 12 mo.* |
| ✻ Carbon neutral band. | |

| Trail Loop | $799 |
| For all sports and workouts. | or $66.58/mo. for 12 mo.* |
| ✻ Carbon neutral band. | |

**Case.** Let's start with your finish.

**Finish - Midnight**



✻ Carbon neutral when paired with select bands. Learn more at apple.com/2030.

**Band.** Discover different styles and pick your favorite.

| Rubber | $249 |
| Flexible, swimproof silicone and fluoroelastomer bands. | or $20.75/mo. for 12 mo.* |

| Textile | From $249 |
| Soft, lightweight materials. Great for everyday wear. | or $20.75/mo. for 12 mo.* |
| ✻ Look for this logo to select a carbon neutral color. | |

| Stainless Steel | From $299 |
| Meticulously crafted steel designs for a sophisticated, upscale look. | or $24.91/mo. for 12 mo.* |
| ✻ Look for this logo to select a carbon neutral color. | |

Textile

# Sport Loop

Soft, breathable, and lightweight, the Sport Loop has a hook-and-loop fastener for quick and easy adjustment. The double-layer nylon weave has dense loops on the skin side that provide soft cushioning while allowing moisture to escape. This weave is made with 82% recycled yarns, some of which contain material from discarded fishing nets.

 Carbon Neutral

Select Sport Loop colors are carbon neutral. The Sport Loop contains 45% recycled content by weight, 100% of manufacturing electricity is covered by clean energy, and 50% or more of all carbon neutral Apple Watch products are shipped without airplanes.°

*Dib, et al. v. Apple Inc.*
CLASS ACTION COMPLAINT

*The images above are from the Products' purchase pages on Apple's website and depict Apple's the representations about carbon neutrality.*



*The image above shows the Apple Watch packaging. The green icon on the side conveys that the product is carbon neutral.*

41.    At the time that the Plaintiffs purchased the Products, each Plaintiff had viewed and was aware of Apple's representations that the Products were "carbon neutral." These representations led each Plaintiff to believe that the Products were, in truth, carbon neutral. Each Plaintiff relied on Apple's representations that the Products were "carbon neutral" when making their purchasing decisions, and those representations played a substantial part in each Plaintiff's decision to purchase the Products.

42.    According to Apple's representations, its carbon neutrality strategy focuses on reducing greenhouse gas emissions from three major sources: electricity, materials, and transportation. Apple claims these efforts result in a 78% reduction in product emissions for the Apple Watch Series 9 paired with Sport Loop,[3] 75% for the Apple Watch SE paired with Sport Loop,[4] and 81% for the Apple Watch Ultra 2 paired

_____

[3] https://www.apple.com/environment/pdf/products/watch/Carbon_Neutral_Apple_Watch_Series_9_PER_Sept2023. pdf at page 3.
[4] https://www.apple.com/environment/pdf/products/watch/Carbon_Neutral_Apple_Watch_SE_PER_Sept2023.pdf at page 3.

with Alpine Loop.[5] To address the remaining emissions, Apple states that it applies "high-quality carbon credits from nature based projects," purportedly resulting in a carbon-neutral product footprint.[6]

43.    To meet the corporate emissions footprint for 2023, which includes the production of these Apple Watch models, Apple primarily relied on retiring a total of 485,000 metric tonnes of carbon dioxide equivalents ($CO_2e$) through two offsetting projects: the Chyulu Hills Project in Kenya and the Guinan Project in China. Specifically, Apple retired 230,000 carbon credits from the Chyulu Hills Project and 255,000 credits from the Guinan Project. A carbon credit represents one metric tonne of $CO_2$ equivalent emissions that has purportedly been reduced, avoided, or removed from the atmosphere. When a company "retires" a credit, it permanently removes that credit from the carbon market, meaning the credit can no longer be traded or used by any other entity to claim carbon reduction emissions.

44.    Apple's Product Environmental Reports for each product also mention a third project, the Forestal Apepu Carbon Project in Paraguay, as a possible source of carbon credits. However, according to the Verra Registry in which the project is listed and which documents all retirement information, Apple retired only 1,457 carbon credits from this project in 2023—a minimal amount compared to the hundreds of thousands of credits retired from the Chyulu Hills and Guinan projects. Indeed, Apple is not listed as a retirement beneficiary for any other retirements from this project, and only one retirement was recorded from this project at the end of 2023, with no beneficiary specified.

45.    As detailed below, Apple's carbon neutrality claims are false and misleading because the two primary offset projects upon which Apple relies—the Chyulu Hills Project and the Guinan Project—fail to provide genuine, additional carbon reductions. Instead, these projects, which account for the vast majority of Apple's claimed carbon offsets, are ineffective and redundant, representing neither real carbon offset value nor legitimate environmental benefits.

46.    On information and belief, Apple's decision to make these "carbon neutral" representations was made in California. First, Apple is a California corporation and is headquartered in the state. Second, Greg Joswiak, Apple's senior vice president of Worldwide Marketing, is based out of Apple's headquarters in California. Third, Apple first announced the alleged "carbon neutrality" of the Products at an event at its

---

[5] https://www.apple.com/environment/pdf/products/watch/Carbon_Neutral_Apple_Watch_Ultra_2_Sept2023.pdf at page 3.
[6] https://www.apple.com/newsroom/2023/09/apple-unveils-its-first-carbon-neutral-products/.

headquarters in Cupertino, CA.[7] The video shown at that event depicted several Apple executives speaking from various locations in California, and specifically included a section in which Lisa Jackson, Apple's vice president of Environment, Policy, and Social Initiatives, made carbon neutral representations about the Products.[8] Lisa Jackson also is based out of Apple's headquarters in California. Fourth, Apple's September 12, 2023, press release that touted the alleged "carbon neutrality" of the Products listed "Cupertino, California" in its dateline, meaning that, among other things, Apple's "carbon neutral" representations were disseminated from California.[9] Fifth, the September 12, 2023, press release includes quotes from Lisa Jackson, in which she makes "carbon neutral" claims on behalf of Apple.[10]

## V.    The Reality Behind Apple's Carbon Neutrality Claims

47.    To substantiate its carbon neutrality claims, Apple relies primarily on carbon credits certified by Verra. Verra is a globally recognized nonprofit organization based in Washington, D.C., that administers and manages the Verified Carbon Standard (VCS) Program, one of the world's leading voluntary carbon offset programs. Companies buying credits from Verra-listed projects rely on Verra as the third-party validator. Verra sets standards to ensure credits represent real, measurable, and additional greenhouse gas reductions, with a strong emphasis on additionality.

### A.    The Chyulu Hills project fails to provide genuine carbon reductions

48.    The Chyulu Hills REDD+ Carbon Project (the "Chyulu Project") is a conservation initiative in Kenya, certified by Verra. According to the Project Description Report, the objectives of the project are to prevent the emission of 20 million tonnes of CO2 (or equivalent emissions) by stopping deforestation and grassland conversion. The project is not based on carbon capture through tree-planting (afforestation or reforestation).

49.    Apple has been a significant customer of this project. From 2016 to 2018, Apple purchased approximately 30% to 40% of the total carbon credits issued by the project each year. Most recently, on January 31, 2024, Apple retired 230,000 credits from the project's 2018 vintage to meet their corporate emissions footprint for 2023, including the production of the Apple Watch lineup.

---

[7] https://www.cnn.com/2023/08/29/tech/new-iphone-15-apple-wonderlust/index.html.
[8] *See* ¶ 39, *supra*.
[9] https://www.apple.com/newsroom/2023/09/apple-unveils-its-first-carbon-neutral-products/.
[10] *Id.*

13

50.     The Chyulu Project encompasses seven land ranch units, covering a total protected area of 410,533.84 hectares in Southeastern Kenya.



*The image above shows the major cities, villages and towns in the Chyulu Project zone.*

//

//

//

*Dib, et al. v. Apple Inc.*
CLASS ACTION COMPLAINT

1

2          51.     However, despite Apple's reliance on carbon credits from the Chyulu Project, the Project fails

3     to meet the fundamental requirement of additionality because a significant portion of the project area,

4     particularly the area responsible for carbon stock production, has been under legal protection since 1983.

5     Specifically, about 18% (74,000 hectares) of the total project area lies within Chyulu Hills National Park,

6     which was established as a national park in 1983 and has been managed by the Kenya Wildlife Service ever

       since.

7          52.     In Kenyan national parks, pursuant to the requisite authority, natural resources are fully

8     protected, and only tourism and research activities are allowed. Since the park's establishment over forty

9     years ago, deforestation and other environmentally harmful activities have been strictly prohibited by law.

10         53.     Significantly, while the Chyulu Hills National Park constitutes only 18% of the total project

11    area, it contains the vast majority of the project's carbon-capturing capacity. Based on data collected by

12    NASA, Google, and USGS, 27% of the wider project area has vegetation cover, totaling 111,000 hectares.

13    Of this vegetated area, 58,000 hectares—or 52%—are within the boundaries of Chyulu Hills National Park.

14
15    //
16    //
17    //
18    //
19    //
20    //
21    //
22    //
23    //
24    //
25    //
26    //
27    //
28



*The satellite image above, overlaid with data from a global tree cover dataset, shows that 52% of the vegetated area of the project is located within the Chyulu Hills National Park.*[11]

54.    The concentration of carbon stock within the national park boundaries is further demonstrated by the project's own carbon stock measurements. The project area is separated into two Project Accounting Areas (PAAs): Grassland and Forested. According to these measurements, the cloud forest class contributes the highest carbon stock at 75%. The second most significant carbon stock contributor is the

---

[11] Available at https://www.globalforestwatch.org/map/ (annotations added).

*Dib, et al. v. Apple Inc.*
CLASS ACTION COMPLAINT

woodland/thicket class. Both of these high-value carbon stock areas are located predominantly or entirely within the national park boundaries.



*The image above is a map showing the Project area land cover.*

55.    Beyond the redundancy of claiming carbon credits for an already-protected area, the project's stated objectives of preventing deforestation and grassland conversion are unfounded. Between 2001 and 2023, the project area lost only 284 hectares of tree cover, representing a mere 0.28% decrease in over two decades. This minimal loss demonstrates that deforestation has never been a significant threat to the area.

17

*Dib, et al. v. Apple Inc.*
CLASS ACTION COMPLAINT

56.     Additionally, while the project claims to prevent grassland conversion by local tribes, the grassland accounting area contributes only 1.22% of the project's total carbon stock, making this objective minimally relevant to the project's carbon credit generation.

57.     In sum, the Chyulu Project fails to provide genuine carbon reductions that would not have occurred without the project. The majority of the project's carbon stock is located within a national park that has been legally protected from deforestation for over forty years. The carbon reductions attributed to this project would have occurred regardless of the project's existence, making Apple's reliance on these credits to claim carbon neutrality misleading to consumers.

**B.     The Guinan Project also fails to provide genuine carbon reductions**

58.     The Guinan Afforestation ARR Project (the "Guinan Project") is a carbon offsetting initiative located in Qiannan Buyi and Miao Autonomous Prefecture, China. The project began in 2015 and is certified under Verra. According to the project description report, it aims to increase carbon sequestration through tree planting, with a goal of generating greenhouse gas emission removals of 18,727,278 metric tonnes of $CO_2$ or equivalent greenhouse gasses over 29 years, an average annual removal of 645,768 tonnes.

59.     Like the Chyulu Project, Apple has been a significant customer of the Guinan Project. From 2016 to 2021, Apple utilized a substantial portion of the total carbon credits produced by the project each year. Most recently, Apple retired 255,000 credits from this project to meet their corporate emissions footprint for 2023, including the production of the 2023 Apple Watch lineup.

60.     According to the project report, "46,000 ha of forest was planted on barren hill and degraded lands in Qiannan Autonomous Prefecture which is poor sustainable ecological environment and karst rocky desertification." The report further claims that "[a]ll project sites were previously barren lands with no natural

1  regeneration or reforestation prior to the project. The sites were entirely covered by barren hills and degraded

2  lands."



*The image above shows the Guinan Project zones in blue. The areas are not contiguous.*

61.     However, these representations are false. Satellite imagery clearly shows that the project area

was already heavily vegetated before the project's commencement in 2015. According to global tree cover

*Dib, et al. v. Apple Inc.*
CLASS ACTION COMPLAINT

data collected by NASA, Google, and USGS, as of 2010—five years before this project began—78% of the project zones' land was already covered by trees.



*The image above shows the 2010 extent of tree cover, defined as all vegetation taller than five meters in height, in the selected area.[12]*

---

[12] Available at https://www.globalforestwatch.org/map/ (annotations added).

62.    The Qiannan Prefecture region where the project is located is, in fact, predominantly forested, with forest cover comprising approximately 56% of the total land area, while cropland accounts for 23% and grassland 20%.



*The image above shows the land use in Qiannan Prefecture.*

63.    Most significantly, despite the project's claim of planting 46,000 hectares of trees in 2015, satellite imagery data from 2000 to 2020 shows no significant increase in tree cover within the project areas during this period. Google Satellite and Street View images further confirm that the area is heavily forested and vegetated. This directly contradicts the project's fundamental claim of creating new forest cover on previously barren land.





*The two images above from Google Satellite show heavily forested landscapes within the project's area.*

64.     The project's claims to have planted 46,000 hectares of trees on "barren land" are thus untrue. The area was predominantly forested and covered by dense vegetation before the project began. Accordingly,

22

1  the carbon credits produced in the project area cannot be attributed to the project itself, as the land was

2  already serving as a carbon sink prior to the project's initiation.

3         65.     Indeed, on November 27, 2024, Verra publicly announced that it was "opening a new review"

4  of the Guinan Project, explaining that it had "received stakeholder comments about the project and deem[ed

5  the comments] to warrant further investigation."[13] Verra also suspended "any further credit issuance from

6  the project."[14] Verra's suspension of credit issuance from an existing project is a major intervention that

7  signals serious integrity concerns. Verra's actions underscore the Guinan Project's inefficacy and the falsity

8  of Apple's "carbon neutral" representations.

9         66.     In sum, like the Chyulu Project, the Guinan Project fails to provide the necessary additional

10  greenhouse gas removals for true carbon offsetting. The project area was already heavily forested before the

11  project began, and satellite data shows no significant increase in forest cover attributable to the project. Thus,

12  Apple's reliance on these credits to claim carbon neutrality is misleading to consumers.

13  **VI.    Apple's Carbon Neutrality Claims Are False and Misleading, and Plaintiffs and the Class**

14  **Members Were Harmed By Relying On Them**

15         67.     As demonstrated above, Apple's claims that its Apple Watch Series 9, Apple Watch SE, and

16  Apple Watch Ultra 2 are "carbon neutral" are false and misleading. Apple represents that while it has reduced

17  75% to 81% of these products' emissions through various greenhouse gas reduction initiatives, the remaining

18  25% are offset through "high-quality carbon credits from nature-based projects." However, the two primary

19  projects from which Apple purchases its carbon credits—accounting for nearly all of its claimed carbon

20  neutrality—fail to provide genuine carbon reductions.

21         68.     Apple cannot hide behind Verra's certification of these projects. As established by 16 C.F.R.

22  § 260.6(c), third-party certification does not eliminate a marketer's obligation to ensure that it has

23  substantiation for all claims reasonably communicated by the certification. Apple, which guarantees that the

24  projects it invests in produce "high-quality carbon credits," should have independently verified that these

25  projects meet the fundamental requirement of additionality.

26

27

28  [13] Available at https://registry.verra.org/app/projectDetail/VCS/2070.
    [14] *Id.*

69.     The carbon credits generated by the Chyulu Hills Project and the Guinan project would have occurred regardless of Apple's involvement or the projects' existence. Including these non-additional carbon credits in Apple's offsetting calculations does not qualify as a genuine offset, which should generate carbon reductions equivalent to the emissions produced by Apple. By claiming carbon neutrality based on these ineffective and redundant offset projects, Apple is misleading consumers about the true environmental impact of its products.

70.     Apple's misrepresentations are material to consumers and drive consumers' (and Plaintiffs') purchasing decisions. As detailed above, research shows that approximately 70% of consumers consider environmental sustainability a crucial factor in their purchasing decisions and are willing to pay premium prices—on average 35% more—for products they believe are sustainable, and that products with environmental, social and governmental related marketing outperformed those without such marketing by 8% annually. Apple has capitalized on this consumer preference by prominently marketing these Apple Watch models as "carbon neutral," using this purported achievement as a key differentiation point in its marketing and charging premium prices for these products.

71.     Apple's deceptive marketing practices also distort the marketplace and impair consumer choice. Consumers seeking to support environmentally responsible companies are deprived of the opportunity to make informed decisions about their purchases, as Apple's false advertising may lead them to choose its products over genuinely sustainable alternatives.

72.     At the time of purchase, each Plaintiff had viewed and was aware of Apple's representations that the Products were "carbon neutral." These representations led each Plaintiff to believe that the Products were, in truth, "carbon neutral." Each Plaintiff relied on Apple's representations that the Products were "carbon neutral" when making their purchasing decisions, and those representations played a substantial part in each Plaintiff's decision to purchase the Products.

73.     Consumers who purchased the Products, including each Plaintiff, suffered economic injury because Apple's false "carbon neutral" claims deprived them of the ability to make informed purchasing decisions in the smartwatch market. These consumers paid a price premium for products they believed were "carbon neutral" but instead received products whose claimed carbon neutrality relies on ineffective and redundant offset projects that fail to provide genuine environmental benefits. Indeed, each Plaintiff would

not have purchased the Products or would not have paid as much for the Products had Plaintiffs known that Apple's "carbon neutral" representations were false.

74.     As a result of Apple's false and misleading claims, consumers who purchased the Products, including each Plaintiff, suffered economic injury in multiple ways. First, these consumers paid a price premium for products they believed were "carbon neutral" but instead received products whose claimed carbon neutrality relies on ineffective and redundant offset projects that fail to provide genuine environmental benefits. In other words, consumers did not receive the benefit of their bargain—they paid for watches with meaningful carbon neutrality but received watches without this promised environmental benefit.

75.     Moreover, Apple has been unjustly enriched by its deceptive conduct. The company has benefited from increased sales and revenue by marketing these Apple Watch models as "carbon neutral," capitalizing on consumer demand for sustainable products while failing to deliver the environmental benefits it promised.

## **EQUITABLE RELIEF**

76.     Plaintiffs have set forth alternate claims for damages and equitable relief. Plaintiffs do not have an adequate remedy at law with respect to future harm caused by Apple's conduct as alleged herein.

77.     Absent an equitable injunction enjoining Apple's conduct alleged herein, Plaintiffs, Class members, and the public will be irreparably harmed and denied an effective and complete remedy because they face a real and tangible threat of future harm emanating from Apple's ongoing conduct that cannot be remedied with monetary damages.

78.     Plaintiffs do not know at this juncture whether Plaintiffs' damages claims will survive through trial, whether the Court will accept a model for legal damages for past harm that Plaintiffs will proffer at the appropriate time, or whether the Court will find that any such damages model adequately compensates Plaintiffs and the Class for their past losses.

79.     Plaintiffs continue to have use for the Products. Yet, they do not and cannot know if Apple's advertising is accurate and truthful. If the Court were to enjoin Apple from making the misrepresentations described herein, Plaintiffs would want to purchase the Products in the future. Without an injunction, Plaintiffs cannot trust Apple's marketing claims and would not purchase the Products again.

*Dib, et al. v. Apple Inc.*
CLASS ACTION COMPLAINT

80.    Moreover, damages alone would not prevent Apple from continuing to make false and misleading claims about its products. No amount of money can rectify the harm caused to future purchasers.

## **CLASS ALLEGATIONS**

81.    Plaintiffs bring this action as a class action on behalf of themselves and all others similarly situated as members of the Class defined as follows:

a. **Nationwide Class:** All persons in the United States who, within the applicable statute of limitations period(s), purchased any of the following Apple Watch models: Apple Watch Series 9, Apple Watch SE (2nd generation), or Apple Watch Ultra 2, for purposes other than resale.

b. **California Subclass:** All residents of California who, within the applicable statute of limitations period(s), purchased any of the following Apple Watch models: Apple Watch Series 9, Apple Watch SE (2nd generation), or Apple Watch Ultra 2, for purposes other than resale.

c. **Florida Subclass:** All residents of Florida who, within the applicable statute of limitations period(s) purchased any of the following Apple Watch models: Apple Watch Series 9, Apple Watch SE (2nd generation), or Apple Watch Ultra 2, for purposes other than resale.

d. **Washington, D.C. Subclass:** All residents of Washington, D.C. who, within the applicable statute of limitations period(s) purchased any of the following Apple Watch models: Apple Watch Series 9, Apple Watch SE (2nd generation), or Apple Watch Ultra 2, for purposes other than resale

82.    Unless otherwise noted, the Nationwide Class, California Subclass, Florida Subclass, and Washington, D.C. Subclass are collectively referred to as the "Class".

83.    Excluded from the Class is (a) Apple, its affiliates, and its employees; (b) persons who purchased or acquired the Products for resale; (c) Plaintiffs' counsel and Defendant's counsel; and (d) the judge and staff of the court assigned to this case, as well as any appellate court judges and staff assigned to any appeal in this matter, and their immediate family members.

84.    Plaintiffs reserve the right to modify or amend the definitions of the proposed Class, including by adding subclasses, before the Court determines whether certification is appropriate.

85.    **Numerosity (Fed. R. Civ. P 23(a)(1)).** The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is currently unknown to Plaintiffs, it is expected to include hundreds of thousands of members.

86.    **Commonality (Fed. R. Civ. P. 23(a)(2)).** Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual Class members. These common questions include:

a.    Whether Apple's representations that the Products are "carbon neutral" are false, misleading, or reasonably likely to deceive;

b.    Whether Apple failed to adequately validate the additionality of its carbon offset projects;

c.    Whether Apple engaged in deceptive or unfair business practices by marketing the Products as "carbon neutral";

d.    Whether Apple's carbon offset projects in the Chyulu Hills and Guinan provide genuine carbon reductions;

e.    Whether and to what extent Apple's conduct caused Class members to pay price premiums for the Products;

f.    Whether Apple's conduct violates consumer protection laws;

g.    Whether Class members are entitled to damages, restitution, restitutionary disgorgement, equitable relief, or other relief; and

h.    The amount and nature of such relief to be awarded to Plaintiffs and the Class.

87.    Plaintiffs and the members of the Class have a commonality of interest in the subject matter of the lawsuit and remedies sought.

88.    **Typicality (Fed. R. Civ. P. 23(a)(3)).** Plaintiffs' claims are typical of the claims of the members of the Class. Apple's misuse of Plaintiffs' and Class Members' identities, personal information, and other identifying information was the same for each.

89. **Injunctive and/or declaratory relief (Fed. R. Civ. P. 23(b)(2)).** As demonstrated above, Apple has acted on grounds generally applicable to the proposed class such that final injunctive relief is appropriate with respect to the Class as a whole.

90. **Fair and adequate representation (Fed. R. Civ. P. 23(a)(4))**. Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained competent counsel experienced in class action litigation in state and federal courts nationwide, and Plaintiffs have no interest adverse to any member of the Class. Plaintiffs intend to prosecute this case vigorously on behalf of themselves and the Class.

91. **Predominance and superiority (Fed. R. Civ. P. 23(b)(3)).** Common questions of law and fact predominate over any questions affecting only individual members, and a class action is superior to other methods for the fair and efficient adjudication of the controversy because:

    a. Proof of Apple's liability on Plaintiffs' claims will also prove liability for the claims of the Class without the need for separate or individualized proceedings;

    b. Evidence regarding defenses or any exceptions to liability that Apple may assert and attempt to prove will come from Apple's records and will not require individualized or separate inquiries or proceedings;

    c. Apple has acted and is continuing to act pursuant to common practices in the same or similar manner with respect to all members of the Class;

    d. The injury suffered by each member of the Class, while meaningful on an individual basis, is not of such magnitude as to make the prosecution of individual actions against Apple economically feasible. Even if members of the Class could afford individual litigation, those actions would put immeasurable strain on the court system. A class action, on the other hand, will permit a large number of claims involving virtually identical facts and legal issues to be resolved efficiently in one proceeding based upon common proofs, without the risk of inconsistent judgments; and

    e. This case is inherently manageable as a class action in that:

        i. Liability and damages can be established for Plaintiffs and the Class with the same common proofs;

ii. A class action will result in an orderly and expeditious administration of claims and it will foster economics of time, effort, and expense;

iii. A class action will contribute to uniformity of decisions concerning Apple's practices; and

iv. As a practical matter, the claims of the Class are likely to go unaddressed absent class certification.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Violation of California's Consumers Legal Remedies Act Cal. Civ. Code §§ 1750, *et seq.***

**(on behalf of the California Subclass and Nationwide Class)**

92. Plaintiffs incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

93. The California Consumers Legal Remedies Act ("CLRA") prohibits "unfair methods of competition and unfair or deceptive acts or practices [...] undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770(a).

94. The Products are "goods" within the meaning of Cal. Civ. Code § 1761(a).

95. Apple is a "person" within the meaning of Cal. Civ. Code § 1761(c).

96. Plaintiffs and Class members are "consumers" within the meaning of Cal. Civ. Code § 1761(d).

97. Apple violated and continues to violate the CLRA by engaging in the following practices proscribed by Cal. Civ. Code § 1770(a) in transactions with Plaintiffs and California Subclass members which were intended to result in, and did result in, the sale of the Products:

a. Representing that the Products have characteristics, benefits, or qualities that they do not have (§ 1770(a)(5));

b. Representing that the Products are of a particular standard, quality, or grade when they are of another (§ 1770(a)(7)); and

c. Advertising goods with intent not to sell them as advertised (§ 1770(a)(9)).

98.     Apple's unfair or deceptive acts and practices were capable of deceiving a substantial portion of the purchasing public.

99.     Apple's representations and omissions were material because they were likely to deceive reasonable consumers about the true nature of the Products' environmental impact. Specifically, Apple represented the Products as "carbon neutral" when in fact the carbon offset projects Apple relies on fail to provide genuine additionality or verifiable carbon reductions, namely that the Chyulu Hills Project primarily generates credits from already-protected areas, and the Guinan Project claims to have planted trees in areas that were already heavily forested. As a result, Apple lacks adequate substantiation for its carbon neutrality claims.

100.    Apple's uniform and material representations and omissions regarding the Products were likely to deceive, and Defendant knew or should have known that its representations and omissions were untrue and misleading.

101.    Plaintiffs and members of the Class could not have reasonably avoided such injury. Plaintiffs and members of the Class were unaware of the existence of the facts that Apple suppressed and/or failed to disclose, and they would not have purchased the Products and/or would have purchased them on different terms had they known the truth.

102.    Plaintiffs and the Class members suffered harm as a result of Defendant's violations because they relied on the carbon neutral claim in deciding to purchase the Product. The carbon neutral claim was a substantial factor in the purchasing decisions of Plaintiffs and the Class members. The carbon neutral claim was material because a reasonable consumer would consider it important in deciding whether to purchase the Product.

103.    As a direct and proximate result of Apple's violations, Plaintiffs and members of the Class have suffered harm in that they purchased Products they would not have purchased or paid significantly more than they would have paid had they known the truth about Apple's representations.

104.    Plaintiffs, on behalf of themselves and all class members, demand judgment against Apple under the CLRA for injunctive relief.

105.    Pursuant to Cal. Civ. Code § 1782(a), on January 17, 2025, Plaintiffs mailed Apple a notice of its alleged violations of the CLRA by certified mail return receipt requested. If, within thirty days after

1    the date that Apple received that notification, Apple fails to provide appropriate relief for its violations of the

2    CLRA, Plaintiffs reserve their rights to amend this Complaint to seek monetary damages.

3        106.    Notwithstanding any other statements in this Complaint, Plaintiffs do not seek monetary

4    damages in conjunction with their CLRA claim—and will not do so—until this thirty-day period has passed.

5                                   **SECOND CAUSE OF ACTION**

6    **Violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, e*t seq.***

7                    **(on behalf of the California Subclass and Nationwide Class)**

8        107.    Plaintiffs incorporate by reference the allegations contained in all preceding paragraphs of

9    this complaint.

10        108.    Plaintiffs have standing to pursue this claim because they have suffered injury in fact and have

11   lost money or property as a result of Apple's actions as described herein. Plaintiffs and Class members

12   overpaid for the Products due to Apple's misrepresentations and omissions about their carbon neutrality.

13   Apple's acts and practices alleged herein constitute unlawful, unfair, and fraudulent business practices in

14   violation of the California's Unfair Competition Law ("UCL"). Cal. Bus. & Prof. Code §§ 17200, *et seq*.

15        109.    Apple's conduct is unlawful because it violates the CLRA and Federal Trade Commission

16   regulations regarding environmental marketing claims, including 16 C.F.R. § 260.4 (prohibiting unqualified

17   general environmental benefit claims) and § 260.5 (requiring competent and reliable scientific evidence for

18   carbon offset claims).

19        110.    Apple's conduct is unfair because it offends established public policy and is immoral,

20   unethical, oppressive, unscrupulous, and substantially injurious to consumers. The harm caused by Apple's

21   conduct outweighs any possible utility of such conduct. Additionally, Apple's conduct was "unfair" because

22   it violated public policy as declared by specific constitutional, statutory or regulatory provisions, including

23   the CLRA and FTC regulations.

24        111.    Apple's conduct is fraudulent because its representations about the Products' carbon

25   neutrality are likely to deceive reasonable consumers. A reasonable consumer would not expect that Apple's

26   carbon neutral claims rely on offset projects that fail to provide genuine environmental benefits.

27

28

112.    Apple's misrepresentations were material because reasonable consumers consider environmental impact when making purchasing decisions, and Apple's deceptive carbon neutral claims were prominently featured in marketing the Products.

113.    As a direct and proximate result of Apple's violations, Plaintiffs and California Subclass members have suffered injury in fact and lost money by purchasing Products they would not have purchased or by paying price premiums they would not have paid had they known the truth.

114.    Plaintiffs seek an injunction enjoining Apple from engaging in the unlawful conduct alleged in this claim and requiring it to fully disclose the truth about the carbon neutrality of the Products, to discontinue their sale with the deceptive and misleading claims, and other appropriate equitable relief, including but not limited to improving its carbon neutrality disclosures. Without adequate disclosures of the Products' true carbon neutrality, continued marketing and sale of the Products are nearly certain to deceive Plaintiffs and Class members.

115.    Plaintiffs and the Class also seek restitution of all money and property lost as a result of Apple's acts in violation of the UCL.

**THIRD CAUSE OF ACTION**

**Violation of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 *et seq.***

**(on behalf of the Florida Subclass)**

116.    Plaintiffs incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

117.    Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 *et seq.* (FDUTPTA) prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).

118.    The stated purpose of FDUTPA is to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2).

119.    At all relevant times, Apple engaged in trade or commerce in the State of Florida and offered for sale, sold, and distributed the Products within the State of Florida, subjecting it to the provisions of

FDUTPA. Apple's conduct occurred in the course of trade or commerce within the meaning of Fla. Stat. § 501.203(8).

120.    Plaintiffs and Class members are "consumers" within the meaning of Fla. Stat. § 501.203(7).

121.    Apple engaged in unfair or deceptive practices in the conduct of trade or commerce, including but not limited Apple violated FDUTPA by engaging in unfair or deceptive practices, including falsely representing the Products as "carbon neutral" when in fact they were not.

122.    Apple's unfair or deceptive acts and practices were likely to mislead a reasonable consumer. A reasonable consumer would understand Apple's representations as meaning that the Products have a carbon neutral footprint. They do not.

123.    Apple's representations and omissions were material because they were likely to deceive reasonable consumers about the true nature of the Products' environmental impact. Specifically, Apple represented the Products as "carbon neutral" when in fact the carbon offset projects Apple relies on fail to provide genuine additionality or verifiable carbon reductions, namely that the Chyulu Hills Project primarily generates credits from already-protected areas, and the Guinan Project claims to have planted trees in areas that were already heavily forested. As a result, Apple lacks adequate substantiation for its carbon neutrality claims.

124.    Apple's representations regarding the Products were likely to deceive, and Apple knew or should have known that its representations were untrue and misleading.

125.    Plaintiffs and members of the Class could not have reasonably avoided such injury. Plaintiffs and members of the Class were unaware of the existence of the facts that Apple suppressed and/or failed to disclose, and they would not have purchased the Products and/or would have purchased them on different terms had they known the truth.

126.    Plaintiffs and the Class members suffered harm as a result of Defendant's violations because they relied on the carbon neutral claim in deciding to purchase the Product. The carbon neutral claim was a substantial factor in the purchasing decisions of Plaintiffs and the Class members. The carbon neutral claim was material because a reasonable consumer would consider it important in deciding whether to purchase the Product.

127.    As a direct and proximate result of Apple's violations, Plaintiffs and members of the Class have suffered harm in that they purchased Products they would not have purchased or paid significantly more than they would have paid had they known the truth about Apple's representations. Further, Plaintiffs and members of the Class have suffered and continue to suffer economic losses and other damages including, but not limited to, the amounts paid for the Products, and any interest that would have accrued on those monies, in an amount to be proven at trial. Accordingly, Plaintiffs seek a monetary award for violation of this Act in the form of damages, restitution, disgorgement of ill-gotten gains to compensate Plaintiffs and the Class for said monies.

128.    Plaintiffs and members of the Class are entitled to seek, and do hereby seek, injunctive relief to put an end to Apple's violations. Plaintiffs have no adequate remedy at law. Without equitable relief, Apple's unfair and deceptive practices will continue to harm Plaintiff and the Class.

129.    Apple's conduct was malicious, fraudulent, and wanton. Apple intentionally and recklessly misled consumers to increase sales of its Products while knowing its carbon neutral claims were not adequately substantiated, warranting an award of punitive damages as permitted by law. Specifically, Apple's conduct was malicious in that Apple deliberately and knowingly misled consumers about the Products' carbon neutrality for its own financial gain. Apple had access to detailed data about both offset projects, including satellite imagery and carbon stock measurements, which demonstrated these projects did not provide genuine carbon reductions, yet proceeded with its deceptive marketing campaign. Apple's conduct was oppressive as it exploited consumers' growing environmental concerns through a sophisticated greenwashing campaign that took advantage of consumers' inability to independently verify carbon neutrality claims. Apple's conduct was fraudulent as Apple intentionally misrepresented material facts about the Products' environmental impact while having knowledge that the Chyulu Hills Project primarily generated credits from an already-protected national park and the Guinan Project claimed to plant trees in areas that were already heavily forested. Neither project provided the genuine, additional carbon reductions required for legitimate carbon neutrality claims.

1

**FOURTH CAUSE OF ACTION**

2

**Violation of the District of Columbia's Consumer Protection Procedures Act**

3

**(on behalf of the Washington, D.C. Subclass)**

4      130.    Plaintiffs incorporate by reference the allegations contained in all preceding paragraphs of

5    this complaint.

6      131.    The District of Columbia Consumer Protection Procedures Act ("DCCPPA") prohibits unfair

7    or deceptive trade practices in connection with the offer, sale, or supply of consumer goods or services. D.C.

8    Code § 28-3904.

9      132.    The Products are "goods" within the meaning of D.C. Code § 28-3901(a)(7).

10     133.    Apple is a "merchant" within the meaning of D.C. Code § 28-3901(a)(3).

11     134.    Plaintiffs and Class members are "consumers" within the meaning of D.C. Code § 28-

12   3901(a)(2).

13     135.    Apple violated the DCCPPA by engaging in the following unfair or deceptive trade practices:

14         a.   Representing that the Products have characteristics, benefits, or qualities that they do

15             not have (§ 28-3904(a));

16         b.   Representing that the Products are of a particular standard, quality, or grade when they

17             are of another (§ 28-3904(d)); and

18         c.   Making misrepresentations as to a material fact about the Products which has a

19             tendency to mislead (§ 28-3904(e)).

20         d.   Advertising the Products without the intent to sell them as advertised (§ 28-3904(h)).

21     136.    Apple's unfair or deceptive acts or practices were capable of deceiving a substantial portion

22   of the purchasing public.

23     137.    Apple's representations were material because they were likely to deceive reasonable

24   consumers about the true nature of the Products' environmental impact.

25     138.    Apple knew or should have known that its representations and omissions were untrue and

26   misleading

27

28

*Dib, et al. v. Apple Inc.*
CLASS ACTION COMPLAINT

139.    Plaintiffs and Class members reasonably relied on Apple's carbon neutrality claims in making their purchasing decisions. Had they known the truth, they would not have purchased the Products or would have paid significantly less.

140.    As a direct and proximate result of Apple's violations, Plaintiffs and members of the Class have suffered harm in that they purchased Products they would not have purchased or paid significantly more than they would have paid had they known the truth about Apple's representations. Further, Plaintiffs and members of the Class have suffered and continue to suffer economic losses and other damages including, but not limited to, the amounts paid for the Products, and any interest that would have accrued on those monies, in an amount to be proven at trial. Accordingly, Plaintiffs seek a monetary award for violation of this Act in the form of damages, restitution, disgorgement of ill-gotten gains to compensate Plaintiffs and the Class for said monies.

141.    Apple's conduct was intentional, reckless, and willful, justifying the imposition of punitive damages to deter future misconduct.

### FIFTH CAUSE OF ACTION

### Breach of Express Warranty

### (on behalf of the California Subclass and Nationwide Class)

142.    Plaintiffs incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

143.    Apple provided an express warranty that the Products are "carbon neutral," meaning they result in no net addition of carbon dioxide to the atmosphere.

144.    This warranty became part of the basis of the bargain between Plaintiffs and Class members and Apple.

145.    Apple breached this warranty because the Products are not carbon neutral. Specifically: the Products' manufacturing process continues to generate carbon emissions; the carbon offset projects Apple relies on do not provide genuine, additional carbon reductions; the majority of claimed reductions from the Chyulu Hills Project come from already-protected areas; the Guinan Project claims afforestation benefits in areas that were already forested.

146.    As a direct and proximate result of Apple's breach, Plaintiffs and Class members have been damaged in the amount of the purchase price of the Products and/or the price premium they paid.

### SIXTH CAUSE OF ACTION

### Breach of Implied Warranty

### (on behalf of the California Subclass and Nationwide Class)

147.    Plaintiffs incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

148.    Apple, as the designer, manufacturer, marketer, distributor, and/or seller of the Products, impliedly warranted that the Products are carbon neutral.

149.    Apple breached the warranty implied in the contract for the sale of the Products because the Products did not conform to Apple's representations that the Products they designed, manufactured, marketed, and/or sold are carbon neutral.

150.    Plaintiffs and Class Members purchased the Products in reliance upon Apple's implied warranties of fitness for the Products' purpose.

151.    The Products were not altered by Plaintiffs and Class Members. The Products were defective when they left the exclusive control of Apple.

152.    Apple knew that the Products would be purchased and used without additional testing by Plaintiffs and Class Members

153.    The Products were unfit for their intended purpose, and Plaintiffs and Class Members did not receive the goods as warranted.

154.    As a direct and proximate cause of Apple's breach of the implied warranty, Plaintiff and Class Members have been injured and harmed because they would not have purchased the Products on the same terms if they knew that the Products were not carbon neutral, and the Products do not have the characteristics, uses, or benefits as promised by Apple.

155.    Plaintiffs and Class Members have been damaged in the amount of the purchase price of the Products and/or the price of the premium they paid.

1

2

3

**SEVENTH CAUSE OF ACTION**

**Unjust Enrichment / Quasi-Contract**

**(on behalf of the California Subclass and Nationwide Class)**

4       156.    Plaintiffs incorporate by reference the allegations contained in all preceding paragraphs of

5    this complaint.

6       157.    By purchasing the Products, Plaintiffs and Class members conferred a benefit on Apple in the

7    form of the purchase price of the Products.

8       158.    Apple knowingly and willingly accepted and enjoyed these benefits.

9       159.    Apple's retention of these benefits is inequitable and unjust because Apple obtained them by

10   misrepresenting the Products' environmental impact and deceiving Plaintiffs and Class members into

11   believing they were purchasing carbon neutral products.

12      160.    Apple has been unjustly enriched by retaining the revenues derived from Plaintiffs' and Class

13   members' purchases of the Products. Retention of those monies under these circumstances is unjust and

14   inequitable because Apple misrepresented the nature of the Products.

15      161.    Apple's unjust enrichment is traceable to, and resulted directly and proximately from, the

16   conduct alleged in this complaint.

17      162.    As a direct and proximate result of Apple's unjust enrichment, Plaintiffs and Class members

18   are entitled to restitution or restitutionary disgorgement in an amount to be proven at trial.

**PRAYER FOR RELIEF**

20       **WHEREFORE**, Plaintiffs individually and on behalf of all other similarly situated persons, demand

21   judgment in their favor and against Defendant Apple Inc. as follows:

22              a.   Certifying this case as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and

23                   (b)(3), and appoint Plaintiffs as class representatives and their counsel as Class

24                   counsel.

25              b.   Entering judgment against Apple and in favor of Plaintiffs and the Class on all counts.

26              c.   Declaring Apple's conduct to be unlawful.

27

28

38

*Dib, et al. v. Apple Inc.*

CLASS ACTION COMPLAINT

    d.   Awarding Plaintiffs and Class members compensatory, statutory, and punitive to which Plaintiffs and Class members are entitled, to be determined by this Court and/or jury.

    e.   Granting an order of restitution and all other forms of equitable monetary relief.

    f.   Granting an order enjoining Apple from labeling, advertising, or packaging the Products as "carbon neutral" as alleged herein.

    g.   Awarding Plaintiffs and the Class their reasonable attorney's fees, expenses and costs of filing and prosecuting this action.

    h.   Awarding such other and further relief as this Court deems appropriate and just.

## JURY DEMAND

163.    Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: February 26, 2025        /s/ Amber L. Schubert

Amber L. Schubert (No. 278696)
**SCHUBERT JONCKHEER & KOLBE LLP**
2001 Union Street, Suite 200
San Francisco, CA 94123
Tel: (415) 788-4220
Fax: (415) 788-0161
aschubert@sjk.law

Fletch Trammell (TX Bar No. 24042053)
*Pro hac vice pending*
**TRAMMELL PC**
3262 Westheimer, #423
Houston, TX 77098
Tel: (800) 405-1740
Fax: (800) 532-0992
fletch@trammellpc.com

Don Bivens (AZ Bar No. 005134)
*Pro hac vice forthcoming*
Teresita T. Mercado (AZ Bar No. 020578)
*Pro hac vice forthcoming*
**DON BIVENS, PLLC**
15169 N. Scottsdale Road, Suite 205
Scottsdale, AZ, 85254
Tel: (602) 762-2661

don@donbivens.com
teresita@donbivens.com
***Counsel for Plaintiffs***

*Dib, et al. v. Apple Inc.*
CLASS ACTION COMPLAINT