1   Amber L. Schubert (No. 278696)
2   **SCHUBERT JONCKHEER & KOLBE LLP**
    2001 Union Street, Suite 200
3   San Francisco, CA 94123
    Tel: (415) 788-4220
4   Fax: (415) 788-0161
    aschubert@sjk.law
5
6   Fletch Trammell (TX Bar No. 24042053)
    *Pro hac vice*
7   **TRAMMELL PC**
    3262 Westheimer, #423
8   Houston, TX 77098
    Tel: (800) 405-1740
9   Fax: (800) 532-0992
    fletch@trammellpc.com
10
11  Don Bivens (AZ Bar No. 005134)
    *Pro hac vice forthcoming*
12  Teresita T. Mercado (AZ Bar No. 020578)
    *Pro hac vice forthcoming*
13  **DON BIVENS, PLLC**
    15169 N. Scottsdale Road, Suite 205
14  Scottsdale, AZ, 85254
    Tel: (602) 762-2661
15  don@donbivens.com
    teresita@donbivens.com
16  ***Counsel for Plaintiffs***

17

18              **UNITED STATES DISTRICT COURT**
              **NORTHERN DISTRICT OF CALIFORNIA**
19

20  OTHMANE DIB, JESUS GUERRERO, LUCA DELA
21  CRUZ, JEANETTE PORILLO, PETER GHANEM,
    RITA CRANE, NATHANIEL SANSOM, FRANK
22  NUÑEZ, and RANY WARDA, individually and as the   Case No: 5:25-cv-2043
    representatives of a class of similarly situated persons,
23                                                    CLASS ACTION
24              Plaintiffs,
                                                      **FIRST AMENDED COMPLAINT**
25          v.
                                                      JURY TRIAL DEMANDED
26  APPLE INC., a California corporation.

27              Defendant.

28

Plaintiffs Othmane Dib, Jesus Guerrero, Luca Dela Cruz, Jeanette Porillo, Peter Ghanem, Rita Crane, Nathaniel Sansom, Frank Nuñez, and Rany Warda ("Plaintiffs"), bring this action on behalf of themselves, and all other persons similarly situated, and allege the following against Apple Inc. ("Apple" or "Defendant"):

**NATURE OF ACTION**

1.      This is a class action lawsuit against Apple on behalf of (1) all persons in the United States who purchased the Apple Watch Series 9, Apple Watch SE (2nd generation), or Apple Watch Ultra 2 (collectively, the "Products"); and (2) all persons in the United States who purchased any Apple product in reliance on Apple's representations that it is a carbon neutral company with respect to its global corporate emissions.

2.      Apple claims that since April 2020 and for each fiscal year that followed, it had "achieved carbon neutrality for [its] corporate emissions by sourcing 100 percent renewable electricity for Apple facilities, implementing energy efficiency, directly abating emissions, and securing high-quality carbon credits to counter-balance all unabated emissions."[1] Apple has repeatedly represented in marketing materials and in its yearly Environmental Progress Reports that it is carbon neutral as to its corporate emissions—in part through the use of carbon credits—for its fiscal years ("FY") 2021, 2022, 2023, and 2024.[2]

3.      Separately, in September 2023, Apple announced the Products as what it claimed were its first-ever "carbon neutral" products. Apple has prominently marketed these Products as "carbon neutral," dedicating substantial portions of its product launch events and marketing materials to highlighting this purported environmental achievement.

4.      According to Apple's representations, the carbon neutrality strategy for the Products involves reducing around 75% of these Products' emissions through various initiatives, while offsetting the remaining percentage by retiring carbon credits from various projects.

5.      A carbon credit represents one metric ton of $CO_2$ equivalent emissions that has purportedly been reduced, avoided, or removed from the atmosphere by certain activities. These credits are typically created by projects—such as reforestation efforts or renewable energy installations—that undertake

---

[1] https://www.apple.com/environment/pdf/Apples_Carbon_Removal_Strategy_White_Paper.pdf, at 5.
[2] *See, e.g.*, https://www.apple.com/environment/pdf/Apple_Environmental_Progress_Report_2025.pdf, at 82.

emissions-reducing actions and then sell the resulting credits to corporations seeking to offset their own emissions. When a company purchases and "retires" a credit, it permanently removes that credit from the carbon market, meaning the credit can no longer be traded or used by any other entity to claim carbon emissions reductions.

6.    To offset its corporate emissions footprint for its FY 2022 (September 26, 2021 to September 24, 2022), Apple claims to have retired 324,100 credits from two offsetting projects: the Chyulu Hills Project in Kenya and the Alto Mayo Project in Peru.[3]

7.    To offset its corporate and product line emissions footprint for its FY 2023 (September 25, 2022 to September 30, 2023), which includes the time during which the Products were on sale and one Plaintiff purchased a Product, Apple claims to have retired 485,000 credits from two offsetting projects: the Chyulu Hills Project and the Guinan Project in China. 471,400 of those credits were retired to offset Apple's corporate emissions for FY 2023. 13,500 of those credits were retired to offset product line emissions for the Products that were sold in FY 2023.[4]

8.    For Apple's FY 2024 (October 1, 2023 to September 28, 2024), which includes the time during which the Products were on sale and several other Plaintiffs purchased Products, Apple claims to have retired 70,300 to offset product line emissions for the Products that were sold in FY 2024. Those credits were generated by the AF Forestal Apepu Expansion Project in Paraguay ("Apepu Project") and the Arbaro Forestal San Pedro Project in Paraguay ("Arbaro Project"). Apple also claims to have retired 666,800 credits in FY 2024 to offset its corporate emissions. Those credits were generated by the Chyulu Hills Project, the Guinan Project, the Apepu Project, the Arbaro Project, and the Guyana REDD+ Project in Guyana.[5]

9.    Apple's corporate and Product carbon neutrality claims are false and misleading. The Chyulu Hills, Guinan, Apepu, and Arbaro Projects all have serious integrity issues that render their credits ineffective and illegitimate. The Chyulu Hills Project generates credits for avoiding deforestation on land that has been legally protected since 1983—long before the project began. The Guinan Project claims to have planted trees on "barren land," when in fact the area was already heavily forested. The Apepu Project purports to result in

---

[3] Id.
[4] https://www.apple.com/environment/pdf/Apple_Environmental_Progress_Report_2024.pdf, at 77-78.
[5] https://www.apple.com/environment/pdf/Apple_Environmental_Progress_Report_2025.pdf, at 82-83.

new eucalyptus plantations but has achieved only a fraction of the tree growth that it claims. Similarly, the Arbaro Project also centers on eucalyptus plantations, yet substantially inflates its reported tree growth.

10. In the cases of the Chyulu Hills and Guinan Projects, the claimed carbon reductions would have occurred regardless of Apple's involvement or the projects' existence. In the cases of the Apepu and Arbaro Projects, the claimed reductions are largely illusory, as the magnitude of promised tree growth—and thus genuine carbon credit generation—never actually occurred. And because Apple's corporate and Product carbon neutrality claims are predicated on the efficacy and legitimacy of these projects, both of these claims are false and misleading.

11. Apple charges and maintains premium prices for its products, including its smartwatch products. Apple's ability to maintain these premium prices depends heavily on brand differentiation and perceived product superiority, including claims of environmental leadership. Research shows that approximately 70% of consumers consider environmental sustainability crucial in their purchasing decisions, with this percentage being even higher among premium product consumers who comprise Apple's target market. Apple has prominently displayed its corporate and Product "carbon neutrality" representations to the public, thereby ensuring that consumers are aware of its claims. Consumers thus know about, and reasonably rely upon, these representations when they make purchasing decisions in connection with Apple products generally, and the Products specifically.

12. Indeed, Apple's "carbon neutral" claims for Apple's product lines, including the Products, serve as a key market differentiator that helps Apple maintain and justify its premium pricing across the categories in which it competes. By positioning the Products as "carbon neutral," Apple strengthens its brand premium and supports its ability to charge higher prices versus competitors. Likewise, by positioning itself as a company with carbon neutral corporate emissions, Apple reinforces its image as an environmental leader, appealing to values-driven consumers and strengthening customer loyalty, brand trust, and willingness to pay a premium for its products. This market differentiation is particularly valuable in the premium hardware and smartwatch segments, where environmental responsibility claims significantly influence consumer choice and willingness to pay premium prices.

13. As a result of Apple's misleading claims, consumers have suffered economic injury in multiple ways: they paid a price premium based in part on false environmental claims; the deceptive

*Dib, et al. v. Apple Inc.*
FIRST AMENDED COMPLAINT

marketing distorted the marketplace by falsely differentiating Apple and Apple products on environmental grounds; and they did not receive the benefit of their bargain—consumers paid for Products marketed as environmentally superior but received goods whose carbon neutrality relied on ineffective offset projects. This harm extends beyond product-level deception: Apple's claims of corporate carbon neutrality also misled consumers into believing they were supporting a company with genuinely net-zero operations, further influencing purchasing decisions, brand loyalty, and willingness to pay a premium.

14.     This action seeks to remedy Apple's deceptive conduct and obtain compensation for (1) consumers who paid premium prices for Products that failed to deliver their promised environmental benefits; and (2) consumers of Apple's entire product line who were misled by Apple's claims of corporate carbon neutrality into believing they were supporting a company with genuinely net-zero operations, thereby influencing their purchasing decisions and willingness to pay premiums. Plaintiffs bring this action on behalf of themselves and other similarly situated consumers for violations of state consumer protection laws, breach of express and implied warranties, unjust enrichment, and fraud.

**PARTIES**

15.     Plaintiff Othmane Dib is a citizen of California and resides in Palmdale, CA. On September 26, 2024, Othmane Dib purchased an Apple Watch Ultra 2 (49mm, Black Titanium case, Black Trail Loop) at a store located in California.

16.     Plaintiff Jesus Guerrero is a citizen of California and resides in Moreno Valley, CA. On October 4, 2024, Jesus Guerrero purchased an Apple Watch Ultra 2 (49mm, Black Titanium case, Black Trail Loop) online for delivery to California.

17.     Plaintiff Luca Dela Cruz is a citizen of California and resides in Bakersfield, CA. On December 26, 2023, Luca Dela Cruz purchased an Apple Watch Series 9 (45mm, Midnight Aluminum case, Midnight Sport Loop) online for delivery to California.

18.     Plaintiff Peter Ghanem is a citizen of California and resides in Canyon Country, CA. On January 31, 2024, Peter Ghanem purchased an Apple Watch Series 9 (41mm, Pink Aluminum case, Pink Sport Loop) online for delivery to California.

19.     Plaintiff Jeanette Porillo is a citizen of California and resides in Pinole, CA. On December 15, 2024, Jeanette Porillo purchased an Apple Watch Ultra 2 (49mm, Black Titanium case, Navy Alpine

Loop) and an Apple Watch SE (40mm, Starlight Aluminum case, Ultramarine Sport Loop) online for delivery to California.

20.     Plaintiff Rita Crane is a lawful permanent resident of the United States and resides in Orlando, FL. On September 7, 2024, Rita Crane purchased an Apple Watch SE (40mm, Aluminum case, Starlight Sport Loop) online for in-store pickup in Florida.

21.     Plaintiff Nathaniel Sansom is a citizen of Washington, D.C. and resides in Washington, D.C. On July 17, 2024, Nathaniel Sansom purchased an Apple Watch Series 9 (45mm, Aluminum case, Midnight Sport Loop) online for delivery to Washington, D.C.

22.     Plaintiff Frank Nuñez is a citizen of California and resides in Oakland, CA. In October 2024, Frank Nuñez purchased an Apple Watch SE (40mm, Starlight case, Starlight Sport Loop) online for delivery to California.

23.     Plaintiff Rany Warda is a citizen of California and resides in Santa Clarita, CA. On September 15, 2023, Rany Warda purchased an Apple Watch Ultra 2 (49mm, Titanium case, Blue Alpine Loop) online for delivery to California.

24.     Defendant Apple Inc. is a corporation organized and existing under the laws of California, with its principal place of business in Cupertino, CA.

## JURISDICTION AND VENUE

25.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d)(2) (the "Class Action Fairness Act") because sufficient diversity of citizenship exists between the parties – Plaintiffs are citizens of several states and Apple is a California corporation with its principal place of business in California. Further, the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, with more than 100 potential class members based on the class defined below. In addition, more than two-thirds of the members of the Class reside in a state other than the state in which Apple is a citizen, and therefore any exceptions to jurisdiction under 28 U.S.C. § 1332(d) do not apply.

26.     Apple is incorporated in California and has its principal place of business in Cupertino, CA. This Court thus has general personal jurisdiction over Apple.

27.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Apple resides in this District and because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

**DIVISIONAL ASSIGNMENT**

28.     Pursuant to Civil L.R. 3-2(c), (e), this action should be assigned to the San Jose Division because a substantial part of the events or omissions giving rise to this action occurred in Santa Clara County.

**FACTS**

**I.     The Climate Crisis**

29.     The climate crisis represents one of the most significant challenges facing humanity today. Scientific consensus demonstrates that human activities, particularly the emission of greenhouse gasses, are fundamentally altering Earth's climate system in ways that pose severe risks to human societies and natural ecosystems.

30.     At the heart of the climate crisis is the greenhouse effect: a natural warming process where atmospheric gasses trap heat from the sun that would otherwise escape into space. While this process is essential for life on Earth, human activities have dramatically increased the concentration of greenhouse gasses in the atmosphere, intensifying this effect beyond natural levels.

31.     Carbon dioxide ($CO_2$) is the primary greenhouse gas driving human-induced climate change, accounting for approximately 80% of U.S. greenhouse gas emissions from human activities. While $CO_2$ occurs naturally in Earth's atmosphere, human activities—such as the burning of fossil fuels (which releases $CO_2$ into the atmosphere) and deforestation (which destroys natural carbon sinks that would have otherwise removed $CO_2$ from the atmosphere)—have increased atmospheric $CO_2$ concentrations to levels unprecedented in human history.

32.     The magnitude of human impact on atmospheric $CO_2$ levels is staggering. For over 800,000 years—a period encompassing all of human civilization—atmospheric greenhouse gas concentrations remained between 200 and 280 parts per million (ppm). However, since the Industrial Revolution, and particularly over the past century, these concentrations have skyrocketed to over 400 ppm, with current levels far exceeding anything experienced in human history.

33.     This dramatic increase in atmospheric $CO_2$ has disrupted Earth's natural carbon cycle—the process by which carbon moves between the atmosphere, land, oceans, and living organisms. While natural processes can eventually remove $CO_2$ from the atmosphere, the current rate of human-caused $CO_2$ emissions far exceeds the planet's natural absorption capacity. This imbalance results in a net accumulation of $CO_2$ in the atmosphere, intensifying the greenhouse effect and accelerating climate change.

34.     The impacts of climate change are already evident and affecting communities across the United States. These impacts include increased frequency and intensity of extreme weather events, rising sea levels threatening coastal communities, disruption of agricultural systems and food security, changes in precipitation patterns affecting water resources, extended wildfire seasons, deteriorating air quality, longer and more severe allergy seasons, and threats to critical infrastructure.

35.     The urgency of addressing climate change has led to significant international action. In 2015, nearly every nation adopted the Paris Agreement, a legally binding international treaty aimed at limiting global temperature rise by reducing greenhouse gas and $CO_2$ emissions. The United States has subsequently enacted domestic legislation, including the Inflation Reduction Act of 2022, to address climate change through emissions reduction.

## II.    Carbon Neutrality Claims

36.     Growing public awareness of the climate crisis is transforming consumer purchasing behavior, with research showing that an overwhelming majority of consumers actively seek out environmentally sustainable products. According to a comprehensive study conducted by IBM and the National Retail Federation, approximately 70% of consumers in the United States and Canada consider environmental sustainability a crucial factor in their purchasing decisions. The same research revealed that these environmentally conscious consumers are willing to pay premium prices—on average 35% more—for products they believe are sustainable or eco-friendly. A different study conducted by NielsenIQ and McKinsey found that products with environmental, social and governmental related marketing outperformed those without such marketing by 8% annually.

37.     In response to this consumer demand, companies increasingly market their products as environmentally responsible, with "carbon neutral" becoming a prominent environmental claim. In relation to products, the term "carbon neutral" means that the production and use of a product results in no net addition

of $CO_2$ to the atmosphere. This is typically achieved by either eliminating carbon emissions entirely from a product's production and use, or by balancing or "offsetting" carbon emissions from manufacture and use with an equivalent amount of carbon removal through verified offset projects.

38.     The practice of carbon offsetting requires companies to compensate for the emission of $CO_2$ or equivalent greenhouse gasses by providing for an emission reduction elsewhere. To offset emissions from the production and use of their products, companies typically purchase carbon "credits" in environmental projects such as forest preservation, renewable energy initiatives, and reforestation efforts. However, the effectiveness of these projects varies significantly.

39.     Central to legitimate carbon offsetting is the principle of "additionality"—the requirement that offset projects must result in carbon reductions that would not have occurred without the project. This principle is mandated by key international climate agreements, including Article 6 of the Paris Agreement and Article 6 of the Kyoto Protocol, which states that offset projects must demonstrate that "credits/units are not awarded for emission reductions that would have happened anyway."

40.     Companies wishing to demonstrate that their products are carbon neutral must meet rigorous standards established by technical specifications such as NQA's Publicly Available Standard 2060 and British Standards Institution's ISO 14068-1. These standards require companies to accurately measure their carbon emissions, implement genuine reduction strategies, verify the effectiveness of any offset projects, ensure offset projects meet additionality requirements, and provide transparent documentation of their carbon neutrality claims.

III.    Carbon Neutrality and "Greenwashing"

41.     The strong consumer preference for sustainable products has led to the proliferation of "greenwashing"—the practice of making false or misleading claims about the environmental benefits of a product. Companies engage in greenwashing to capitalize on growing environmental consciousness while avoiding the costs and challenges of achieving genuine sustainability.

42.     Carbon neutrality claims are particularly susceptible to greenwashing because of the technical complexity of carbon accounting, the lack of transparency and reliable standards in the carbon offset market, companies' frequent failure to properly qualify or explain their carbon neutrality claims, the questionable effectiveness of many offset projects, and limited regulatory oversight of environmental marketing claims.

43.     Carbon neutrality claims based on offsetting are particularly susceptible to greenwashing when companies rely on ineffective or redundant offset projects that fail to deliver genuine environmental benefits. This occurs when offset projects would have happened regardless of the company's investment, when projects do not actually reduce emissions as claimed, or when the same environmental benefits are counted multiple times.

44.     Recognizing the potential for deception in environmental marketing claims, the Federal Trade Commission created the "Green Guides" (16 C.F.R. Part 260) to help marketers avoid making unfair or deceptive environmental claims. The Green Guides specifically address carbon offset claims, providing that marketers must "employ competent and reliable scientific and accounting methods to properly quantify claimed emission reductions" and ensure claims are appropriately substantiated. Under 16 C.F.R. § 260.5, it is deceptive to claim carbon offsets represent emission reductions if the same reductions are already required by law.

45.     Importantly, under 16 C.F.R. § 260.6(c), third-party certification does not eliminate a marketer's obligation to ensure that it has substantiation for all claims reasonably communicated by the certification. In other words, companies cannot simply rely on third-party certifications to validate their environmental claims - they must independently ensure the accuracy and reliability of their claims, including the effectiveness of any offset projects they use. Moreover, 16 C.F.R.§ 260.4 prohibits unqualified general environmental benefit claims, requiring companies to be able to substantiate all reasonable interpretations of their environmental claims.

## IV.     Apple's False and Misleading Carbon Neutrality Claims

### A.     Corporate Claims

46.     Since 2020, Apple has repeatedly claimed that it has achieved carbon neutrality for its global corporate operations:

      a.    In a July 21, 2020, press release, Apple stated that it was "[a]lready carbon neutral today for corporate emissions worldwide";[6]

---

[6] https://www.apple.com/newsroom/2020/07/apple-commits-to-be-100-percent-carbon-neutral-for-its-supply-chain-and-products-by-2030/.

b.  In an October 25, 2022, press release, Apple stated that it "has been carbon neutral for its global corporate operations since 2020";[7]

c.  In an April 5, 2023, press release, Apple stated that it was "[a]lready carbon neutral for its global corporate operations";[8]

d.  In an April 19, 2023, press release, Apple stated that it was "[a]lready carbon neutral for its global corporate operations";[9]

e.  In a September 12, 2023, press release, Apple stated that "[i]n 2020, Apple achieved carbon neutrality for its global corporate operations";[10]

f.  In a September 12, 2023, YouTube video that has garnered over 5.3 million views, Apple stated that "Apple's offices are already carbon neutral . . . [through] a mix of clean energy and eliminating greenhouse emissions;"[11]

g.  In its 2024 Environmental Progress Report (published in 2023), Apple stated that "[w]e achieved carbon neutrality in 2020" and that it achieved corporate carbon neutral status for its FY 2022 and 2023 through the retirement of carbon credits;[12]

h.  In a January 2024 white paper, Apple stated that it "has been carbon neutral for our global corporate operations since 2020";[13]

i.  In its 2025 Environmental Progress Report (published in 2024), Apple stated that "[b]ecame carbon neutral for our corporate emissions" in 2020 and that it achieved corporate carbon neutral status for its FY 2022, 2023, and 2024 through the retirement of carbon credits;[14]

47.  These claims are designed to position Apple as a leader in corporate sustainability and climate responsibility. Specifically, sustainability claims appeal directly to a growing demographic of consumers—particularly younger consumers—who value environmentally responsible purchasing. Indeed, research

---

[7] https://www.apple.com/newsroom/2022/10/apple-calls-on-global-supply-chain-to-decarbonize-by-2030/.
[8] https://www.apple.com/newsroom/2023/04/apple-and-global-suppliers-expand-renewable-energy-to-13-point-7-gigawatts/.
[9] https://www.apple.com/newsroom/2023/04/apple-announces-major-progress-toward-climate-goals-ahead-of-earth-day/.
[10] https://www.apple.com/newsroom/2023/09/apple-unveils-its-first-carbon-neutral-products/.
[11] https://www.youtube.com/watch?v=QNv9PRDIhes.
[12] https://www.apple.com/environment/pdf/Apple_Environmental_Progress_Report_2024.pdf.
[13] https://images.apple.com/ca/environment/pdf/Apples_Carbon_Removal_Strategy_White_Paper.pdf.
[14] https://www.apple.com/environment/pdf/Apple_Environmental_Progress_Report_2025.pdf.

confirms that younger consumers are more likely to buy products from companies they perceive as environmentally conscious.

48.    Apple's representations of carbon neutrality are not merely corporate policies—they are central to the company's branding strategy. By emphasizing its green credentials, Apple enhances its reputation as a socially and environmentally responsible brand.

49.    Apple leverages its environmental commitments to distinguish itself from competitors in the consumer electronics market. While many manufacturers offer consumer hardware, Apple uses its purported climate responsibility as a differentiator that enhances the perceived value of its products.

50.    Apple's climate neutrality commitments serve as a brand multiplier, reinforcing loyalty among existing customers and attracting new customers who are influenced by environmental concerns. Apple's sustainability marketing functions not as a neutral corporate disclosure, but as a strategic commercial representation intended to drive consumer behavior. These claims thus contribute materially to Apple's ability to sell more products and command premium prices.

51.    By promoting itself as carbon neutral and environmentally responsible, Apple creates a competitive advantage and garners consumer goodwill that translates into increased sales, market share, and customer retention.

52.    At the time that each Plaintiffs purchased the Products, they had viewed and were aware of Apple's representations that it was "carbon neutral" as to its corporate emissions. These representations led Plaintiffs to believe that Apple was, in truth, a carbon neutral company as to its corporate emissions. Each Plaintiff relied on Apple's representations about its corporate carbon neutrality when making his or her purchasing decisions, and those representations played a substantial part in the Plaintiffs' decision to purchase the Products.

53.    According to Apple's representations, its corporate carbon neutrality strategy focuses on reducing greenhouse gas emissions through five "pillars": low-carbon design, energy efficiency, clean electricity, direct emissions abatement, and carbon removal through "investments in carbon removal projects."[15] The carbon removal strategy relies on heavily on the Chyulu Hills and Guinan Projects. In FY 2022, Apple retired 324,100 credits from the Chyulu Hills Project and another project against its corporate

---

[15] https://images.apple.com/ca/environment/pdf/Apples_Carbon_Removal_Strategy_White_Paper.pdf, at 5.

emissions footprint to achieve purported carbon neutrality.[16] In FY 2023, Apple retired 471,400 credits from the Chyulu Hills and Guinan Projects against its corporate emissions footprint to achieve purported carbon neutrality.[17] And in FY 2024, Apple retired 666,800 credits from the Chyulu Hills, Guinan, Apepu, Arbaro, and Guyana REDD+ Projects against its corporate emissions footprint to achieve purported carbon neutrality.[18]

54.     However, as detailed below, Apple's carbon neutral representations are false and misleading because they rely on offsets from projects that are critically flawed and do not produce sufficient genuine carbon credits.

55.     On information and belief, Apple's decision to make these "carbon neutral" representations was made in California. First, Apple is a California corporation and is headquartered in the state. Second, Greg Joswiak, Apple's senior vice president of Worldwide Marketing, and Lisa Jackson, Apple's vice president of Environment, Policy, and Social Initiatives, are based out of Apple's headquarters in California. Third, Apple's September 12, 2023, press release that touted the Apple's corporate carbon neutrality listed "Cupertino, California" in its dateline, meaning that, among other things, Apple's "carbon neutral" representations were disseminated from California.[19]

### B.     Product-Specific Claims

56.     In a September 12, 2023, product launch, Apple announced what it claimed was its first-ever carbon neutral products: the Apple Watch Series 9, the Apple Watch SE and the Apple Watch Ultra 2.[20] Apple utilized this product launch to emphasize its purported commitment to carbon neutrality by 2030, dedicating much of its release event to Apple's environmental initiatives.

57.     Apple disseminated its carbon neutral claims in, among other forums and mediums, a live stream announcement video that has garnered over 33 million views to date. In that video, Lisa Jackson, Apple's vice president of Environment, Policy, and Social Initiatives, touted the carbon neutrality of the products and explained that a portion of the emissions caused by the Products "are offset by high-quality

---

[16] https://www.apple.com/environment/pdf/Apple_Environmental_Progress_Report_2025.pdf, at 82.
[17] *Id.*
[18] https://www.apple.com/environment/pdf/Apple_Environmental_Progress_Report_2025.pdf, at 83.
[19] https://www.apple.com/newsroom/2023/09/apple-unveils-its-first-carbon-neutral-products/.
[20] *See, e.g.*, https://www.apple.com/newsroom/2023/09/apple-unveils-its-first-carbon-neutral-products/; https://www.apple.com/newsroom/2023/09/apple-introduces-the-advanced-new-apple-watch-series-9/.

credits from projects like forests and wetlands that actively remove carbon from the atmosphere. This last step brings the net carbon footprint of Apple Watch Series 9 down to zero, making it our first-ever carbon neutral product! Any combination of aluminum Series 9 and new Sport Loop is carbon neutral and has been certified by an independent third party. To help you recognize it, you'll see this new logo on the box. We are so excited about this achievement, and it's how we plan to get all Apple products to carbon neutral, by innovating across design, engineering, and operations to steeply reduce emissions before applying high-quality carbon credits."[21]

58.    Apple prominently advertises the Products' carbon neutrality, highlighting this purported environmental achievement as a key feature in its marketing materials, product packaging, and retail displays. The "carbon neutral" designation appears on the products' packaging with a distinctive green icon, and features prominently in Apple's online marketing and retail presence.



*The image above shows the Apple Watch Series 9 product page on Apple's website.*

---

[21] Apple, *Apple Event – September 12*, YouTube (Sep. 12, 2023), https://www.youtube.com/live/ZiP1l7jlIIA?t=1308s, at 24:39-25:31.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Which Apple Watch is right for you?





**Apple Watch SE**

All the essentials.
Light on price.

Find a Store

Learn more >





**Apple Watch Series 9**

Powerful sensors,
advanced health features.

Find a Store

Learn more >





**Apple Watch Ultra 2**

The most rugged
and capable.

Find a Store

Learn more >

44mm or 40mm
aluminum case size

45mm or 41mm
aluminum or stainless
steel case size

49mm titanium
case size



Carbon-neutral
combinations available[2]



Carbon-neutral
combinations available[2]



Carbon-neutral
combinations available[2]

*Dib, et al. v. Apple Inc.*
First Amended Complaint

**Case.** Let's start with your finish.

**Finish - Natural**



✼ 95% recycled titanium. Carbon neutral when paired with select bands. Learn more at apple.com/2030.

**Band.** Choose your adventure.

**Alpine Loop**                                    $799
For outdoor adventure and         or $66.58/mo.
hiking.                                         for 12 mo.*
✼ Carbon neutral band.

**Trail Loop**                                      $799
For all sports and workouts.      or $66.58/mo.
                                              for 12 mo.*
✼ Carbon neutral band.

**Case.** Let's start with your finish.

**Finish - Midnight**

  

✼ Carbon neutral when paired with select bands. Learn more at apple.com/2030.

**Band.** Discover different styles and pick your favorite.

**Rubber**                                          $249
Flexible, swimproof silicone    or $20.75/mo.
and fluoroelastomer bands.          for 12 mo.*

**Textile**                                  From $249
Soft, lightweight materials.      or $20.75/mo.
Great for everyday wear.            for 12 mo.*
✼ Look for this logo to select a carbon neutral color.

**Stainless Steel**                        From $299
Meticulously crafted steel      or $24.91/mo.
designs for a sophisticated,        for 12 mo.*
upscale look.
✼ Look for this logo to select a carbon neutral color.

Textile
## Sport Loop

Soft, breathable, and lightweight, the Sport Loop features a hook-and-loop fastener for quick and easy adjustment. The double-layer nylon weave has dense loops on the skin side that provide soft cushioning while allowing moisture to escape. This weave is made with 82% recycled yarns, some of which contain material from discarded fishing nets.

✼ Carbon Neutral

Select Sport Loop colors are carbon neutral. The Sport Loop contains 45% recycled content by weight, 100% of manufacturing electricity is covered by clean energy, and 50% or more of all carbon neutral Apple Watch products are shipped without airplanes.°

*Dib, et al. v. Apple Inc.*
FIRST AMENDED COMPLAINT

*The images above are from the Products' purchase pages on Apple's website and depict Apple's representations about carbon neutrality.*



*The image above shows the Apple Watch packaging. The green icon on the side conveys that the product is carbon neutral.*

59.     At the time that the Plaintiffs purchased the Products, each Plaintiff had viewed and was aware of Apple's representations that the Products were "carbon neutral." These representations led each Plaintiff to believe that the Products were, in truth, carbon neutral. Each Plaintiff relied on Apple's representations that the Products were "carbon neutral" when making their purchasing decisions, and those representations played a substantial part in each Plaintiff's decision to purchase the Products.

60.     According to Apple's representations, its carbon neutrality strategy focuses on reducing greenhouse gas emissions from three major sources: electricity, materials, and transportation. Apple claims these efforts result in a 78% reduction in product emissions for the Apple Watch Series 9 paired with Sport Loop,[22] 75% for the Apple Watch SE paired with Sport Loop,[23] and 81% for the Apple Watch Ultra 2 paired

---

[22] https://www.apple.com/environment/pdf/products/watch/Carbon_Neutral_Apple_Watch_Series_9_PER_Sept2023.pdf at page 3.
[23] https://www.apple.com/environment/pdf/products/watch/Carbon_Neutral_Apple_Watch_SE_PER_Sept2023.pdf at page 3.

with Alpine Loop.[24] To address the remaining emissions, Apple states that it applies "high-quality carbon credits from nature based projects," purportedly resulting in a carbon-neutral product footprint.[25]

61.    However, as detailed below, Apple's carbon neutral representations are false and misleading because they rely on offsets from projects that are critically flawed and do not produce sufficient genuine carbon credits. Apple's carbon neutral representations also are false and misleading—even assuming that the credits from these projects are legitimate—for the independent reason that Apple did not retire enough credits against its FY 2024 product line emissions to achieve carbon neutrality for the Products.

62.    On information and belief, Apple's decision to make these "carbon neutral" representations was made in California. First, Apple is a California corporation and is headquartered in the state. Second, Greg Joswiak, Apple's senior vice president of Worldwide Marketing, is based out of Apple's headquarters in California. Third, Apple first announced the alleged "carbon neutrality" of the Products at an event at its headquarters in Cupertino, CA.[26] The video shown at that event depicted several Apple executives speaking from various locations in California, and specifically included a section in which Lisa Jackson, Apple's vice president of Environment, Policy, and Social Initiatives, made carbon neutral representations about the Products. Lisa Jackson also is based out of Apple's headquarters in California. Fourth, Apple's September 12, 2023, press release that touted the alleged "carbon neutrality" of the Products listed "Cupertino, California" in its dateline, meaning that, among other things, Apple's "carbon neutral" representations were disseminated from California.[27] Fifth, the September 12, 2023, press release includes quotes from Lisa Jackson, in which she makes "carbon neutral" claims on behalf of Apple.[28]

*(1)    Carbon Credits Used for Products Sold in FY 2023*

63.    Apple's 2024 Environmental Progress Report makes disclosures about Apple's corporate emissions during its FY 2023 and product line emissions for products that Apple sold during its FY 2023. Apple disclosed that during its FY 2023, it retired 471,400 credits against its corporate emissions for that

---

[24] https://www.apple.com/environment/pdf/products/watch/Carbon_Neutral_Apple_Watch_Ultra_2_Sept2023.pdf at page 3.
[25] https://www.apple.com/newsroom/2023/09/apple-unveils-its-first-carbon-neutral-products/.
[26] https://www.cnn.com/2023/08/29/tech/new-iphone-15-apple-wonderlust/index.html.
[27] https://www.apple.com/newsroom/2023/09/apple-unveils-its-first-carbon-neutral-products/.
[28] *Id.*

year and 13,500 credits against its product line emissions for products sold that year.[29] Apple thus retired 484,900 total credits against its FY 2023 product line and corporate emissions.

64. The Products were the only purportedly carbon neutral Apple products that were available for sale in Apple's FY 2023. The 13,500 credits that were retired against Apple's product line emissions for its FY 2023 thus were retired to offset the Products' emissions and to support Apple's carbon neutrality claims as to the Products that were sold in FY 2023 (including the Product that Plaintiff Rany Warda purchased on September 15, 2023).

65. In that same report, Apple named only two projects as possible sources of the credits that it retired in FY 2023: the Chyulu Hills and Guinan Projects. Apple disclosed that it retired 230,000 credits from the Chyulu Hills Project and 255,000 from the Guinan Project in FY 2023.[30] Apple thus retired 485,000 credits from the Chyulu Hills and Guinan Projects against its aggregate FY 2023 emissions. This figure directly corresponds with the aggregate number of credits that Apple retired against its product line and corporate emissions in FY 2023 (484,900). In other words, according to Apple's public disclosures, all of the credits that Apple retired against its product line *and* its corporate emissions for FY 2023 came from these two projects.

66. These disclosures compel the conclusion that Apple retired credits from the Chyulu Hills and Guinan Projects to offset the emissions of the Products sold in FY 2023, and that Apple relied on these offsets to support its carbon neutrality representations as to the Products sold in that year.

67. As detailed below, Apple's carbon neutrality claims are false and misleading because the two offset projects upon which Apple relies for Products sold in FY 2023—the Chyulu Hills Project and the Guinan Project—fail to provide genuine, additional carbon reductions. Instead, these projects are ineffective and redundant, representing neither real carbon offset value nor legitimate environmental benefits.

### (2) Carbon Credits Used for Products Sold in FY 2024

68. On April 16, 2025, after Plaintiffs filed the original complaint, Apple published its 2025 Environmental Progress Report.[31] Apple's 2025 Environmental Progress Report makes disclosures about

---

[29] https://www.apple.com/environment/pdf/Apple_Environmental_Progress_Report_2024.pdf, at 77.
[30] https://www.apple.com/environment/pdf/Apple_Environmental_Progress_Report_2024.pdf, at 78.
[31] https://www.apple.com/newsroom/2025/04/apple-surpasses-60-percent-reduction-in-global-greenhouse-gas-emissions/; *see* https://www.apple.com/environment/pdf/Apple_Environmental_Progress_Report_2025.pdf.

Apple's corporate emissions during its FY 2024 and product line emissions for products that Apple sold during its FY 2024. Apple disclosed that during its FY 2024, it retired 668,800 credits against its corporate emissions for that year and 70,300 credits against its product line emissions for products sold that year.[32] Apple reported that it retired 73,093 credits (2021 vintage) from the Apepu Project and 78,507 credits from the Arboro Project (2019, 2020, 2021, and 2022 vintages) "to both product and corporate emissions for 2024." Although Apple did not specify how many of the 70,300 product line credits retired in FY 2024 came from the Apepu Project versus the Arbaro Project, Apple's disclosures make clear that all the product line credits that it retired in FY 2024 came from one of those two projects.[33]

69. The Products were the only purportedly carbon neutral Apple products that were available for sale in Apple's FY 2024. The 70,300 credits from the Arbaro and Apepu Projects that were retired against Apple's product line emissions for its FY 2024 thus were retired to offset the Products' emissions and to support Apple's carbon neutrality claims as to the Products that were sold in FY 2024 (including the Products that several Plaintiffs purchased).

## V. The Reality Behind Apple's Carbon Neutrality Claims

70. To substantiate its carbon neutrality claims, Apple relies primarily on carbon credits from projects certified by Verra. Verra manages the Verified Carbon Standard (VCS) Program. Each project is critically flawed.

### A. The Chyulu Hills project fails to provide genuine carbon reductions

71. The Chyulu Project is a conservation initiative in Kenya, certified by Verra. According to the Project Description Report, the objectives of the project are to prevent the emission of 20 million tons of $CO_2$ (or equivalent emissions) by stopping deforestation and grassland conversion. The project is not based on carbon capture through tree-planting (afforestation or reforestation).

72. As discussed above, Apple has been a significant customer of this project. Apple retired hundreds of thousands of credits from this project against its corporate emissions in FY 2022, 2023, and

---

[32] https://www.apple.com/environment/pdf/Apple_Environmental_Progress_Report_2025.pdf, at 82.
[33] *See also, e.g.*, https://www.apple.com/environment/pdf/products/watch/Apple_Watch_Ultra_2_PER_Sept2024.pdf, at 12 (identifying the Apepu Project as a possible source of credits that Apple retires against Apple Watch Ultra 2 emissions); https://www.apple.com/environment/pdf/products/watch/Apple_Watch_SE_PER_Sept2024.pdf, at 12 (same for Apple Watch SE (second generation)).

2024. Apple also retired credits from this project against its product line emissions (and thus against the Products' emissions) in FY 2023.

73.    The Chyulu Project encompasses seven land ranch units, covering a total protected area of 410,533.84 hectares (Ha) in Southeastern Kenya.



*The image above shows the major cities, villages and towns in the Chyulu Project zone.*

74.     However, despite Apple's reliance on carbon credits from the Chyulu Project, the Project fails to meet the fundamental requirement of additionality because a significant portion of the project area, particularly the area responsible for carbon stock production, has been under legal protection since 1983. Specifically, about 18% (74,000 Ha) of the total project area lies within Chyulu Hills National Park, which was established as a national park in 1983 and has been managed by the Kenya Wildlife Service ever since.

75.     In Kenyan national parks, pursuant to the requisite authority, natural resources are fully protected, and only tourism and research activities are allowed. Since the park's establishment over forty years ago, deforestation and other environmentally harmful activities have been strictly prohibited by law.

76.     Significantly, while the Chyulu Hills National Park constitutes only 18% of the total project area, it contains the vast majority of the project's carbon-capturing capacity. Based on data collected by NASA, Google, and USGS, 27% of the wider project area has vegetation cover, totaling 111,000 Ha. Of this vegetated area, 58,000 Ha—or 52%—are within the boundaries of Chyulu Hills National Park.

//
//
//
//
//
//
//
//
//
//
//
//



*The satellite image above, overlaid with data from a global tree cover dataset, shows that 52% of the vegetated area of the project is located within the Chyulu Hills National Park.*[34]

77.    The concentration of carbon stock within the national park boundaries is further demonstrated by the project's own carbon stock measurements. The project area is separated into two Project Accounting Areas (PAAs): Grassland and Forested. According to these measurements, the cloud forest class contributes the highest carbon stock at 75%. The second most significant carbon stock contributor is the

<hr />

[34] Available at https://www.globalforestwatch.org/map/ (annotations added).

*Dib, et al. v. Apple Inc.*
FIRST AMENDED COMPLAINT

woodland/thicket class. Both of these high-value carbon stock areas are located predominantly or entirely within the national park boundaries.



*The image above is a map showing the Project area land cover.*

78.    Beyond the redundancy of claiming carbon credits for an already-protected area, the project's stated objectives of preventing deforestation and grassland conversion have not been achieved. According to

the project's most recent project verification report,[35] the project's efficacy is assessed with reference to the VM0009 REDD+ methodology. Under that methodology, the calculation of a project's carbon credit generation is based on the historic rate of deforestation and land conversion in the project area. Those historic rates serve as proxies for the baseline threat, estimating the extent of vegetation cover that would have been lost in the absence of the project. In other words, it defines how much carbon stock (biomass) the project is assumed to protect, forming the basis for calculating avoided emissions.

79.    Under the VM0009 methodology, land conversion risk is modeled using a function with two key parameters: α, which represents the combined effects influencing land conversion at the beginning of the historic reference period (intercept); and β, which captures the time-dependent effect on cumulative conversion (slope). These parameters are fitted to site-specific data for the project area. These inputs are used to model the likelihood of deforestation over time.

80.    The project reported the following parameter values for each vegetation type:[36]

| Parameter | Forest Project Accounting Area | Grassland Project Accounting Area |
|-----------|-------------------------------|-----------------------------------|
| α | -0.5673113 | -1.139118 |
| β | 0.0001032 | 0.0005784 |

81.    When these parameters are incorporated into the VM0009 deforestation risk function, the model estimates an average annual deforestation rate of 0.92% for forest areas and 4.27% for grassland areas. Based on the area sizes reported by the project, these rates imply an annual forested area loss of 2,443 Ha/year and an annual grassland area loss of 4,659 Ha/year. In short, the project claims that in the absence of its intervention, the project area would lose approximately 2,443 Ha of forest and 4,659 Ha of grassland per year.

82.    The Global Land Cover and Land Use v2 ("GLCLU") data set was used to assess this claim. The dataset is a high-resolution, time-series product based on Landsat satellite imagery. Landsat is widely used in scientific, environmental, policy, and commercial applications and is well known for its consistent

---

[35] Chyulu Hills REDD+ Project Verification Report, at 2 (Oct. 26, 2022), available at https://registry.verra.org/app/projectDetail/VCS/1408.
[36] Chyulu Hills REDD+ Project Description Report, at 110 (Sept. 9, 2016), available at https://registry.verra.org/app/projectDetail/VCS/1408.

*Dib, et al. v. Apple Inc.*
FIRST AMENDED COMPLAINT

and reliable data. GLCLU provides a 30-meter spatial resolution for annual land cover and land use classification data for the entire globe from 2000 to 2020.

83.    To ascertain the land cover dynamics within the project area, a spatial overlay analysis was conducted using GLCLU data for the years 2000 and 2015. The red outline in the image below indicates the project area as defined by the project documentation. By overlaying this boundary on the GLCLU layers for the selected years, the analysis identifies the types of land cover present in the project area at each point in time (with a 30-meter spatial resolution):



84.    A temporal land cover analysis was conducted within the project area to compare land cover conditions between 2000 and 2015. Specifically, it separated the project area into forest and grassland areas and calculated the historical land cover loss for each category.

85.    A pixel-by-pixel comparison between the 2000 and 2015 data for the forest areas revealed a total forest cover loss of 604.27 Ha between 2000 and 2015, implying an average annual deforestation rate of 40.28 Ha per year. In the visualization below, areas that experienced tree cover loss between 2000 and 2015 are represented by red pixels:

*Dib, et al. v. Apple Inc.*
FIRST AMENDED COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12



13   86.   The observed historical deforestation rate for forested areas in the project area is thus far less

14   than the project's claimed rate, which is the rate that forms the basis of the project's purported legitimacy

15   and efficacy. Indeed, a comparison of the claimed and observed rate of historical deforestation shows that

16   the claimed rate is ***over 60 times higher than the observed rate***.

17   87.   To assess the actual performance of the project during its operational phase, the same land

18   cover change analysis for forested areas was repeated for 2015-2020 (the years during which the project was

19   active and claimed to be protecting forested areas from deforestation). This analysis reveals not only that

20   there was no reduction in deforestation rates during that time, but that annual deforestation rates in forested

21   areas ***were even higher during the project reporting period*** compared to historical baselines.

22   88.   A similar pixel-by-pixel comparison between the 2000 and 2015 data for the grassland areas

23   within the project area was conducted. It revealed a total grassland cover loss of 6,164.81 Ha between 2000

24   and 2015, implying an average conversion rate of 410.98 Ha per year. In the visualization below, areas that

25   experienced grassland cover loss between 2000 and 2015 are represented by red pixels:

26
27
28



89.    The observed historical deforestation rate for grassland areas in the project area is thus far less than the project's claimed rate, which is the rate that forms the basis of the project's purported legitimacy and efficacy. Indeed, a comparison of the claimed and observed rate of historical conversion of grassland areas shows that the claimed rate is ***over 11 times higher than the observed rate***.

90.    To assess the actual performance of the project during its operational phase, the same land cover change analysis for grassland areas was repeated for 2015-2020 (the years during which the project was active and claimed to be protecting grassland areas from conversion). This analysis reveals not only that there was no reduction in conversion rates during that time, but that annual conversion rates in grassland areas ***were even higher during the project reporting period*** compared to historical baselines.

91.    In sum, the Chyulu Project fails to provide genuine carbon reductions that would not have occurred without the project. The stark disparities between the project's inflated baseline rates and the actual observed deforestation and conversion rates—both historically and during the project's operational period—

demonstrate that the project's credits do not represent real or additional emissions reductions. The land was never under the level of threat claimed by the project, and in fact, deforestation and conversion increased while the project was active. Because the credits are based on grossly exaggerated baselines and were issued despite a lack of measurable environmental benefit, they fail to meet the fundamental criteria of validity: real, additional, and verifiable impact. As a result, the credits are illegitimate and Apple's reliance on these credits to claim carbon neutrality renders those claims false and misleading.

**B.    The Guinan Project fails to provide genuine carbon reductions**

92.    The Guinan Project is a carbon offsetting initiative located in Qiannan Buyi and Miao Autonomous Prefecture, China. The project began in 2015 and is certified by Verra. The project's crediting period spans from 2016 to 2044. According to the project description report, it aims to increase carbon sequestration through tree planting, with a goal of generating greenhouse gas emission removals of 18,727,278 metric tons of $CO_2$ or equivalent greenhouse gasses over 29 years, an average annual removal of 645,768 tons.

93.    Like the Chyulu Project, Apple has been a significant customer of the Guinan Project. Apple retired hundreds of thousands of credits from this project against its corporate emissions in FY 2022, 2023, and 2024. Apple also retired credits from this project against its product line emissions (and thus against the Products' emissions) in FY 2023.

94.    According to the project's report, "46,000 ha of forest was planted on barren hill and degraded lands in Qiannan Autonomous Prefecture which is poor sustainable ecological environment and karst rocky desertification." The report further claims that "[a]ll project sites were previously barren lands with no natural

regeneration or reforestation prior to the project. The sites were entirely covered by barren hills and degraded lands."



*The image above shows the Guinan Project zones in blue. The areas are not contiguous.*

95.    To ascertain the land cover dynamics within the project area, a spatial overlay analysis was conducted using GLCLU data for the years 2010, 2015, and 2020. The red outline in the image below indicates the project area as defined by the project documentation. By overlaying this boundary on the

*Dib, et al. v. Apple Inc.*
FIRST AMENDED COMPLAINT

GLCLU layers for the selected years, the analysis identifies the types of land cover present in the project area at each point in time (with a 30-meter spatial resolution):



96.    The total area of the project is approximately 87,200 Ha. As of 2010, the area was comprised of 85.4% tree cover; 9.3% short vegetation; 1.3% cropland, and 4% water bodies and built-up areas. This alone undercuts the project's claim that it planted 46,000 Ha of trees, which is roughly half of the total project area, because the vast majority of the land in the project area was covered with trees before the project even began, leaving little room for extensive new planting.

97.    To further assess the validity of the project's afforestation claims, a temporal analysis of land cover within the project area was conducted using data from 2010 (pre-project baseline), 2015 (project initiation), and 2020 (post implementation). The maps below illustrate the extent of tree cover across the project area during these years; the accompanying table quantifies the total distribution of land cover type:

*Dib, et al. v. Apple Inc.*
FIRST AMENDED COMPLAINT



**Land Cover of the Project Area**

| Project Status | Year | Trees Area [ha] | Short Vegetation Area [ha] | Cropland Area [ha] |
|---|---|---|---|---|
| Pre-Project Baseline | 2010 | 74438.77 | 8102.57 | 1142.33 |
| Project Initiation Year | 2015 | 73881.85 | 8103.55 | 893.06 |
| Post-Implementation | 2020 | 71702.12 | 7092.54 | 888.37 |

98.    Contrary to the project's claims of planting over 46,000 Ha of trees, this analysis shows no observable increase in tree cover following the initiation of the project. Indeed, the data show a steady decline in tree-covered area over time. And short vegetation and cropland areas remained largely unchanged or slightly decreased, providing no indication of large-scale land use conversion to tree areas.

99.    Indeed, a focused spatial analysis that compared tree cover pixels across 2010, 2015, and 2020 demonstrated that not a single pixel in the 2020 dataset indicated new tree cover that had not already existed in 2015 or 2010. In other words, there was no detectable increase in tree cover anywhere in the project boundaries during the period when planting was reportedly being carried out. This strongly suggests that ***no new afforestation occurred***. In short, the project has resulted in ***no*** additional, legitimate carbon reductions.

100.    Indeed, on November 27, 2024, Verra publicly announced that it was "opening a new review" of the Guinan Project, explaining that it had "received stakeholder comments about the project and deem[ed the comments] to warrant further investigation."[37] Verra also suspended "any further credit issuance from the project."[38] Verra's suspension of credit issuance from an existing project is a major intervention that

---

[37] Available at https://registry.verra.org/app/projectDetail/VCS/2070.
[38] *Id.*

signals serious integrity concerns. Verra's actions underscore the Guinan Project's inefficacy and the falsity of Apple's "carbon neutral" representations.

101.    In sum, for the reasons explained above, Guinan Project fails to provide the necessary additional greenhouse gas removals for true carbon offsetting. Thus, Apple's reliance on these credits to claim carbon neutrality is misleading to consumers.

### C.    The Apepu Project fails to provide adequate genuine carbon reductions

102.    The Apepu Project is a carbon offsetting initiative based in Paraguay. The project claims to generate carbon credits by planting eucalyptus trees, which sequester carbon and are harvested for timber. Eucalyptus trees are grown in rotational cycles of 10 to 13 years, after which they are harvested for use in the timber industry and replanted. According to the project documentation, the initiative operates under the UNFCCC ARR framework and is currently undergoing validation by Verra's Climate, Community & Biodiversity (CCB) Program. The project's crediting reporting period spans from 2019 to 2039.

103.    As discussed above, according to Apple's 2025 Environmental Progress Report, Apple retired 73,093 credits (2021 vintage) from the Apepu Project against its corporate and product line emissions for FY 2024.[39]

104.    The Apepu Project's 2024 monitoring report claims that between 2019 and 2021, the project planted 2,370 Ha of trees, which resulted in carbon reductions that correspond to 71,636 carbon credits.[40] However, a high-resolution geospatial analysis using the Esri Sentinel-2 Land Use/Land Cover data set contradicts this claim. The Sentinel-2 data set provides 10-meter spatial resolution global land cover classifications derived from Sentinel-2 satellite imagery, which offers detailed insights into land use patterns.[41] The Sentinel-2 data set enables high-resolution monitoring of land use and land coverage change.

105.    Below is a spatial overlay analysis of the claimed boundaries of the Apepu Project using Esri Sentinel-2 data for the years 2019 and 2024:




106.    To assess the validity of the Apepu Project's claims, a temporal analysis of land cover within the project boundaries was conducted using satellite-based raster data from 2019 (the project initiation year) and 2024 (post implementation). The analysis is based on high-resolution (10-meter) land cover data, with each pixel classified into one of two categories: tree cover (represented in white) and non-tree cover (represented in black). This binary classification allows for a clear comparison of the extent of the tree cover between the two years.

107.    This pixel-by-pixel comparison identifies areas where land cover has changed over time. Specifically, new white pixels on the 2024 map, when compared to the 2019 map, indicate areas where tree cover has increased. The maps below demonstrate the extent of tree cover in 2019 and 2024, respectively, as well as the net gain in forested areas over the five-year period:



108.    This analysis demonstrates that only 277.68 Ha of new tree cover has been generated within the project area between 2019 and 2024. However, as noted above, the project claims to have planted 2,370.5 Ha of trees—an overstatement of approximately 754% compared to the observed increase. The Apepu Project thus could not have generated 71,636 genuine carbon credits since its inception. Thus, Apple's reliance on 73,093 credits from this project (2021 vintage) to claim product line carbon neutrality renders its carbon neutrality representations false and misleading.

**D.    The Arbaro Project fails to provide adequate genuine carbon reductions**

109.    Like the Apepu Project, the Arbaro Project is a carbon offsetting initiative based in Paraguay that claims to generate carbon credits by planting eucalyptus trees, which sequester carbon and are harvested for timber. The Arbaro Project's crediting period spans from 2019 to 2039.

110.    According to Apple's 2025 Environmental Progress Report, Apple retired 78,507 credits (2019, 2020, 2021, and 2022 vintages) from the Arbaro Project against its corporate and product line emissions for FY 2024.[42]

111.    The Arbaro Project's 2024 monitoring report claims that between 2015 and 2022, the project planted 4,259 Ha of trees and resulted in carbon reductions that correspond to 369,052 carbon credits.[43] However, a temporal-spatial overlay analysis performed between two industry-leading data sets contradicts this claim. Specifically, the analysis was conducted using the Sentinel-2 data set discussed above, which comprises data from 2017-2024, and the GLCLU data set, which comprises data through 2020. A combined methodological approach was necessary to capture the full temporal scope of the project and analyze pre-intervention baselines to current outcomes.

112.    To ensure analytical coherence, both datasets were cross validated for 2020, a point at which the datasets overlap. This cross-validation exercise revealed a negligible 1% discrepancy in total reported tree cover between the two sources, confirming a high degree of alignment and validation that it is appropriate to conduct an analysis on the integrated datasets. This methodology enables a robust end-to-end assessment of the project's impact over the full 2015-2024 period.

113.    To quantify the extent of tree coverage change within the project boundaries, a Python-based geospatial analysis was conducted using satellite-derived land cover datasets pictured below. The image on the left depicts GLCLU data of the project area from 2015; the image on the right depicts Sentinel-2 data of the project area from 2024.

 

---

[42] https://www.apple.com/environment/pdf/Apple_Environmental_Progress_Report_2025.pdf, at 83.
[43] Afforestation in cooperation with local landowners for Forestal San Pedro S.A. (Monitoring Report) at 3 (Oct. 9, 2024), available at https://registry.verra.org/app/projectDetail/VCS/2361.

114.    The analysis demonstrated that in 2015, there was approximately 7,911 Ha of tree coverage within the project area, and in 2024, there was approximately 10,931 Ha of tree coverage within the project area. In other words, there was a total observable increase of approximately 3,020 Ha of tree cover within the project area between 2015 and 2024.

115.    However, as discussed above, the project claims to have resulted in an increase of 4,259 Ha in tree coverage during that same period and issued carbon credits based on that magnitude of purported increase. In other words, the project's self-reported planting figures overstated the level of tree planting (and thus carbon reductions) by nearly 41%. This overstatement renders the credits that Apple retired from this project against its product line emissions for FY 2024 illegitimate. Thus, Apple's reliance on 78,507 credits from this project (2019, 2020, 2021, and 2022 vintages) to claim product line carbon neutrality renders its carbon neutrality representations false and misleading.

**E.    Apple Did Not Retire Sufficient Credits in FY 2024 to Render the Products Carbon Neutral**

116.    Irrespective of whether the carbon credits that Apple retired in FY 2024 to offset the Products' emissions were legitimate (they were not), Apple's carbon neutrality claims are false and misleading for an additional and independent reason: Apple did not retire enough carbon credits in FY 2024 to offset the emissions for the Products sold in that year.

117.    According to Apple's product environmental reports, the estimated carbon emissions requiring offsetting per Product is as follows: Apple Watch Ultra 2 - 12 kg $CO_2e$;[44] Apple Watch Series 9 - 8.1 kg $CO_2e$;[45] and Apple Watch SE - 7.2 kg $CO_2e$.[46]

118.    One carbon credit represents the reduction or removal of one metric ton (1,000 kg) of $CO_2$ from the atmosphere. For its FY 2024, Apple retired 70,300 carbon credits to offset product line emissions. This corresponds to 70,300,000 kilograms of $CO_2$.

119.    Taking a conservative approach and assuming that the average emissions requiring offsetting for each watch sold in FY 2024 was 8.1 kg $CO_2e$, then Apple's FY 2024 product line retirements would be sufficient to offset the emissions of approximately 8.68 million Apple Watches.

---

[44] https://www.apple.com/environment/pdf/products/watch/Apple_Watch_Ultra_2_PER_Sept2024.pdf.
[45] https://www.apple.com/environment/pdf/products/watch/Carbon_Neutral_Apple_Watch_Series_9_PER_Sept2023.pdf.
[46] https://www.apple.com/environment/pdf/products/watch/Apple_Watch_SE_PER_Sept2024.pdf.

120.    However, third party reporting indicates that Apple sold approximately 34 million Apple Watch units globally in 2024.[47]  Taking an extremely conservative approach and assuming that purportedly carbon neutral Products accounted for only 30% of total Apple Watch sales in FY 2024, Apple did not retire sufficient credits to offset the emissions associated with the Products. This discrepancy renders Apple's statements that the Products are carbon neutral false and misleading.

**VI.    Apple's Carbon Neutrality Claims Are False and Misleading, and Plaintiffs and the Class Members Were Harmed By Relying On Them**

121.    Apple's claims that its Apple Watch Series 9, Apple Watch SE, and Apple Watch Ultra 2 are "carbon neutral" are false and misleading. As discussed, Apple retired illegitimate credits from ineffective projects against the Products' emissions in FY 2023 and 2024. It also did not retire enough credits in FY 2024 to fully offset its product line emissions for that year. Apple's claims that it has achieved carbon neutrality for corporate emissions also are false and misleading for similar reasons: Apple relied on illegitimate credits to offset its corporate carbon emissions, meaning that Apple is, in truth, not a carbon neutral company as to its corporate emissions.

122.    Apple cannot hide behind Verra's certification of these projects. As established by 16 C.F.R. § 260.6(c), third-party certification does not eliminate a marketer's obligation to ensure that it has substantiation for all claims reasonably communicated by the certification. Apple, which guarantees that the projects it invests in produce "high-quality carbon credits," should have independently verified that these projects meet the fundamental requirement of additionality. As demonstrated above, information available in the public domain demonstrates that each of the four projects at issue have serious integrity concerns and do not produce legitimate carbon credits. By claiming carbon neutrality based on these ineffective and redundant offset projects, Apple is misleading consumers about the true environmental impact of its corporate footprint and its products.

123.    Apple's Product-specific and corporate carbon neutral misrepresentations are material to consumers and drive consumers' (and Plaintiffs') purchasing decisions. As detailed above, research shows that approximately 70% of consumers consider environmental sustainability a crucial factor in their

---

[47] https://www.coolest-gadgets.com/apple-watches-statistics/#google_vignette (36 to 38 million);
https://www.fastcompany.com/91305794/the-apple-watch-faces-a-wearables-wake-up-call (34 million).

purchasing decisions and are willing to pay premium prices—on average 35% more—for products they believe are sustainable, and that products with environmental, social and governmental related marketing outperformed those without such marketing by 8% annually. Apple has capitalized on this consumer preference by prominently marketing the Products as "carbon neutral," using this purported achievement as a key differentiation point in its marketing and charging premium prices for these products. This harm extends beyond product-level deception: Apple's claims of corporate carbon neutrality also misled consumers (and Plaintiffs) into believing they were supporting a company with genuinely net-zero corporate operations, further influencing purchasing decisions, brand loyalty, and willingness to pay a premium.

124.    Apple's deceptive marketing practices also distort the marketplace and impair consumer choice. Consumers seeking to support environmentally responsible companies are deprived of the opportunity to make informed decisions about their purchases, as Apple's false advertising leads them to choose its products over genuinely sustainable alternatives.

125.    At the time of purchase, each Plaintiff had viewed and was aware of Apple's representations that the Products were "carbon neutral." These representations led each Plaintiff to believe that the Products were, in truth, "carbon neutral." Each Plaintiff relied on Apple's representations that the Products were "carbon neutral" when making their purchasing decisions, and those representations played a substantial part in each Plaintiff's decision to purchase the Products.

126.    Consumers who purchased the Products, including each Plaintiff, suffered economic injury because Apple's false "carbon neutral" claims deprived them of the ability to make informed purchasing decisions in the smartwatch market. These consumers paid a price premium for products they believed were "carbon neutral" but instead received products whose claimed carbon neutrality relies on ineffective and redundant offset projects that fail to provide genuine environmental benefits. Indeed, each Plaintiff would not have purchased the Products or would not have paid as much for the Products had Plaintiffs known that Apple's Product-specific "carbon neutral" representations were false.

127.    As a result of Apple's false and misleading claims, consumers who purchased the Products, including each Plaintiff, suffered economic injury in multiple ways. Significantly, these consumers paid a price premium for products they believed were "carbon neutral" but instead received products whose claimed carbon neutrality relies on ineffective and redundant offset projects that fail to provide genuine environmental

benefits. In other words, consumers did not receive the benefit of their bargain—they paid for watches with meaningful carbon neutrality but received watches without this promised environmental benefit.

128.    Moreover, Apple has been unjustly enriched by its deceptive conduct. The company has benefited from increased sales and revenue by marketing these Apple Watch models as "carbon neutral," capitalizing on consumer demand for sustainable products while failing to deliver the environmental benefits it promised.

129.    At the time of purchase, each Plaintiff had viewed and was aware of Apple's representations that it was carbon neutral as to its corporate emissions. These representations led Plaintiffs to believe that Apple was, in truth, "carbon neutral" with respect to corporate emissions. Each Plaintiff relied on these representations when making his or her purchasing decisions, and those representations played a substantial part in their decisions to purchase Apple products.

130.    As a result of Apple's false and misleading representations regarding its corporate carbon neutrality, consumers, including each Plaintiff, suffered economic injury in several ways. Chief among these is that consumers were led to believe that Apple had achieved genuine carbon neutrality across its corporate operations when in fact Apple's claimed neutrality was largely dependent on low-quality or duplicative carbon offset projects that failed to deliver real, additional environmental benefits. This misrepresentation deprived consumers of the benefit of their bargain: they purchased Apple products in reliance on Apple's corporate sustainability claims, believing they were supporting a company with truly carbon-neutral operations, when they were not. Indeed, each Plaintiff would not have purchased the Products or would not have paid as much for the Products had Plaintiffs known that Apple's corporate carbon neutral representations were false.

131.    Furthermore, Apple has been unjustly enriched through its deceptive portrayal of corporate carbon neutrality. By promoting its entire corporate enterprise as environmentally responsible and carbon neutral, Apple has cultivated a brand image that appeals to environmentally conscious consumers, thereby boosting consumer goodwill, loyalty, and sales across its product lines. This reputational benefit, and the resulting increase in revenue, was obtained not through meaningful environmental achievement, but through misleading marketing that masked the company's continued reliance on ineffective offset strategies rather than actual emissions reductions.

1

**EQUITABLE RELIEF**

2      132.    Plaintiffs have set forth alternate claims for damages and equitable relief. Plaintiffs do not

3   have an adequate remedy at law with respect to future harm caused by Apple's conduct as alleged herein.

4      133.    Absent an equitable injunction enjoining Apple's conduct alleged herein, Plaintiffs, Class

5   members, and the public will be irreparably harmed and denied an effective and complete remedy because

6   they face a real and tangible threat of future harm emanating from Apple's ongoing conduct that cannot be

7   remedied with monetary damages.

8      134.    Plaintiffs do not know at this juncture whether Plaintiffs' damages claims will survive through

9   trial, whether the Court will accept a model for legal damages for past harm that Plaintiffs will proffer at the

10   appropriate time, or whether the Court will find that any such damages model adequately compensates

11   Plaintiffs and the Class for their past losses.

12      135.    Plaintiffs continue to have use for the Products. Yet, they do not and cannot know if Apple's

13   advertising is accurate and truthful. If the Court were to enjoin Apple from making the misrepresentations

14   described herein, Plaintiffs would want to purchase the Products in the future. Without an injunction,

15   Plaintiffs cannot trust Apple's marketing claims and would not purchase the Products again.

16      136.    Moreover, damages alone would not prevent Apple from continuing to make false and

17   misleading claims about its products. No amount of money can rectify the harm caused to future purchasers.

18

**CLASS ALLEGATIONS**

19      137.    Plaintiffs bring this action as a class action on behalf of themselves and all others similarly

20   situated as members of the Classes defined as follows:

21          a.   **Nationwide Watch Subclass:**  All persons in the United States who, within the

22              applicable statute of limitations period(s), purchased any of the following Apple

23              Watch models: Apple Watch Series 9, Apple Watch SE (2nd generation), or Apple

24              Watch Ultra 2, for purposes other than resale.

25          b.   **California Watch Subclass:**  All residents of California who, within the applicable

26              statute of limitations period(s), purchased any of the following Apple Watch models:

27              Apple Watch Series 9, Apple Watch SE (2nd generation), or Apple Watch Ultra 2, for

28              purposes other than resale.

c.  **Florida Watch Subclass:**  All residents of Florida who, within the applicable statute of limitations period(s) purchased any of the following Apple Watch models: Apple Watch Series 9, Apple Watch SE (2nd generation), or Apple Watch Ultra 2, for purposes other than resale.

d.  **Washington, D.C. Watch Subclass:**  All residents of Washington, D.C. who, within the applicable statute of limitations period(s) purchased any of the following Apple Watch models: Apple Watch Series 9, Apple Watch SE (2nd generation), or Apple Watch Ultra 2, for purposes other than resale.

e.  **Nationwide Corporate Emissions Subclass:**  All persons in the United States who, within the applicable statute of limitations period(s), purchased any Apple product for purposes other than resale in reliance on Apple's corporate carbon neutrality representations.

f.  **California Corporate Emissions Subclass:**  All residents of California who, within the applicable statute of limitations period(s), purchased any Apple product for purposes other than resale in reliance on Apple's corporate carbon neutrality representations.

g.  **Florida Corporate Emissions Subclass:**  All residents of Florida who, within the applicable statute of limitations period(s), purchased any Apple product for purposes other than resale in reliance on Apple's corporate carbon neutrality representations.

h.  **Washington, D.C. Corporate Emissions Subclass:**  All residents of Washington, D.C. who, within the applicable statute of limitations period(s), purchased any Apple product for purposes other than resale in reliance on Apple's corporate carbon neutrality representations.

138.    Unless otherwise noted, the Nationwide Watch Subclass, California Watch Subclass, Florida Watch Subclass, and Washington, D.C. Watch Subclass are collectively referred to as the "Watch Class." The Nationwide Corporate Emissions Subclass, California Corporate Emissions Subclass, Florida Corporate Emissions Subclass, and Washington, D.C. Corporate Emissions Subclass are collectively referred to as the "Corporate Emissions Class" (together with the Watch Class, the "Classes").

139.    Excluded from the Classes are (a) Apple, its affiliates, and its employees; (b) persons who purchased or acquired the Products for resale; (c) Plaintiffs' counsel and Defendant's counsel; and (d) the judge and staff of the court assigned to this case, as well as any appellate court judges and staff assigned to any appeal in this matter, and their immediate family members.

140.    Plaintiffs reserve the right to modify or amend the definitions of the proposed Classes, including by adding subclasses, before the Court determines whether certification is appropriate.

141.    **Numerosity (Fed. R. Civ. P 23(a)(1)).** The Classes are so numerous that joinder of all members is impracticable. While the exact number of Class members is currently unknown to Plaintiffs, it is expected to include hundreds of thousands of members.

142.    **Commonality (Fed. R. Civ. P. 23(a)(2)).** Common questions of law and fact exist as to all members of the Classes and predominate over any questions solely affecting individual Class members. These common questions include:

a.    Whether Apple's representations that the Products are "carbon neutral" are false, misleading, or reasonably likely to deceive;

b.    Whether Apple's representations that it achieved corporate level carbon neutrality are false, misleading, or reasonably likely to deceive;

c.    Whether Apple failed to adequately validate the additionality of its carbon offset projects;

d.    Whether Apple engaged in deceptive or unfair business practices by marketing the Products as "carbon neutral";

e.    Whether Apple engaged in deceptive or unfair business practices by marketing itself as company with carbon neutral corporate emissions;

f.    Whether Apple's carbon offset projects discussed above provide genuine carbon reductions;

g.    Whether and to what extent Apple's conduct caused Watch Class members to pay price premiums for the Products;

h.    Whether and to what extent Apple's conduct caused Corporate Emissions Class members to pay price premiums for Apple products;

i.   Whether Apple's conduct violates consumer protection laws;

j.   Whether Class members are entitled to damages, restitution, restitutionary disgorgement, equitable relief, or other relief; and

k.   The amount and nature of such relief to be awarded to Plaintiffs and the Class.

143.   Plaintiffs and the members of the Classes have a commonality of interest in the subject matter of the lawsuit and remedies sought.

144.   **Typicality (Fed. R. Civ. P. 23(a)(3)).** Plaintiffs' claims are typical of the claims of the members of the Classes. The members of the Watch Class relied on and were misled by same representations when they purchased the Products. The members of the Corporate Emissions class relied on and were misled by the same representations when they purchased Apple products.

145.   **Injunctive and/or declaratory relief (Fed. R. Civ. P. 23(b)(2)).** As demonstrated above, Apple has acted on grounds generally applicable to the Classes such that final injunctive relief is appropriate with respect to the Classes as a whole.

146.   **Fair and adequate representation (Fed. R. Civ. P. 23(a)(4))**. Plaintiffs will fairly and adequately protect the interests of the members of the Classes. Plaintiffs have retained competent counsel experienced in class action litigation in state and federal courts nationwide, and Plaintiffs have no interest adverse to any member of the Classes. Plaintiffs intend to prosecute this case vigorously on behalf of themselves and the Classes.

147.   **Predominance and superiority (Fed. R. Civ. P. 23(b)(3)).** Common questions of law and fact predominate over any questions affecting only individual members, and a class action is superior to other methods for the fair and efficient adjudication of the controversy because:

a.   Proof of Apple's liability on Plaintiffs' claims will also prove liability for the claims of the Classes without the need for separate or individualized proceedings;

b.   Evidence regarding defenses or any exceptions to liability that Apple may assert and attempt to prove will come from Apple's records and will not require individualized or separate inquiries or proceedings;

c.   Apple has acted and is continuing to act pursuant to common practices in the same or similar manner with respect to all members of the Classes;

d.   The injury suffered by each member of the Classes, while meaningful on an individual basis, is not of such magnitude as to make the prosecution of individual actions against Apple economically feasible. Even if members of the Classes could afford individual litigation, those actions would put immeasurable strain on the court system. A class action, on the other hand, will permit a large number of claims involving virtually identical facts and legal issues to be resolved efficiently in one proceeding based upon common proofs, without the risk of inconsistent judgments; and

e.   This case is inherently manageable as a class action in that:

   i.    Liability and damages can be established for Plaintiffs and the Classes with the same common proofs;

   ii.   A class action will result in an orderly and expeditious administration of claims and it will foster economics of time, effort, and expense;

   iii.  A class action will contribute to uniformity of decisions concerning Apple's practices; and

   iv.   As a practical matter, the claims of the Classes are likely to go unaddressed absent class certification.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Violation of California's Consumers Legal Remedies Act Cal. Civ. Code §§ 1750, *et seq.***

**(on behalf of the California Watch Subclass and Nationwide Watch Subclass)**

148.   Plaintiffs incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

149.   The California Consumers Legal Remedies Act ("CLRA") prohibits "unfair methods of competition and unfair or deceptive acts or practices [...] undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770(a).

150.   The Products are "goods" within the meaning of Cal. Civ. Code § 1761(a).

151.   Apple is a "person" within the meaning of Cal. Civ. Code § 1761(c).

152.   Plaintiffs and Class members are "consumers" within the meaning of Cal. Civ. Code § 1761(d).

153.   Apple violated and continues to violate the CLRA by engaging in the following practices proscribed by Cal. Civ. Code § 1770(a) in transactions with Plaintiffs and Class members which were intended to result in, and did result in, the sale of the Products:

       a.   Representing that the Products have characteristics, benefits, or qualities that they do not have (§ 1770(a)(5));

       b.   Representing that the Products are of a particular standard, quality, or grade when they are of another (§ 1770(a)(7)); and

       c.   Advertising goods with intent not to sell them as advertised (§ 1770(a)(9)).

154.   Apple's unfair or deceptive acts and practices were capable of deceiving a substantial portion of the purchasing public.

155.   Apple's representations and omissions were material because they were likely to deceive reasonable consumers about the true nature of the Products' environmental impact. Specifically, Apple represented the Products as "carbon neutral" when in fact the carbon offset projects Apple relies on fail to provide genuine additional or legitimate carbon reductions. As a result, Apple lacks adequate substantiation for its carbon neutrality claims.

156.   Apple's uniform and material representations and omissions regarding the Products were likely to deceive, and Apple knew or should have known that its representations and omissions were untrue and misleading.

157.   Plaintiffs and members of the Class could not have reasonably avoided such injury. Plaintiffs and members of the Class were unaware of the existence of the facts that Apple suppressed and/or failed to disclose, and they would not have purchased the Products and/or would have purchased them on different terms had they known the truth.

158.   Plaintiffs and the Class members suffered harm as a result of Defendant's violations because they relied on the carbon neutral claim in deciding to purchase the Product. The carbon neutral claim was a substantial factor in the purchasing decisions of Plaintiffs and the Class members. The carbon neutral claim

was material because a reasonable consumer would consider it important in deciding whether to purchase the Product.

159. As a direct and proximate result of Apple's violations, Plaintiffs and members of the Class have suffered harm in that they purchased Products they would not have purchased or paid significantly more than they would have paid had they known the truth about Apple's representations.

160. Plaintiffs, on behalf of themselves and all class members, demand judgment against Apple under the CLRA for injunctive and monetary relief.

161. Pursuant to Cal. Civ. Code § 1782(a), on January 17, 2025, Plaintiffs mailed Apple a notice of its alleged violations of the CLRA by certified mail return receipt requested. Plaintiffs' counsel received a return receipt indicating that Apple received the CLRA notice on February 3, 2025. The form, content, and delivery of the CLRA notice satisfy § 1782(a)(1) and (2). The notice of violations and demand for remedial action, as of the filing of this First Amended Complaint, did not result in adequate correction, repair, replacement, and/or other remedy by Apple, including all remedial action set forth in the notice letter and as set forth under § 1782(c). Plaintiffs file this First Amended Complaint more than 30 days after the date that Apple received the CLRA notice.

162. As a direct and proximate result of Apple's violations, Plaintiffs and members of the Class have suffered harm in that they purchased Products they would not have purchased or paid significantly more than they would have paid had they known the truth about Apple's representations. Further, Plaintiffs and members of the Class have suffered and continue to suffer economic losses and other damages including, but not limited to, the amounts paid for the Products, and any interest that would have accrued on those monies, in an amount to be proven at trial. Accordingly, Plaintiffs seek a monetary award for violation of this Act in the form of damages, restitution, disgorgement of ill-gotten gains to compensate Plaintiffs and the Class for said monies.

163. Given that Apple's conduct violated California Civil Code § 1780, Plaintiffs and members of the Class are entitled to seek, and do hereby seek, injunctive relief to put an end to Apple's violations. Plaintiffs have no adequate remedy at law. Without equitable relief, Apple's unfair and deceptive practices will continue to harm Plaintiff and the Class.

*Dib, et al. v. Apple Inc.*
FIRST AMENDED COMPLAINT

164.    Apple's conduct was malicious, fraudulent, and wanton. Apple intentionally and recklessly misled consumers to increase sales of its Products while knowing its carbon neutral claims were not adequately substantiated, warranting an award of punitive damages as permitted by law. Specifically, Apple's conduct was malicious in that Apple deliberately and knowingly misled consumers about the Products' carbon neutrality for its own financial gain. Apple had access to detailed data about the offset projects, including satellite imagery and carbon stock measurements, which demonstrated these projects did not provide genuine carbon reductions, yet proceeded with its deceptive marketing campaign. Apple's conduct was oppressive as it exploited consumers' growing environmental concerns through a sophisticated greenwashing campaign that took advantage of consumers' inability to independently verify carbon neutrality claims. Apple's conduct was fraudulent as Apple intentionally misrepresented material facts about the Products' environmental impact while having actual or constructive knowledge that the four projects did not produce legitimate carbon credits.

**SECOND CAUSE OF ACTION**

**Violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, e*t seq.***

**(on behalf of the California Watch Subclass and Nationwide Watch Subclass)**

165.    Plaintiffs incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

166.    Plaintiffs have standing to pursue this claim because they have suffered injury in fact and have lost money or property as a result of Apple's actions as described herein. Plaintiffs and Class members overpaid for the Products due to Apple's misrepresentations and omissions about their carbon neutrality. Apple's acts and practices alleged herein constitute unlawful, unfair, and fraudulent business practices in violation of the California's Unfair Competition Law ("UCL"). Cal. Bus. & Prof. Code §§ 17200, *et seq*.

167.    Apple's conduct is unlawful because it violates the CLRA and Federal Trade Commission regulations regarding environmental marketing claims, including 16 C.F.R. § 260.4 (prohibiting unqualified general environmental benefit claims) and § 260.5 (requiring competent and reliable scientific evidence for carbon offset claims).

168.    Apple's conduct is unfair because it offends established public policy and is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers. The harm caused by Apple's

46

conduct outweighs any possible utility of such conduct. Additionally, Apple's conduct was "unfair" because it violated public policy as declared by specific constitutional, statutory or regulatory provisions, including the CLRA and FTC regulations.

169.    Apple's conduct is fraudulent because its representations about the Products' carbon neutrality are likely to deceive reasonable consumers. A reasonable consumer would not expect that Apple's carbon neutral claims rely on offset projects that fail to provide genuine environmental benefits.

170.    Apple's misrepresentations were material because reasonable consumers consider environmental impact when making purchasing decisions, and Apple's deceptive carbon neutral claims were prominently featured in marketing the Products.

171.    As a direct and proximate result of Apple's violations, Plaintiffs and Class members have suffered injury in fact and lost money by purchasing Products they would not have purchased or by paying price premiums they would not have paid had they known the truth.

172.    Plaintiffs seek an injunction enjoining Apple from engaging in the unlawful conduct alleged in this claim and requiring it to fully disclose the truth about the carbon neutrality of the Products, to discontinue their sale with the deceptive and misleading claims, and other appropriate equitable relief, including but not limited to improving its carbon neutrality disclosures. Without adequate disclosures of the Products' true carbon neutrality, continued marketing and sale of the Products are nearly certain to deceive Plaintiffs and Class members.

173.    Plaintiffs and the Class also seek restitution of all money and property lost as a result of Apple's acts in violation of the UCL.

**THIRD CAUSE OF ACTION**

**Violation of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 *et seq.***

**(on behalf of the Florida Watch Subclass)**

174.    Plaintiffs incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

175.    Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 *et seq.* (FDUTPTA) prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).

176.    The stated purpose of FDUTPA is to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2).

177.    At all relevant times, Apple engaged in trade or commerce in the State of Florida and offered for sale, sold, and distributed the Products within the State of Florida, subjecting it to the provisions of FDUTPA. Apple's conduct occurred in the course of trade or commerce within the meaning of Fla. Stat. § 501.203(8).

178.    Plaintiffs and Class members are "consumers" within the meaning of Fla. Stat. § 501.203(7).

179.    Apple engaged in unfair or deceptive practices in the conduct of trade or commerce, including but not limited Apple violated FDUTPA by engaging in unfair or deceptive practices, including falsely representing the Products as "carbon neutral" when in fact they were not.

180.    Apple's unfair or deceptive acts and practices were likely to mislead a reasonable consumer. A reasonable consumer would understand Apple's representations as meaning that the Products have a carbon neutral footprint. They do not.

181.    Apple's representations and omissions were material because they were likely to deceive reasonable consumers about the true nature of the Products' environmental impact. Specifically, Apple represented the Products as "carbon neutral" when in fact the carbon offset projects Apple relies on fail to provide genuine additional or legitimate carbon reductions. As a result, Apple lacks adequate substantiation for its carbon neutrality claims.

182.    Apple's representations regarding the Products were likely to deceive, and Apple knew or should have known that its representations were untrue and misleading.

183.    Plaintiffs and members of the Class could not have reasonably avoided such injury. Plaintiffs and members of the Class were unaware of the existence of the facts that Apple suppressed and/or failed to disclose, and they would not have purchased the Products and/or would have purchased them on different terms had they known the truth.

184.    Plaintiffs and the Class members suffered harm as a result of Defendant's violations because they relied on the carbon neutral claim in deciding to purchase the Product. The carbon neutral claim was a substantial factor in the purchasing decisions of Plaintiffs and the Class members. The carbon neutral claim

was material because a reasonable consumer would consider it important in deciding whether to purchase the Product.

185. As a direct and proximate result of Apple's violations, Plaintiffs and members of the Class have suffered harm in that they purchased Products they would not have purchased or paid significantly more than they would have paid had they known the truth about Apple's representations. Further, Plaintiffs and members of the Class have suffered and continue to suffer economic losses and other damages including, but not limited to, the amounts paid for the Products, and any interest that would have accrued on those monies, in an amount to be proven at trial. Accordingly, Plaintiffs seek a monetary award for violation of this Act in the form of damages, restitution, disgorgement of ill-gotten gains to compensate Plaintiffs and the Class for said monies.

186. Plaintiffs and members of the Class are entitled to seek, and do hereby seek, injunctive relief to put an end to Apple's violations. Plaintiffs have no adequate remedy at law. Without equitable relief, Apple's unfair and deceptive practices will continue to harm Plaintiff and the Class.

187. Apple's conduct was malicious, fraudulent, and wanton. Apple intentionally and recklessly misled consumers to increase sales of its Products while knowing its carbon neutral claims were not adequately substantiated, warranting an award of punitive damages as permitted by law. Specifically, Apple's conduct was malicious in that Apple deliberately and knowingly misled consumers about the Products' carbon neutrality for its own financial gain. Apple had access to detailed data about the offset projects, including satellite imagery and carbon stock measurements, which demonstrated these projects did not provide genuine carbon reductions, yet proceeded with its deceptive marketing campaign. Apple's conduct was oppressive as it exploited consumers' growing environmental concerns through a sophisticated greenwashing campaign that took advantage of consumers' inability to independently verify carbon neutrality claims. Apple's conduct was fraudulent as Apple intentionally misrepresented material facts about the Products' environmental impact while having actual or constructive knowledge that the four projects did not produce legitimate carbon credits.

**FOURTH CAUSE OF ACTION**

**Violation of the District of Columbia's Consumer Protection Procedures Act**

**(on behalf of the Washington, D.C. Watch Subclass)**

188.    Plaintiffs incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

189.    The District of Columbia Consumer Protection Procedures Act ("DCCPPA") prohibits unfair or deceptive trade practices in connection with the offer, sale, or supply of consumer goods or services. D.C. Code § 28-3904.

190.    The Products are "goods" within the meaning of D.C. Code § 28-3901(a)(7).

191.    Apple is a "merchant" within the meaning of D.C. Code § 28-3901(a)(3).

192.    Plaintiffs and Class members are "consumers" within the meaning of D.C. Code § 28-3901(a)(2).

193.    Apple violated the DCCPPA by engaging in the following unfair or deceptive trade practices:

    a.  Representing that the Products have characteristics, benefits, or qualities that they do not have (§ 28-3904(a));

    b.  Representing that the Products are of a particular standard, quality, or grade when they are of another (§ 28-3904(d)); and

    c.  Making misrepresentations as to a material fact about the Products which has a tendency to mislead (§ 28-3904(e)).

    d.  Advertising the Products without the intent to sell them as advertised (§ 28-3904(h)).

194.    Apple's unfair or deceptive acts or practices were capable of deceiving a substantial portion of the purchasing public.

195.    Apple's representations were material because they were likely to deceive reasonable consumers about the true nature of the Products' environmental impact.

196.    Apple knew or should have known that its representations and omissions were untrue and misleading

197.    Plaintiffs and Class members reasonably relied on Apple's carbon neutrality claims in making their purchasing decisions. Had they known the truth, they would not have purchased the Products or would have paid significantly less.

198.    As a direct and proximate result of Apple's violations, Plaintiffs and members of the Class have suffered harm in that they purchased Products they would not have purchased or paid significantly more than they would have paid had they known the truth about Apple's representations. Further, Plaintiffs and members of the Class have suffered and continue to suffer economic losses and other damages including, but not limited to, the amounts paid for the Products, and any interest that would have accrued on those monies, in an amount to be proven at trial. Accordingly, Plaintiffs seek a monetary award for violation of this Act in the form of damages, restitution, disgorgement of ill-gotten gains to compensate Plaintiffs and the Class for said monies. Plaintiffs also seek the greater of either statutory or treble damages pursuant to D.C. Code § 28-3905(k)(1).

199.    Apple's conduct was intentional, reckless, and willful, justifying the imposition of punitive damages to deter future misconduct.

## FIFTH CAUSE OF ACTION

### Breach of Express Warranty

### (on behalf of the California Watch Subclass and Nationwide Watch Subclass)

200.    Plaintiffs incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

201.    Apple provided an express warranty that the Products are "carbon neutral," meaning they result in no net addition of carbon dioxide to the atmosphere.

202.    This warranty became part of the basis of the bargain between Plaintiffs and Class members and Apple.

203.    Apple breached this warranty because the Products are not carbon neutral. Specifically: the Products' manufacturing process continues to generate carbon emissions; the carbon offset projects Apple relies on do not provide genuine, additional carbon reductions.

204.    As a direct and proximate result of Apple's breach, Plaintiffs and Class members have been damaged in the amount of the purchase price of the Products and/or the price premium they paid.

51

**SIXTH CAUSE OF ACTION**

**Breach of Implied Warranty**

**(on behalf of the California Watch Subclass and Nationwide Watch Subclass)**

205.    Plaintiffs incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

206.    Apple, as the designer, manufacturer, marketer, distributor, and/or seller of the Products, impliedly warranted that the Products are carbon neutral.

207.    Apple breached the warranty implied in the contract for the sale of the Products because the Products did not conform to Apple's representations that the Products they designed, manufactured, marketed, and/or sold are carbon neutral.

208.    Plaintiffs and Class Members purchased the Products in reliance upon Apple's implied warranties of fitness for the Products' purpose.

209.    The Products were not altered by Plaintiffs and Class Members. The Products were defective when they left the exclusive control of Apple.

210.    Apple knew that the Products would be purchased and used without additional testing by Plaintiffs and Class Members.

211.    The Products were unfit for their intended purpose, and Plaintiffs and Class Members did not receive the goods as warranted.

212.    As a direct and proximate cause of Apple's breach of the implied warranty, Plaintiff and Class Members have been injured and harmed because they would not have purchased the Products on the same terms if they knew that the Products were not carbon neutral, and the Products do not have the characteristics, uses, or benefits as promised by Apple.

213.    Plaintiffs and Class Members have been damaged in the amount of the purchase price of the Products and/or the price of the premium they paid.

**SEVENTH CAUSE OF ACTION**

**Unjust Enrichment / Quasi-Contract**

**(on behalf of the California Watch Subclass and Nationwide Watch Class)**

214.    Plaintiffs incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

215.    By purchasing the Products, Plaintiffs and Class members conferred a benefit on Apple in the form of the purchase price of the Products.

216.    Apple knowingly and willingly accepted and enjoyed these benefits.

217.    Apple's retention of these benefits is inequitable and unjust because Apple obtained them by misrepresenting the Products' environmental impact and deceiving Plaintiffs and Class members into believing they were purchasing carbon neutral products.

218.    Apple has been unjustly enriched by retaining the revenues derived from Plaintiffs' and Class members' purchases of the Products. Retention of those monies under these circumstances is unjust and inequitable because Apple misrepresented the nature of the Products.

219.    Apple's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged in this complaint.

220.    As a direct and proximate result of Apple's unjust enrichment, Plaintiffs and Class members are entitled to restitution or restitutionary disgorgement in an amount to be proven at trial.

**SEVENTH CAUSE OF ACTION**

**Violation of California's Consumers Legal Remedies Act Cal. Civ. Code §§ 1750, *et seq.***

**(on behalf of the California Corporate Emissions Subclass**

**and Nationwide Corporate Emissions Subclass)**

221.    Plaintiffs incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

222.    The California Consumers Legal Remedies Act ("CLRA") prohibits "unfair methods of competition and unfair or deceptive acts or practices [...] undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770(a).

223.    Apple's products are "goods" within the meaning of Cal. Civ. Code § 1761(a).

224.    Apple is a "person" within the meaning of Cal. Civ. Code § 1761(c).

225.    Plaintiffs and Class members are "consumers" within the meaning of Cal. Civ. Code § 1761(d).

226.    Apple violated and continues to violate the CLRA by engaging in the following practices proscribed by Cal. Civ. Code § 1770(a) in transactions with Plaintiffs and Class members which were intended to result in, and did result in, the sale of Apple products:

      a.    Representing that Apple products have characteristics, benefits, or qualities that they do not have (§ 1770(a)(5));

      b.    Representing that Apple products are of a particular standard, quality, or grade when they are of another (§ 1770(a)(7)); and

      c.    Advertising goods with intent not to sell them as advertised (§ 1770(a)(9)).

227.    Apple's unfair or deceptive acts and practices were capable of deceiving a substantial portion of the purchasing public.

228.    Apple's representations and omissions were material because they were likely to deceive reasonable consumers about the true nature of the environmental impact of Apple products. Specifically, Apple represented that consumers were purchasing products from a company with carbon neutral corporate emissions, when in fact the projects on which Apple relies on fail to provide genuine additional or legitimate carbon reductions.

229.    Apple's uniform and material representations and omissions regarding its corporate emissions were likely to deceive, and Apple knew or should have known that its representations and omissions were untrue and misleading.

230.    Plaintiffs and members of the Class could not have reasonably avoided such injury. Plaintiffs and members of the Class were unaware of the existence of the facts that Apple suppressed and/or failed to disclose, and they would not have purchased the Products and/or would have purchased them on different terms had they known the truth.

231.    Plaintiffs and the Class members suffered harm as a result of Defendant's violations because they relied on the carbon neutral claim in deciding to purchase Apple products. The carbon neutral claim was a substantial factor in the purchasing decisions of Plaintiffs and the Class members. The carbon neutral claim

was material because a reasonable consumer would consider it important in deciding whether to purchase Apple Products.

232.    As a direct and proximate result of Apple's violations, Plaintiffs and members of the Class have suffered harm in that they purchased Apple products they would not have purchased or paid significantly more than they would have paid had they known the truth about Apple's representations.

233.    Plaintiffs, on behalf of themselves and all class members, demand judgment against Apple under the CLRA for injunctive and monetary relief.

234.    Pursuant to Cal. Civ. Code § 1782(a), on January 17, 2025, Plaintiffs mailed Apple a notice of its alleged violations of the CLRA by certified mail return receipt requested. Plaintiffs' counsel received a return receipt indicating that Apple received the CLRA notice on February 3, 2025. The form, content, and delivery of the CLRA notice satisfy § 1782(a)(1) and (2). Specifically, that notice discussed Apple's reliance on the Chyulu Hills and Guinan projects and the illegitimate nature of the credits that Apple retired from those projects. The notice of violations and demand for remedial action, as of the filing of this First Amended Complaint, did not result in adequate correction, repair, replacement, and/or other remedy by Apple, including all remedial action set forth in the notice letter and as set forth under § 1782(c). Plaintiffs file this First Amended Complaint more than 30 days after the date that Apple received the CLRA notice.

235.    As a direct and proximate result of Apple's violations, Plaintiffs and members of the Class have suffered harm in that they purchased Apple products they would not have purchased or paid significantly more than they would have paid had they known the truth about Apple's representations. Further, Plaintiffs and members of the Class have suffered and continue to suffer economic losses and other damages including, but not limited to, the amounts paid for Apple products, and any interest that would have accrued on those monies, in an amount to be proven at trial. Accordingly, Plaintiffs seek a monetary award for violation of this Act in the form of damages, restitution, disgorgement of ill-gotten gains to compensate Plaintiffs and the Class for said monies.

236.    Given that Apple's conduct violated California Civil Code § 1780, Plaintiffs and members of the Class are entitled to seek, and do hereby seek, injunctive relief to put an end to Apple's violations. Plaintiffs have no adequate remedy at law. Without equitable relief, Apple's unfair and deceptive practices will continue to harm Plaintiff and the Class.

237.    Apple's conduct was malicious, fraudulent, and wanton. Apple intentionally and recklessly misled consumers to increase sales of its products while knowing its carbon neutral claims were not adequately substantiated, warranting an award of punitive damages as permitted by law. Specifically, Apple's conduct was malicious in that Apple deliberately and knowingly misled consumers about its corporate carbon neutrality for its own financial gain. Apple had access to detailed data about the offset projects, including satellite imagery and carbon stock measurements, which demonstrated these projects did not provide genuine carbon reductions, yet proceeded with its deceptive marketing campaign. Apple's conduct was oppressive as it exploited consumers' growing environmental concerns through a sophisticated greenwashing campaign that took advantage of consumers' inability to independently verify carbon neutrality claims. Apple's conduct was fraudulent as Apple intentionally misrepresented material facts about the Products' environmental impact while having actual or constructive knowledge that the projects did not produce legitimate carbon credits.

**EIGHTH CAUSE OF ACTION**

**Violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, e*t seq.***

**(on behalf of the California Corporate Emissions Subclass**

**and Nationwide Corporate Emissions Subclass)**

238.    Plaintiffs incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

239.    Plaintiffs have standing to pursue this claim because they have suffered injury in fact and have lost money or property as a result of Apple's actions as described herein. Plaintiffs and Class members overpaid for Apple products due to Apple's misrepresentations and omissions about their corporate carbon neutrality. Apple's acts and practices alleged herein constitute unlawful, unfair, and fraudulent business practices in violation of the California's Unfair Competition Law ("UCL"). Cal. Bus. & Prof. Code §§ 17200, *et seq*.

240.    Apple's conduct is unlawful because it violates the CLRA and Federal Trade Commission regulations regarding environmental marketing claims, including 16 C.F.R. § 260.4 (prohibiting unqualified general environmental benefit claims) and § 260.5 (requiring competent and reliable scientific evidence for carbon offset claims).

241.    Apple's conduct is unfair because it offends established public policy and is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers. The harm caused by Apple's conduct outweighs any possible utility of such conduct. Additionally, Apple's conduct was "unfair" because it violated public policy as declared by specific constitutional, statutory or regulatory provisions, including the CLRA and FTC regulations.

242.    Apple's conduct is fraudulent because its representations about its corporate carbon neutrality are likely to deceive reasonable consumers. A reasonable consumer would not expect that Apple's carbon neutral claims rely on offset projects that fail to provide genuine environmental benefits.

243.    Apple's misrepresentations were material because reasonable consumers consider environmental impact when making purchasing decisions, and Apple's deceptive carbon neutral claims were prominently featured in marketing materials.

244.    As a direct and proximate result of Apple's violations, Plaintiffs and Class members have suffered injury in fact and lost money by purchasing Apple products they would not have purchased or by paying price premiums they would not have paid had they known the truth.

245.    Plaintiffs seek an injunction enjoining Apple from engaging in the unlawful conduct alleged in this claim and requiring it to fully disclose the truth about the carbon neutrality of its corporate emissions, to discontinue their sale with the deceptive and misleading claims, and other appropriate equitable relief, including but not limited to improving its carbon neutrality disclosures. Without adequate disclosures of Apple's true carbon neutrality, continued marketing and sale of Apple products are nearly certain to deceive Plaintiffs and Class members.

246.    Plaintiffs and the Class also seek restitution of all money and property lost as a result of Apple's acts in violation of the UCL.

### NINTH CAUSE OF ACTION

**Violation of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 *et seq.***

**(on behalf of the Florida Corporate Emissions Subclass)**

247.    Plaintiffs incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

248.     Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 *et seq.* (FDUTPTA) prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).

249.     The stated purpose of FDUTPA is to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2).

250.     At all relevant times, Apple engaged in trade or commerce in the State of Florida and offered for sale, sold, and distributed Apple products within the State of Florida, subjecting it to the provisions of FDUTPA. Apple's conduct occurred in the course of trade or commerce within the meaning of Fla. Stat. § 501.203(8).

251.     Plaintiffs and Class members are "consumers" within the meaning of Fla. Stat. § 501.203(7).

252.     Apple engaged in unfair or deceptive practices in the conduct of trade or commerce by falsely representing that it was carbon neutral as to corporate emissions when in fact it was not.

253.     Apple's unfair or deceptive acts and practices were likely to mislead a reasonable consumer. A reasonable consumer would understand Apple's representations as meaning that Apple, as a company, has a corporate-level carbon neutral footprint. It does not.

254.     Apple's representations and omissions were material because they were likely to deceive reasonable consumers about the true nature of Apple product's environmental impact. Specifically, Apple represented that it was a carbon neutral company when in fact the carbon offset projects Apple relies on fail to provide genuine additional or legitimate carbon reductions. As a result, Apple lacks adequate substantiation for its carbon neutrality claims.

255.     Apple's representations were likely to deceive, and Apple knew or should have known that its representations were untrue and misleading.

256.     Plaintiffs and members of the Class could not have reasonably avoided such injury. Plaintiffs and members of the Class were unaware of the existence of the facts that Apple suppressed and/or failed to disclose, and they would not have purchased Apple products and/or would have purchased them on different terms had they known the truth.

*Dib, et al. v. Apple Inc.*
FIRST AMENDED COMPLAINT

257.   Plaintiffs and the Class members suffered harm as a result of Apple's violations because they relied on the carbon neutral claim in deciding to purchase Apple products. The carbon neutral claim was a substantial factor in the purchasing decisions of Plaintiffs and the Class members. The carbon neutral claim was material because a reasonable consumer would consider it important in deciding whether to purchase Apple products.

258.   As a direct and proximate result of Apple's violations, Plaintiffs and members of the Class have suffered harm in that they purchased Apple products they would not have purchased or paid significantly more than they would have paid had they known the truth about Apple's representations. Further, Plaintiffs and members of the Class have suffered and continue to suffer economic losses and other damages including, but not limited to, the amounts paid for Apple products, and any interest that would have accrued on those monies, in an amount to be proven at trial. Accordingly, Plaintiffs seek a monetary award for violation of this Act in the form of damages, restitution, disgorgement of ill-gotten gains to compensate Plaintiffs and the Class for said monies.

259.   Plaintiffs and members of the Class are entitled to seek, and do hereby seek, injunctive relief to put an end to Apple's violations. Plaintiffs have no adequate remedy at law. Without equitable relief, Apple's unfair and deceptive practices will continue to harm Plaintiff and the Class.

260.   Apple's conduct was malicious, fraudulent, and wanton. Apple intentionally and recklessly misled consumers to increase sales of its products while knowing its carbon neutral claims were not adequately substantiated, warranting an award of punitive damages as permitted by law. Specifically, Apple's conduct was malicious in that Apple deliberately and knowingly misled consumers about its corporate carbon neutrality for its own financial gain. Apple had access to detailed data about the offset projects, including satellite imagery and carbon stock measurements, which demonstrated these projects did not provide genuine carbon reductions, yet proceeded with its deceptive marketing campaign. Apple's conduct was oppressive as it exploited consumers' growing environmental concerns through a sophisticated greenwashing campaign that took advantage of consumers' inability to independently verify carbon neutrality claims. Apple's conduct was fraudulent as Apple intentionally misrepresented material facts about the Products' environmental impact while having actual or constructive knowledge that the projects did not produce legitimate carbon credits.

**TENTH CAUSE OF ACTION**

**Violation of the District of Columbia's Consumer Protection Procedures Act**

**(on behalf of the Washington, D.C. Corporate Emissions Subclass)**

261.    The District of Columbia Consumer Protection Procedures Act ("DCCPPA") prohibits unfair or deceptive trade practices in connection with the offer, sale, or supply of consumer goods or services. D.C. Code § 28-3904.

262.    Apple products are "goods" within the meaning of D.C. Code § 28-3901(a)(7).

263.    Apple is a "merchant" within the meaning of D.C. Code § 28-3901(a)(3).

264.    Plaintiffs and Class members are "consumers" within the meaning of D.C. Code § 28-3901(a)(2).

265.    Apple violated the DCCPPA by engaging in the following unfair or deceptive trade practices:

      a.    Representing that its products have characteristics, benefits, or qualities that they do not have (§ 28-3904(a));

      b.    Representing that its products are of a particular standard, quality, or grade when they are of another (§ 28-3904(d));

      c.    Making misrepresentations as to a material fact about its products and itself as a company which have a tendency to mislead (§ 28-3904(e));

      d.    Using innuendo or ambiguity as to a material fact about its products and itself as a company which have a tendency to mislead (§ 28-3904(f-1));

      e.    Advertising its products without the intent to sell them as advertised (§ 28-3904(h)).

266.    Apple's unfair or deceptive acts or practices were capable of deceiving a substantial portion of the purchasing public.

267.    Apple's representations were material because they were likely to deceive reasonable consumers about the true nature of the Apple and its products' environmental impacts.

268.    Apple knew or should have known that its representations and omissions were untrue and misleading

269.    Plaintiffs and Class members reasonably relied on Apple's carbon neutrality claims in making their purchasing decisions. Had they known the truth, they would not have purchased Apple products or would have paid significantly less.

270.    As a direct and proximate result of Apple's violations, Plaintiffs and members of the Class have suffered harm in that they purchased Apple products they would not have purchased or paid significantly more than they would have paid had they known the truth about Apple's representations. Further, Plaintiffs and members of the Class have suffered and continue to suffer economic losses and other damages including, but not limited to, the amounts paid for Apple products, and any interest that would have accrued on those monies, in an amount to be proven at trial. Accordingly, Plaintiffs seek a monetary award for violation of this Act in the form of damages, restitution, disgorgement of ill-gotten gains to compensate Plaintiffs and the Class for said monies. Plaintiffs also seek the greater of either statutory or treble damages pursuant to D.C. Code § 28-3905(k)(1).

271.    Apple's conduct was intentional, reckless, and willful, justifying the imposition of punitive damages to deter future misconduct.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs individually and on behalf of all other similarly situated persons, demand judgment in their favor and against Defendant Apple Inc. as follows:

a. Certifying this case as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3), and appoint Plaintiffs as class representatives and their counsel as Class counsel.

b. Entering judgment against Apple and in favor of Plaintiffs and the Classes on all counts.

c. Declaring Apple's conduct to be unlawful.

d. Awarding Plaintiffs and Class members compensatory, statutory, treble, and punitive to which Plaintiffs and Class members are entitled, to be determined by this Court and/or jury.

e. Granting an order of restitution and all other forms of equitable monetary relief.

f.  Granting an order enjoining Apple from labeling, advertising, or packaging the Products as "carbon neutral" as alleged herein.

g.  Granting an order enjoining Apple from advertising itself as carbon neutral as to its corporate emissions.

h.  Awarding Plaintiffs and the Classes their reasonable attorney's fees, expenses and costs of filing and prosecuting this action.

i.  Awarding such other and further relief as this Court deems appropriate and just.

### JURY DEMAND

272.    Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: May 19, 2025                      */s/ Amber L. Schubert*

Amber L. Schubert (No. 278696)
**SCHUBERT JONCKHEER & KOLBE LLP**
2001 Union Street, Suite 200
San Francisco, CA 94123
Tel: (415) 788-4220
Fax: (415) 788-0161
aschubert@sjk.law

Fletch Trammell (TX Bar No. 24042053)
*Pro hac vice*
**TRAMMELL PC**
3262 Westheimer, #423
Houston, TX 77098
Tel: (800) 405-1740
Fax: (800) 532-0992
fletch@trammellpc.com

Don Bivens (AZ Bar No. 005134)
*Pro hac vice forthcoming*
Teresita T. Mercado (AZ Bar No. 020578)
*Pro hac vice forthcoming*
**DON BIVENS, PLLC**
15169 N. Scottsdale Road, Suite 205
Scottsdale, AZ, 85254
Tel: (602) 762-2661
don@donbivens.com
teresita@donbivens.com

***Counsel for Plaintiffs***

*Dib, et al. v. Apple Inc.*
FIRST AMENDED COMPLAINT