KEVIN POLONCARZ (State Bar No. 211434)
TIMOTHY DUNCHEON (State Bar No. 338184)
JULIA BARRERO (State Bar No. 352614)
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, California 94105-2533
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
Email: kpoloncarz@cov.com

SARAH HARRINGTON (*Pro hac vice*)
LAURA KIM (*Pro hac vice*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202) 662-6000
Facsimile: (202) 208-9100
Email: sharrington@cov.com

Counsel for Proposed *Amicus Curiae*
Environmental Defense Fund

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| OTHMANE DIB, JESUS GUERRERO, LUCA DELA CRUZ, JEANETTE PORILLO, PETER GHANEM, RITA CRANE, NATHANIEL SANSOM, FRANK NUÑEZ, and RANY WARDA, individually and as the representatives of a class of similarly situated persons,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>APPLE INC., a California corporation,<br><br>　　Defendant. | Civil Case No.: 5:25-cv-02043-NW-NMC<br><br>**[PROPOSED] *AMICUS CURIAE* BRIEF OF ENVIRONMENTAL DEFENSE FUND IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**<br><br>Motion Hearing Date: November 12, 2025<br>Time: 9:00 AM<br>Judge: Hon. Noël Wise<br>Location: Courtroom 3 – 5th Floor |

[PROPOSED] *AMICUS CURIAE* BRIEF OF ENVIRONMENTAL
DEFENSE FUND IN SUPPORT OF DEFENDANT'S MOTION TO
DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT

Case No. 5:25-cv-02043-NW-NMC

**TABLE OF CONTENTS**

INTRODUCTION & INTEREST OF *AMICUS CURIAE*...........................................................1

ARGUMENT...............................................................................................................3

I.     High-Quality Carbon Offsets Are a Key Tool for Addressing the Climate Crisis ...........3

        A.    Corporate Climate Action is Essential to Mitigating Global Emissions...............3

        B.    Carbon Credits Play a Key Role in Corporate Climate Action............................5

        C.    Apple's Approach to Reducing Its Emissions Follows Corporate Best Practices..7

II.    Apple Lawfully Substantiates Its Carbon-Neutral Claims And May Rely on
     Project Documents Provided by the Carbon Crediting Body To Do So........................10

CONCLUSION...........................................................................................................18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Whiteside v. Kimberly Clark Corp.*,
 108 F.4th 771 (9th Cir. 2024) ........................................................................ 10

**Statutes**

Cal. Bus. & Prof. Code § 17580.5(b)(1) ........................................................... 10

**Regulations & Policy Statements**

16 C.F.R. § 260.2 ............................................................ 10, 11, 12, 14, 16, 17

16 C.F.R. § 260.5(a) .......................................................................... 13, 15

16 C.F.R. § 260.6 ............................................................................... 14, 16

Commission Guidance Regarding the Listing of Voluntary Carbon Credit Derivative
 Contracts, 89 Fed. Reg. 83,378 (Oct. 15, 2024) ........................................... 6

FTC Policy Statement Regarding Advertising Substantiation, appended to *Thompson
 Medical Co.*, 104 FTC 648, 839 (1984), *aff'd*, 791 F.2d 189 (D.C. Cir. 1986) .............. 10, 14

FTC, Green Guides, Statement of Basis and Purpose,
 https://www.ftc.gov/sites/default/files/attachments/press-releases/ftc-issues-revised-
 green-guides/greenguidesstatement.pdf ........................................................ 13

**Other Authorities**

Apple, 2023 Environmental Progress Report (FY 2022),
 https://www.apple.com/environment/pdf/Apple_Environmental_Progress_Report_20
 23.pdf ............................................................................................ 8, 9

Deloitte, Deloitte research reveals inaction on climate change could cost the world's
 economy US $178 trillion by 2070, May 23, 2022,
 https://www.deloitte.com/global/en/about/press-room/deloitte-research-reveals-
 inaction-on-climate-change-could-cost-the-world-economy-us-dollar-178-trillion-by-
 2070.html ............................................................................................ 5

Env't. Def. Fund, Major NGOs Unveil Updated Guidance for Companies Navigating
 Tropical Forest Carbon Credit Market, Feb. 9, 2023,
 https://www.edf.org/media/major-ngos-unveil-updated-guidance-companies-
 navigating-tropical-forest-carbon-credit-market ........................................... 1, 15

[PROPOSED] *AMICUS CURIAE* BRIEF OF ENVIRONMENTAL
DEFENSE FUND IN SUPPORT OF DEFENDANT'S MOTION TO
DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT

Case No. 5:25-cv-02043-NW-NMC

Env't. Def. Fund & ENGIE Impact, Mobilizing Voluntary Carbon Markets to Drive Climate Action: Recommendations, Mar. 2021, https://library.edf.org/AssetLink/a08x10w3a7x8p5vloow5tyb2w7c01s34.pdf ...................... 1

Env't. Def. Fund et al., Joint Open Letter on the Use of High-Quality Carbon Credits in Scope 3 Emissions Abatement, June 18, 2024, https://www.nature.org/content/dam/tnc/nature/en/documents/joint-letter-to-sbti-on-carbon-credits-for-scope-3.pdf ................ 2

Env't. Prot. Agency, Sources of Greenhouse Gas Emissions, https://www.epa.gov/ghgemissions/sources-greenhouse-gas-emissions.............................. 4

Fred Krupp, *Climate Advocates Must Use the Market*, WALL ST. J., Apr. 21, 2024.................... 5

HSBC and CDP, Strengthening the chain: Industry insights to accelerate sustainable supply chain transformation, Oct. 2024, https://cdn.cdp.net/cdp-production/cms/reports/documents/000/007/890/original/CDP_HSBC_Report_2024.pdf ........ 4

Int'l Energy Agency, World Investment 2024: Overview and key findings, https://www.iea.org/reports/world-energy-investment-2024/overview-and-key-findings.............................................................................. 4

Int'l Org. for Standardization, Net Zero Guidelines, https://www.iso.org/netzero...................... 7

Intergovernmental Panel on Climate Change, Climate Change 2022: Mitigation of Climate Change Frequently Asked Questions, https://www.ipcc.ch/report/ar6/wg3/downloads/report/IPCC_AR6_WGIII_FAQs_Compiled.pdf ...... 5

Integrity Council for the Voluntary Carbon Market, Core Carbon Principles, Assessment Framework and Assessment Procedure Version 1.1, Jan. 2024, https://icvcm.org/wp-content/uploads/2024/02/CCP-Book-V1.1-FINAL-LowRes-15May24.pdf.......................... 6

Nat. Res. Def. Council, Greenhouse Effect 101, June 5, 2023, https://www.nrdc.org/stories/greenhouse-effect-101#gases .................................................. 4

Net Zero Tracker, https://zerotracker.net/ ................................................................................ 8

Science Based Targets initiative ("SBTi"), The Corporate Net-Zero Standard Version 1.2, Mar. 2024, https://sciencebasedtargets.org/resources/files/Net-Zero-Standard-Criteria.pdf ...................................... 7

Science Based Targets initiative ("SBTi"), Target Dashboard, https://sciencebasedtargets.org/target-dashboard .................................................................... 8

Trove Research, Corporate Emission Performance and the Use of Carbon Credits, June 1, 2023, https://www.msci.com/www/research-report/corporate-emission-performance/04624149658................................................. 6

United Nations, Integrity Matters: Net Zero Emissions Commitments by Businesses,
Financial Institutions, Cities and Regions, Nov. 2022,
https://www.un.org/sites/un2.un.org/files/high-levelexpertgroupupdate7.pdf ........................ 7

Verra, Program Guide v.4.4, Aug. 29, 2023, https://verra.org/wp-
content/uploads/2023/08/VCS-Program-Guide-v4.4.pdf ............................................. 12, 14

Verra, VCS Standard v.4.7, Apr. 16, 2024, https://verra.org/wp-
content/uploads/2024/04/VCS-Standard-v4.7-FINAL-4.15.24.pdf .................................... 12

iv

1

## INTRODUCTION & INTEREST OF *AMICUS CURIAE*

Environmental Defense Fund ("EDF") is a nonprofit organization headquartered in New York City that links science, economics, and the law to create innovative, equitable and cost-effective solutions to urgent environmental problems.  EDF is one of the world's largest environmental organizations with hundreds of thousands of members across the United States and a staff of over 1,000 scientists, economists, policy experts, lawyers and other professionals from around the world.  EDF's core missions include protecting public health and the environment and stabilizing the climate.  EDF does not accept gifts from companies with whom it works or that are involved or impacted by EDF's U.S. advocacy or litigation, nor does EDF invest or otherwise have a financial interest in carbon credits, carbon crediting projects or markets.

Given the imperative need for near-term emission reductions, ambitious corporate action is critically important to addressing the climate crisis.  In the view of EDF and other major environmental nonprofit organizations, corporate strategies to reduce emissions should prioritize internal decarbonization efforts and take into account the entire value chain.  Alongside deep operational and value chain decarbonization, high-quality carbon credits purchased on the voluntary carbon market enable companies to take immediate, economically feasible climate action.[1]  High-quality credits can achieve meaningful emissions reductions and counterbalance (or "offset") a corporation's remaining emissions as it progresses toward achieving emissions reduction targets.  Stakeholders in the voluntary carbon market are engaged in developing robust methodologies, paired with stringent information-gathering and verification processes, to ensure that responsible corporate buyers have access to quality credits.  These guardrails

---

[1] *See, e.g.*, Env't. Def. Fund & ENGIE Impact, Mobilizing Voluntary Carbon Markets to Drive Climate Action: Recommendations 7, Mar. 2021, available at https://library.edf.org/AssetLink/a08x10w3a7x8p5vloow5tyb2w7c01s34.pdf ("The vital and growing role of the voluntary carbon markets in delivering emissions reductions, avoidance and removals should be recognized, enabled and accelerated."); Env't. Def. Fund, Major NGOs Unveil Updated Guidance for Companies Navigating Tropical Forest Carbon Credit Market, Feb. 9, 2023, available at https://www.edf.org/media/major-ngos-unveil-updated-guidance-companies-navigating-tropical-forest-carbon-credit-market ("Combined with companies' emissions reductions and complementary actions, the voluntary market can play an important part in helping to limit global warming to 1.5 degrees Celsius.") (hereinafter "Tropical Forest Guidance").

1    help distinguish the high-integrity carbon credits that EDF supports from projects that claim dubious

2    environmental benefits.

3        Accordingly, EDF routinely encourages its corporate partners to engage in behavior like that of

4    Apple, which has undertaken significant efforts to first reduce its emissions internally and then purchase

5    and retire carbon credits to address remaining emissions.  EDF and other leading environmental

6    organizations have repeatedly expressed public support for practices similar to those deployed by Apple.[2]

7        Unfortunately, misguided and unfounded greenwashing litigation increasingly targets companies

8    that make legitimate environmental claims based on justifiable, good-faith emission reduction strategies.

9    Such litigation can chill corporate action.  At best, companies may not publicize their sustainability efforts,

10   foregoing opportunities to inspire broader action and generate private sector momentum and diminishing

11   employee excitement to align their company operations with climate goals.  At worst, companies that fear

12   legal action may not invest in decarbonization and climate mitigation at all.

13       Apple complied with consumer protection law here because it had a reasonable basis to

14   substantiate all reasonable consumer interpretations of its carbon-neutral claims.  To substantiate its

15   claims, Apple first reduced its own emissions, by an impressive 75% or more depending on the Apple

16   Watch model, and then purchased carbon credits to offset remaining emissions.  In purchasing those

17   credits, Apple—like many carbon credit buyers—relied in significant part on the methodology and

18   procedural architecture deployed by carbon-crediting nonprofit organizations that list projects, issue

19   credits, and operate a registry to document their issuance, ownership and retirement.

20       Such organizations have developed carbon crediting methodologies built on science-based

21   principles to assess and quantify the reductions or removals achieved by a project and the criteria necessary

22   to demonstrate that the resulting reductions or removals are additional and permanent.  Before issuing

23   credits, registries also require that a third-party independent auditor produce monitoring, validation, and

24   verification reports confirming that a project complies with the applicable methodology.  Finally, they

25

26   [2] *See generally* Env't. Def. Fund et al., Joint Open Letter on the Use of High-Quality Carbon Credits in
     Scope 3 Emissions Abatement, June 18, 2024, available at

27   https://www.nature.org/content/dam/tnc/nature/en/documents/joint-letter-to-sbti-on-carbon-credits-for-
     scope-3.pdf.

28

[PROPOSED] *AMICUS CURIAE* BRIEF OF ENVIRONMENTAL                    Case No. 5:25-cv-02043-NW-NMC
DEFENSE FUND IN SUPPORT OF DEFENDANT'S MOTION TO
DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT

require that some credits be remitted to a buffer pool of credits to ensure that, if it is later determined that some issued credits do not correspond to real reductions, there are enough carbon credits to cover the deficit. This architecture helps to ensure that responsible corporate buyers can rely on the legitimacy of documents, reports, and materials evidencing these processes made available by carbon credit issuing bodies to substantiate the validity of the carbon credits they purchase.

Plaintiffs contend that Apple lacked a reasonable basis to substantiate its corporate and product-specific carbon neutral claims because *Plaintiffs'* preferred method of substantiation differs from Apple's. As a matter of law, this argument fails. Marketers must ensure claims are supported by a reasonable basis before they make their claims, and the Green Guides allow marketers flexibility in selecting the sources of evidence used for such substantiation. Here, Apple relied on numerous publicly available audits based on science-backed methodologies confirming that the projects in question generated verified offsets or removals. Thus, Apple possessed a reasonable basis when it made its carbon neutral claims. Plaintiffs do not allege that Apple was aware of any deficiencies in the evidence it relied upon at the time when the claims were made. Accordingly, Apple's carbon neutral claims are lawful notwithstanding Plaintiffs' alternative carbon credit calculations.

Plaintiffs' view that Apple was required to independently research and verify the carbon reduction associated with each purchased credit also misapplies the law. Because few companies have the resources or expertise to engage in comprehensive (and duplicative) investigation of every offset project, Plaintiffs' legal theory would chill corporate action to mitigate climate change. It would also disincentivize companies from making claims about the actions they are taking, potentially resulting in *harm* to the environment and *less* information for consumers. Apple's motion to dismiss should be granted.

## ARGUMENT

### I.    High-Quality Carbon Offsets Are a Key Tool for Addressing the Climate Crisis

#### A.    Corporate Climate Action is Essential to Mitigating Global Emissions

Global warming—which destabilizes our climate and leads to more frequent extreme weather events such as fires, floods, severe storms, heat waves, droughts, and sea level rise—results from the

release of greenhouse gas emissions into the atmosphere.[3]  Greenhouse gases include carbon dioxide ($CO_2$), methane ($CH_4$), and nitrous oxide ($N_2O$).  Human activities, particularly the burning of fossil fuels, emit more greenhouse gases—especially carbon dioxide—than can be sustainably absorbed by the Earth.[4]  Slowing the release of carbon dioxide into the atmosphere, so that the amount of carbon dioxide emitted equals the amount that can be absorbed, will help to restabilize the climate.  Experts use the term "net zero" to refer to a global state in which the emissions rate of human-caused (or "anthropogenic") greenhouse gases equals the planet's rate of anthropogenic carbon uptake.

Achieving a "net zero" world requires bold corporate climate action—and soon.  The next five to ten years will determine whether our planet will hurtle toward increasingly catastrophic damage from climate change or maintain the climate that humans have enjoyed for the last 125,000 years.  The world's largest corporations have the influence and resources to help stabilize emissions, including by supporting investment in lower-emission energy sources.  Private companies drive 48% of energy investment decisions, representing a larger impact than either governments or households.[5]  And while some may believe that climate action squanders corporate resources, in fact, the opposite is true.  A 2024 report from HSBC and global environmental nonprofit CDP found that businesses have saved $13.6 billion in costs by working with their suppliers to reduce emissions in their value chains (referred to as "Scope 3 emissions").[6]  In fact, climate inaction could cost $178 trillion in global economic value by 2070, while

---

[3] Env't. Prot. Agency, Sources of Greenhouse Gas Emissions, available at https://www.epa.gov/ghgemissions/sources-greenhouse-gas-emissions (last accessed July 16, 2025).

[4] Nat. Res. Def. Council, Greenhouse Effect 101, June 5, 2023, available at https://www.nrdc.org/stories/greenhouse-effect-101#gases.

[5] Int'l Energy Agency, World Investment 2024: Overview and key findings, available at https://www.iea.org/reports/world-energy-investment-2024/overview-and-key-findings (last accessed July 16, 2025).

[6] HSBC and CDP, Strengthening the chain: Industry insights to accelerate sustainable supply chain transformation 5–6, Oct. 2024, available at https://cdn.cdp.net/cdp-production/cms/reports/documents/000/007/890/original/CDP_HSBC_Report_2024.pdf.

immediate action could *add* $43 trillion to the world's economy.[7]  The private sector increasingly recognizes the significant business risk that climate change poses to operations and value chains, as well as the potential business value of climate action from supply chain resilience, sale of climate-friendly products, and workforce retention (among other benefits).  Businesses are responding to this risk and opportunity by setting voluntary climate targets, disclosing greenhouse gas emissions, engaging suppliers, developing transition plans, and making investments in low-carbon solutions.  Both businesses and society at large are better off when businesses take a lead role in climate action rather than sitting on the sidelines.

**B.    Carbon Credits Play a Key Role in Corporate Climate Action**

Carbon credits represent an important piece in the corporate climate action equation.  Climate action has a cost.[8]  For hundreds of years, society has been developing systems and technologies that rely on fossil fuels.  Shifting to new lower-emission approaches, with the goal of matching the Earth's rate of carbon absorption, is urgent and necessary—but will take time and vast investment.  Policies that can help to reduce emissions quickly at low costs are therefore critical tools to have in our arsenal.

Verified carbon credits have been recognized by the world's leading climate experts as one such cost-effective tool.[9]  While carbon credits should be a complement to—not a replacement for—deep emissions reductions, these tools can help smooth and accelerate the global net zero transition and drive critical private-sector finance toward underfunded global climate priorities like halting deforestation.  Companies may choose to purchase carbon credits for a variety of reasons as part of a holistic sustainability or climate change strategy.   For example, companies might  use carbon credits to

---

[7] Deloitte, Deloitte research reveals inaction on climate change could cost the world's economy US $178 trillion by 2070, May 23, 2022, available at https://www.deloitte.com/global/en/about/press-room/deloitte-research-reveals-inaction-on-climate-change-could-cost-the-world-economy-us-dollar-178-trillion-by-2070.html.

[8] Fred Krupp, *Climate Advocates Must Use the Market*, WALL ST. J., Apr. 21, 2024, available at https://www.wsj.com/opinion/climate-advocates-must-use-the-market-carbon-credits-certificates-enable-investment-f7fa5731.

[9] Intergovernmental Panel on Climate Change, Climate Change 2022: Mitigation of Climate Change Frequently Asked Questions 19, available at https://www.ipcc.ch/report/ar6/wg3/downloads/report/IPCC_AR6_WGIII_FAQs_Compiled.pdf (last accessed July 16, 2025).

counterbalance or offset remaining emissions along the path to net zero or a similar climate target; to support projects with benefits for climate change, nature, and/or local communities; to drive innovation in climate-smart technologies; or to contribute broadly to the global goals of mitigating climate change in line with the Paris Agreement. Carbon credits can also be used to make related public-facing claims such as "carbon neutral" and "net zero." These claims allow businesses to communicate effectively with stakeholders (including customers) and are highly valuable for building an internal business case for climate action. Studies suggest that, far from encouraging companies to rest on their laurels or pollute further, "companies that are material users of carbon credits decarbonize twice as fast as those that do not use carbon credits."[10]

Notable recent efforts have been made to improve the integrity of the voluntary carbon market. For example, in 2023, the Integrity Council for the Voluntary Carbon Market ("ICVCM"), an independent governance body, announced the launch of its Core Carbon Principles, which are intended to establish principles for high-quality carbon offsets.[11] In October 2024, the Commodity Futures Trading Commission issued guidance regarding trading of carbon credit derivative contracts. *See* Commission Guidance Regarding the Listing of Voluntary Carbon Credit Derivative Contracts, 89 Fed. Reg. 83,378 (Oct. 15, 2024). These initiatives to hold the voluntary carbon market to rigorous standards acknowledge that carbon crediting methodologies inherently face some "uncertainty."[12]

Yet these efforts have proceeded in parallel with innovative climate action from leading companies seeking to deploy capital beyond their value chain to achieve credible reductions and removals, often through reliance upon the science-based methodologies and independence provided by recognized registries, which deploy accredited third-party verification bodies to apply their standards and determine

---

[10] *See* Trove Research, Corporate Emission Performance and the Use of Carbon Credits 3, June 1, 2023, available at https://www.msci.com/www/research-report/corporate-emission-performance/04624149658.

[11] *See* Integrity Council for the Voluntary Carbon Market, Core Carbon Principles, Assessment Framework and Assessment Procedure Version 1.1 16–19, Jan. 2024, available at https://icvcm.org/wp-content/uploads/2024/02/CCP-Book-V1.1-FINAL-LowRes-15May24.pdf.

[12] *Id.* at 36.

which reductions are worthy of recognition and in what amount.  The recent efforts to improve the credibility and integrity of the market do not impugn companies that have proceeded to achieve significant reductions, offset their remaining emissions, and make credible claims in the absence of such guidance or regulation.  Such companies can—and do, as Apple does here—have a "reasonable basis" on which to substantiate their carbon-reduction claims.

Consumer protection law should not be applied to deter advertisers of carbon-related claims from relying on the methodologies and information from crediting bodies and third-party auditors with extensive expertise in the relevant project sectors.  If the law were to do so, companies would likely not invest in urgent global climate mitigation projects via carbon credits.  It is for exactly these reasons that a lawsuit like this poses considerable danger for the market—and, indeed, for corporate climate action generally.

### C.    Apple's Approach to Reducing Its Emissions Follows Corporate Best Practices

Apple's enterprise sustainability strategy—which underpins its enterprise and product-level claims—meets or exceeds global sustainability best practices, representing a leadership position even among peer companies.  Several leading institutions, such as the Science Based Targets initiative ("SBTi"), the United Nations' High-Level Expert Group on the Net-Zero Commitments of Non-State Entities, and the International Organization for Standardization, have developed voluntary standards, frameworks or best practices for companies when setting emission reduction goals.[13]  While these frameworks continue to be refined, and there remains some debate on their particular technical elements or requirements, there is significant convergence among experts on broad principles that constitute high-integrity corporate climate action.  For example, these experts dictate that businesses should set "science-aligned" goals, which means companies must identify ways of reducing their emissions consistent with

---

[13] *See, e.g.*, Science Based Targets initiative ("SBTi"), The Corporate Net-Zero Standard Version 1.2, Mar. 2024, available at https://sciencebasedtargets.org/resources/files/Net-Zero-Standard-Criteria.pdf; United Nations, Integrity Matters: Net Zero Emissions Commitments by Businesses, Financial Institutions, Cities and Regions, Nov. 2022, available at https://www.un.org/sites/un2.un.org/files/high-levelexpertgroupupdate7.pdf (hereinafter "SBTi Standard"); Int'l Org. for Standardization, Net Zero Guidelines, available at https://www.iso.org/netzero (hereinafter "ISO Net Zero") (last accessed July 16, 2025).

7

the goals of the Paris Agreement.  This roughly translates to a 50% absolute reduction in a company's greenhouse gas emissions by 2030, and a more than 90% absolute reduction by around 2050 to achieve net zero status.

Apple has committed to reducing its absolute emissions by 75% by 2030 compared to a 2015 baseline, with its remaining emissions balanced using high-quality carbon credits.[14]  Apple's 2050 goal of a 90% reduction[15] in its enterprise emissions aligns with the absolute reductions required for definitions of "net zero" established by leading corporate best practices, meaning that it is consistent with the overall trajectory needed to achieve the Paris Agreement's goals.[16]  Furthermore, Apple's near-term 2030 goal was set through, and validated by, SBTi.[17]  Apple pursues a robust corporate strategy wherein it minimizes its impact on the environment by substantially reducing its direct and indirect emissions and investing in high-quality credits to offset the small amount of remaining emissions.  Apple also pursues a similar strategy with respect to specific products, advertising that its Apple Watch Series 9, Apple Watch Ultra 2, and Apple Watch SE are "carbon neutral."  *See* ECF 30-2 at 15.

Even among large corporations, Apple is a leader in climate action.  Out of the top 2,000 global companies by revenue, only about 850 have a net zero goal.[18]  Out of those 850, only roughly 60% also include value chain emissions in their climate targets as Apple does.[19]  And not only has Apple set goals aligned with or exceeding corporate climate standards, but it is also demonstrating marked progress toward achieving them.  As of fiscal year 2022, Apple had recorded a 45% reduction in value chain emissions.[20]

---

[14] Apple, 2023 Environmental Progress Report (FY 2022) 9, available at https://www.apple.com/environment/pdf/Apple_Environmental_Progress_Report_2023.pdf (hereinafter "FY 2022 Environmental Progress Report") (last accessed July 16, 2025); *see also* ECF 30-5 at 10.

[15] FY 2022 Environmental Progress Report, *supra* note 14, at 9; *see also* ECF 30-5 at 13.

[16] *See* SBTi Standard *supra* note 13; *see also* ISO Net Zero *supra* note 13.

[17] Science Based Targets initiative ("SBTi"), Target Dashboard, available at https://sciencebasedtargets.org/target-dashboard (last accessed July 16, 2025).

[18] Net Zero Tracker, available at https://zerotracker.net/ (last accessed July 16, 2025).

[19] *Id.*

[20] FY 2022 Environmental Progress Report, *supra* note 14, at 9.

As of fiscal year 2024, Apple had achieved a 60% reduction.  ECF 30-5 at 125.  Apple has completed 80% of its mission to reduce emissions by three-quarters before 2030 with over half a decade to go.

Central to Apple's success is its substantial investment in high-impact strategies to decarbonize its business and supply chain.  The company has lowered emissions through investing in clean energy, implementing manufacturing energy efficiency strategies, increasing the use of recycled materials, helping to catalyze clean aluminum production, addressing highly polluting fluorinated gases, and shifting the transportation of products to lower-emitting ocean travel.  ECF 30-5 at 125–133.  Even as it has made these multi-billion-dollar investments in reducing emissions, Apple's revenue has grown by more than 65%, demonstrating that the company has decoupled economic growth from emissions.  ECF 30-5 at 125.

For offsetting its remaining emissions, Apple purchases voluntary carbon credits and is transparent about how those purchases fit into its broader emission reduction program.  As noted above, Apple publicly reports on its environmental progress toward its science-aligned goals.[21]  These company reports detail Apple's sustainability governance and climate strategy, as well as its public policy advocacy in support of the Paris Agreement.[22]  Indeed, Plaintiffs' First Amended Complaint cites numerous publicly-available press releases, reports, and other web resources, which describe how Apple openly disseminates its carbon neutral claims and substantiation.  *See* ECF 24 at ¶ 46.

Apple employed an exemplary product-level carbon neutrality strategy for the Apple Watches in question.  Apple identified critical greenhouse gas emissions hotspots associated with the product and deployed substantial investments toward innovative solutions to reduce these emissions in line with science.  *See* ECF 30-3 at 35–48; ECF 30-4 at 1–15; 19–32.  For example, Apple addressed emissions from energy consumption in Apple Watch manufacturing and consumer use through direct renewable energy investments (including matching customer charging emissions with renewable energy), and collaboration with suppliers.  Additionally, Apple mitigated emissions associated with the transportation of products by minimizing air freight and shifting to ocean and rail transport.  Apple transparently disclosed these product emissions and the steps taken to directly reduce them, and then went above-and-

---

[21] *Id*. at 9–10; *see also* ECF 30-5 at 10, 125.

[22] FY 2022 Environmental Progress Report, *supra* note 14, at 13, 29–30.

beyond to match any remaining emissions with high-quality carbon credits. This product-level strategy, in support of a holistic and robust enterprise-level climate strategy, can serve as an example for other companies looking to mitigate the environmental impacts of complex global value chains.

## II.    Apple Lawfully Substantiates Its Carbon-Neutral Claims And May Rely on Project Documents Provided by the Carbon Crediting Body To Do So

In arguing that Apple's carbon neutral claims are misleading or deceptive, Plaintiffs misapply consumer protection law. Plaintiffs argue that Apple violates the consumer protection laws of California and various other states, including the California Unfair Competition Law. *See generally* ECF 24 at ¶¶ 148–271. To support their claims, they repeatedly cite and rely on the Federal Trade Commission's ("FTC" or "Commission") Guides for the Use of Environmental Marketing Claims ("Green Guides"). *See, e.g.*, *id.* ¶¶ 44–45, 122. California law explicitly provides that compliance with the Green Guides is a defense to Plaintiffs' claims. Cal. Bus. & Prof. Code § 17580.5(b)(1) (providing that it is a defense "that the person's environmental marketing claims conform to the standards or are consistent with the examples contained in" the Green Guides); *see Whiteside v. Kimberly Clark Corp.*, 108 F.4th 771, 784 (9th Cir. 2024) (noting that the Green Guides have been codified as law in section 17580.5). Here, Apple fully complied with the Green Guides when making its corporate and product-specific carbon neutral claims.

The Green Guides provide that "[m]arketers must ensure that all reasonable interpretations of their claims are truthful, not misleading, and supported by a reasonable basis before they make the claims." 16 C.F.R. § 260.2 (citing FTC Policy Statement Regarding Advertising Substantiation, appended to *Thompson Medical Co.*, 104 FTC 648, 839 (1984), *aff'd*, 791 F.2d 189 (D.C. Cir. 1986) ("Substantiation Policy Statement")). What constitutes a "reasonable basis" depends on "[1] the type of claim, [2] the product, [3] the consequences of a false claim, [4] the benefits of a truthful claim, [5] the cost of developing substantiation for the claim, and [6] the amount of substantiation experts in the field believe is reasonable." Substantiation Policy Statement, 104 FTC at 840. For environmental marketing claims, "a reasonable basis often requires competent and reliable scientific evidence." 16 C.F.R. § 260.2. The Green Guides explain:

> Such evidence consists of tests, analyses, research, or studies that have been conducted and evaluated in an objective manner by qualified persons

10

[PROPOSED] *AMICUS CURIAE* BRIEF OF ENVIRONMENTAL
DEFENSE FUND IN SUPPORT OF DEFENDANT'S MOTION TO
DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT

Case No. 5:25-cv-02043-NW-NMC

> and are generally accepted in the profession to yield accurate and reliable results. Such evidence should be sufficient in quality and quantity based on standards generally accepted in the relevant scientific fields, when considered in light of the entire body of relevant and reliable scientific evidence, to substantiate that each of the marketing claims is true.

*Id.*

Finally, the timing of the claim is important: 16 C.F.R. § 260.2 explicitly provides that marketers must fulfill the substantiation requirement "before they make the claims." *Id.*

Apple used competent and reliable scientific evidence as a "reasonable basis" to support its carbon neutral claims. In the first place, Plaintiffs allege no problem—nor can they—with the vast majority of carbon-reducing efforts that substantiate the claims. That is, they do not contest the substantiation of Apple's corporate sustainability efforts and product environmental reports indicating that Apple has achieved industry-leading success at *directly* reducing emissions. At the company level, these undertakings include prioritizing low-carbon design, energy efficiency, renewable electricity, and direct reductions in greenhouse gas emissions from facilities and Apple's supply chain. *See* ECF 30-2, at 4–7. For Apple's relevant Apple Watch models, the company has invested in (1) transitioning to 100% clean electricity for manufacturing; (2) matching emissions from charging with 100% clean electricity; (3) relying on increased shipping through lower-carbon modes like ocean/rail instead of air transportation; and (4) using recycled and renewable materials. ECF 30-3 at 36; ECF 30-4 at 3, 20. All this is plainly a "reasonable basis" to substantiate the bulk of Apple's carbon neutral claims.

As it pertains to the remaining 25% of Apple's corporate or product-based emissions offset by carbon credits, Apple substantiated its carbon neutral claim by relying on carbon crediting methodologies, third-party monitoring, verification, validation reports, and buffer pools to substantiate emission-reduction claims based on purchased offsets. Science-based methodologies that set forth the steps a project developer must take to generate and measure a carbon credit produce "reliable scientific evidence" regarding quantification of emission reductions, as required in 16 C.F.R. § 260.2.

Carbon crediting methodologies approved by Verra must meet the principles set out in its Verified Carbon Standard, including requirements that greenhouse gas emission reduction and removals are "real," "measurable," "permanent," "additional," "independently audited," "unique," "transparent" and

11

[PROPOSED] *AMICUS CURIAE* BRIEF OF ENVIRONMENTAL
DEFENSE FUND IN SUPPORT OF DEFENDANT'S MOTION TO
DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT

Case No. 5:25-cv-02043-NW-NMC

"conservative."[23]  Each methodology is subject to a public review and comment period, and periodic review at least every five years to ensure that methodologies "continue to reflect best practices, scientific consensus, and evolving market conditions and technical developments.[24]  Moreover, under registry protocols, credits are generally not issued until after a project demonstrates results consistent with methodology requirements; the emission reductions or removals must be verified first.[25]  Additionally, recognizing that forestry management projects do not permanently preclude future greenhouse gas emissions, any such emissions reductions must be verified over time and are backed by a buffer pool.[26]

Whether a project is executed according to the science-based specifications in the methodology is additionally "evaluated in an objective manner by qualified persons," as required by section 260.2 of the Green Guides.  Every project must be validated and verified by an independent third party prior to credit issuance.[27]  Under Verra's Verified Carbon Standard, as with most reputable carbon credit issuing bodies, this is done by a validation and verification body ("VVB"), which is a qualified, independent auditor, accredited in in the sector they audit.[28]  The VVB produces the monitoring, validation, and verification report to demonstrate that the project meets the applicable protocols designed to ensure the project represents GHG emission reductions or removals that are real, measurable, additional, permanent, independently verified, conservatively estimated.[29]  Third-party validation in this format is a critical element of the carbon crediting process.

VVBs conduct desk research and site visits to confirm that crediting projects are designed and carried out according to prescribed methodologies.  VVB reports explicating the results of these detailed

---

[23] *See* Verra, Program Guide v.4.4 10, Aug. 29, 2023, available at https://verra.org/wp-content/uploads/2023/08/VCS-Program-Guide-v4.4.pdf (hereinafter "Program Guide").

[24] *Id.* at 18.

[25] Verra, VCS Standard v.4.7 4, Apr. 16, 2024, https://verra.org/wp-content/uploads/2024/04/VCS-Standard-v4.7-FINAL-4.15.24.pdf (hereinafter "VCS Standard").

[26] *Id.* at 5.

[27] *See* Program Guide, *supra* note 23, at 7, 14; *see also* VCS Standard, *supra* note 25, at 61–67.

[28] Program Guide, *supra* note 23, at 12, 14–15.

[29] *See* VCS Standard, *supra* note 25, at 61–67.

[PROPOSED] *AMICUS CURIAE* BRIEF OF ENVIRONMENTAL DEFENSE FUND IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT

Case No. 5:25-cv-02043-NW-NMC

assessments are one of the most widely accepted sources of information currently available for substantiating—not certifying—emissions reductions in the voluntary carbon market. As a general rule, substantiation provided by expert VVBs accredited to verify certain project sectors will result in more consistent and reliable qualification of projects and quantification of the resulting reductions than asking each offset purchaser to conduct such tasks on its own.

Carbon offsets were a key topic of focus during the FTC's 2012 Green Guides rulemaking, yet the Commission provided relatively broad guidance in the final rule, stating simply that, "[g]iven the complexities of carbon offsets, sellers should employ competent and reliable scientific and accounting methods to properly quantify claimed emission reductions." 16 C.F.R. § 260.5(a). During the comment period, some commenters urged the Commission to prescribe more specific substantiation requirements for claims involving carbon offsets. For example, the Commission could have specified that environmental marketers relying on carbon offsets were required to use pixel-by-pixel analysis of land cover, or conduct a spatial overlay analysis using Global Land Cover and Land Use v2 (GLCLU) data, as Plaintiffs' do in their First Amended Complaint, or even required substantiation of claims using maps available from the website www.globalforestwatch.org/map/, as Plaintiffs do in their initial Complaint.

But the Commission expressly declined to prescribe specific sources or processes for substantiation of carbon offset claims, emphasizing that "[t]he FTC Act gives marketers *the flexibility to choose the substantiation method they prefer* as long as it meets the basic standards under the Act."[30] This flexibility has enabled companies to rely on carbon credits to make climate commitments in the absence of more specific criteria or regulations. It also allows for necessary innovation in the scientific evidence underpinning credible carbon credit-based claims.

The flexibility of the substantiation test promulgated by the FTC supports Apple's reasonable reliance on recognized methodologies and structure for verifying carbon-reduction or removal claims. Whether an advertiser has a "reasonable basis" for substantiation turns in part on "the cost of developing

---

[30] *See* FTC, Green Guides Statement of Basis and Purpose, at 71, https://www.ftc.gov/sites/default/files/attachments/press-releases/ftc-issues-revised-green-guides/greenguidesstatement.pdf (emphasis added).

substantiation for the claim" and "the amount of substantiation experts in the field believe is reasonable." Substantiation Policy Statement, 104 FTC at 840. It would be prohibitively costly to require a company, before making a carbon-related claim, to independently substantiate the amount of carbon avoided or removed by forest projects in southwestern Kenya or on the high plateau of northwestern China.

Recognized carbon crediting bodies have already established and fine-tuned science-based methodologies to determine when a project should give rise to carbon credits (and how many); provide a framework for how information about a project is monitored, validated, and verified to comply with those methodologies; and provide for credits in a buffer pool as a safeguard in case some of the anticipated reductions do not occur.[31] VVBs accredited by such registries already monitor, validate, and verify this information, which is then provided to potential purchasers. No expert in the field has suggested that purchasers (as a rule) should *independently* perform all of these functions.

Irrespective of any critiques that may be raised with respect to particular methodologies or developments in them over time to reflect the evolution of science, Plaintiffs fail to state a cognizable claim. Plaintiffs do not allege that Apple failed entirely to substantiate their offset-based carbon neutral claims, but instead argue that the evidence Plaintiffs present in their First Amended Complaint is superior to the science-based quantifications relied on by Apple at the time the claims were made. But so long as *Apple's* preferred method of substantiation meets the basic requirements of the FTC Act, Plaintiffs cannot compel Apple to use *Plaintiffs'* preferred techniques to substantiate claims.

Marketers are, and logically can only be, responsible for substantiating claims based on information "generally accepted in the profession to yield accurate and reliable results" at the time the claim is made. 16 C.F.R. § 260.2. This is a reasonable limitation in light of the normal and expected evolution of research and scientific consensus required to substantiate claims. Plaintiffs challenge Apple's

---

[31] Plaintiffs appear to misunderstand Verra's architecture and Apple's carbon neutral claim. Plaintiffs incorrectly allege that Verra is a "third-party certifier" and cite the provision of the Green Guides concerning misrepresentation of endorsements or certifications. *See* ECF 24 at ¶ 122 (citing 16 C.F.R. § 260.6). But although Verra provides the framework for verification, broadly oversees third-party VVBs, ensures that each individual project has submitted all required materials, and issues the credits, it is *not* a VVB and does not audit or directly verify any project. *See* Program Guide, *supra* note 23, at 7–9.

carbon neutral claims based on *post hoc* factual research that has allegedly revealed flaws in certain projects from which Apple purchased credits. *See* ECF 24 ¶¶ 70–115. But Plaintiffs fail to advance *non-conclusory* allegations that there was contemporaneous information indicating that experts in the field would have concluded at the time that the projects would not give rise to a sufficient number of real, additional, and permanent credits and that this information was credible enough that Apple reasonably should have known it lacked a "reasonable basis" to substantiate its carbon neutral claims at the time they were made. As discussed, Apple's reliance on the methodologies, project documents, monitoring, reporting and verification documents provided by Verra and the VVBs, constituted "competent and reliable scientific and accounting methods" as required by the Green Guides. 16 C.F.R. § 260.5(a).

None of this is to say that a corporate purchaser making a claim based (in part) on use of carbon credits should *never* engage in additional inquiry beyond reliance on a recognized registry's methodology and the information in a monitoring, verification, and validation report. In some circumstances, additional inquiry may be important to ensure that there is a "reasonable basis" for the claim.[32] For example, there might be internal contradictions or dubious statements in the monitoring, verification, and validation report for a given project. There might be information reasonably known at the time of purchase casting material doubt on the legitimacy of the credits. (And, of course, additional inquiry would be critical if the credits were issued by an unreliable carbon crediting entity with a questionable methodology or were provided directly from the project proponent without any third-party vetting.) But given that the credits implicated by Plaintiffs' allegations were issued by Verra after being verified by a third party to comply with science-based methodology—and given the existence of Verra's buffer pool to guard against later occurring events that would undermine methodology calculations—Apple's reliance on documents evidencing the crediting methodologies and issuance process available at the time Apple made its carbon neutral claims was reasonable and sufficient under the Green Guides and applicable law.

EDF regularly participates in methodology development and assessment to identify high-quality, reliable carbon crediting methodologies. The Integrity Council for the Voluntary Carbon Market and

---

[32] *See generally* Tropical Forest Guidance, *supra* note 1.

[PROPOSED] *AMICUS CURIAE* BRIEF OF ENVIRONMENTAL DEFENSE FUND IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT

Case No. 5:25-cv-02043-NW-NMC

Carbon Credit Quality Initiative, for example, are both designed to assess the methodologies of credits transacted in the voluntary carbon market. Through this work, EDF is well aware that methodologies differ and may result in a range of emissions quantifications. Yet, current standards, including those underpinning Verra's carbon registry, still provide essential and reputable frameworks as the voluntary carbon market develops absent mandatory regulation.

Unlike in compliance systems such as the California Compliance Offset Program, Singapore's International Carbon Credit Framework or the International Civil Aviation Organization's CORSIA, no federal standard for carbon crediting methodologies currently exists. Therefore, while EDF empathizes and in theory supports the Plaintiffs' efforts to assess the integrity of carbon credits, EDF also acknowledges that no current federal law, regulation or policy specifies emission reduction activity types or quantification methods eligible for use in voluntary carbon markets or environmental marketing claims. In the vacuum of such federal guidance, the methodologies and structure of a recognized carbon crediting body, together with the monitoring, validation and verification reports produced by independent third parties in connection with each project, are "sufficient in quality and quantity based on standards generally accepted in the relevant scientific fields" and can support a reasonable basis for carbon credit claims under the Green Guides. 16 C.F.R. § 260.2.

Plaintiffs further note that, under 16 C.F.R. § 260.6, marketers are still required to substantiate claims even when it has third-party certification. But as explained above, Apple adequately substantiated its carbon neutral claims. Apple employs a certifier, SCS Global Services, and its Carbon Neutral Certified label to supplement, but not replace carbon credit validation and verification performed by accredited VVBs. ECF 30-3 at 49; ECF 30-4 at 16, 33. Plaintiffs' invocations of 16 C.F.R. § 260.6 either fundamentally misunderstand or ignore the independent substantiation underlying Apple's carbon neutral claims.

In sum, at the time that Apple made its carbon neutral claims upon which Plaintiffs allegedly relied, the company's carbon neutral claims were reasonably based, in part, on carbon credits verified by independent auditors according to science-based methodologies and a robust carbon crediting architecture. In this context, Apple possessed a "reasonable basis," consisting of "competent and reliable scientific

16

[PROPOSED] *AMICUS CURIAE* BRIEF OF ENVIRONMENTAL
DEFENSE FUND IN SUPPORT OF DEFENDANT'S MOTION TO
DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT

Case No. 5:25-cv-02043-NW-NMC

1    evidence…generally accepted in the profession to yield accurate and reliable results," to substantiate its

2    claims.  16 C.F.R. § 260.2.  Accordingly, Apple's claims complied with the Green Guides, defeating

3    Plaintiffs' contrary contentions.

4         It is critical that this Court hold the line because Plaintiffs' theory implies no limiting principle to

5    how much additional vetting and verification is required beyond that already done by carbon crediting

6    bodies and by VVBs (in verifying compliance with a given methodology).  If any *post hoc* evidence

7    casting doubt on an underlying project can plausibly give rise to a claim that a "carbon neutral" statement

8    is misleading, then a potential purchaser of carbon credits might be required to engage in a full and

9    ongoing investigation of every project.  Conceivably, an offset purchaser might even need to send

10   employees to southwestern Kenya or to the high plateau of northwestern China to inspect each project in

11   person for the entire duration of the crediting and monitoring periods.  Transactions would be limited to

12   the most sophisticated buyers if each purchaser were required to replicate the work of the carbon crediting

13   body, registry and accredited VVBs in order to make claims related to the performance of carbon credits

14   used as offsets.

15         Plaintiffs' proposed legal standard could have the unintended effect of discouraging companies

16   from engaging in voluntary climate efforts to reduce emissions.  Requiring companies to independently

17   verify every single offset project would reduce resources available to support precisely the sort of

18   emission-reduction projects society needs to address the climate crisis.  And even when companies deploy

19   their resources to meaningfully mitigate climate change, legal risk would disincentivize them from

20   advertising their efforts to the public, resulting in less information for consumers.  If Plaintiffs were to

21   prevail, even at the pleading stage, companies would be dissuaded from even trying to buy carbon credits

22   or make carbon-related claims. Such an outcome would help neither consumers nor the environment.

23

24

25

26

27

28

**CONCLUSION**

For all of these reasons, the Court should grant Apple's motion to dismiss.

DATED: July 18, 2025

By: */s/ Kevin Poloncarz*
    KEVIN POLONCARZ

KEVIN POLONCARZ (State Bar No. 211434)
TIMOTHY DUNCHEON (State Bar No. 338184)
JULIA BARRERO (State Bar No. 352614)
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, California 94105-2533
Telephone: (415) 591-6000
Facsimile: (415) 591-6091

SARAH HARRINGTON (*Pro hac vice*)
LAURA KIM (*Pro hac vice*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202) 662-6000
Facsimile: (202) 208-9100
Email:  sharrington@cov.com

Counsel for Proposed *Amicus Curiae*
Environmental Defense Fund

[PROPOSED] *AMICUS CURIAE* BRIEF OF ENVIRONMENTAL
DEFENSE FUND IN SUPPORT OF DEFENDANT'S MOTION TO
DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT

Case No. 5:25-cv-02043-NW-NMC